1

```
 1            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
 2
    Case No. 19-cr-00098-CMA-1
 3   _____

 4   UNITED STATES OF AMERICA,

 5        Plaintiff,

 6   vs.

 7   LEONARD L. LUTON,

 8        Defendant.

 9   _____

10            Proceedings before NINA WANG, United States

11   Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 10:32 a.m., February

13   20th, 2019, in the United States Courthouse, Denver,

14   Colorado.

15   _____

16            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

18   _____

19                    APPEARANCES

20            MARTHA ANN PALUCH, Attorney at Law, appearing for

21   the Plaintiff.

22            LAURA SUELAU and JANE FISHER-BYRIALSEN, Attorneys

23   at Law, appearing for Defendants.

24   _____

25                 PRELIMINARY HEARING
```

2

```
1                    P R O C E E D I N G S
2            (Whereupon, the within electronically recorded
3    proceedings are herein transcribed, pursuant to order of
4    counsel.)
5            THE COURT:  We are back on the record on the
6    criminal docket on February 20th, 2019 before Magistrate
7    Judge Nina Wang.  I believe the next two matters were taken
8    together, is that correct?
9            MS. PALUCH:  That's correct, Your Honor.
10           THE COURT:  All right.  Could I have appearances of
11   counsel, please.
12           MS. PALUCH:  Good morning, Your Honor.  Martha
13   Paluch, appearing on behalf of the United States.  With me at
14   counsel table is FBI Special Agent Kevin Hoyland.
15           THE COURT:  Good morning, Ms. Paluch.
16           MS. SUELAU:  Laura Suelau for Leonard Luton, who's
17   seated at counsel table.
18           THE COURT:  Good morning.
19           MS. FISHER-BYRIALSEN:  Good morning, Your Honor.
20   Jane Fisher-Byrialsen (inaudible).
21           THE COURT:  Good morning.  All right, I believe we
22   are here for a preliminary hearing on these two matters that
23   are related, is that correct?
24           MS. PALUCH:  That is correct, Your Honor.
25           THE COURT:  And then, Ms. Paluch, when you're ready
```

1    you may proceed.

2           MS. PALUCH:  Thank you, Your Honor.  The United

3    States calls Agent Hoyland to the stand.

4                    AGENT KEVIN HOYLAND,

5    called as a witness, first having been duly sworn, testified

6    as follows:

7           CLERK:  Thank you, please be seated. (Inaudible).

8           THE WITNESS:  Good morning.  My name is Kevin

9    Hoyland.  K-E-V-I-N, last name H-O-Y-L-A-N-D.

10          MS. PALUCH:  May I proceed, Your Honor?

11          THE COURT:  You may.

12                    DIRECT EXAMINATION

13   BY MS. PALUCH:

14       Q    Good morning, Agent Hoyland.

15       A    Good morning.

16       Q    How are you employed?

17       A    I work with the FBI.

18       Q    And how long have you been employed by the FBI?

19       A    Approximately seven years.

20       Q    Are you the lead agent in this case?

21       A    Yes, I am.

22       Q    How did this matter come to your attention?

23       A    I received a phone call from the Estes -- Estes

24   Park Police Department in early December, 2018, related to a

25   elder fraud case where they had a victim in their

4

1    jurisdiction.

2         Q    Okay.  And did you eventually meet with the victim?

3         A    Yes, I did.

4         Q    And what was the nature of the fraud?

5         A    The fraud began as a lottery scheme.

6         Q    Okay.  What was the victim's -- what is the

7    victim's name?

8         A    The victim's name is Sandra Olson.

9         Q    Okay.

10        A    O-L-S-O-N.

11        Q    How old is Ms. Olson?

12        A    She is 80 years old.

13        Q    And where does Ms. Olson live?

14        A    She lives in Estes Park, Colorado.

15        Q    And, for the record, is Estes Park located within

16   the State and District of Colorado?

17        A    It is.

18        Q    What did Ms. Olson relate to you?

19        A    Ms. Olson stated that in February, 2018, she

20   received a letter stating that she had won a Spain lottery.

21   That letter was dated February 16th, 2018.

22        Q    Was there anything required of her in order to

23   receive her winnings?

24        A    Yes.  In relation to the $2.8 million the letter

25   stated that she won, she was required to remit 5 percent of

1   that upfront, prior to receiving her winnings.

2       Q    Did Ms. Olson send money as requested?

3       A    She did.

4       Q    In total, how much money did Ms. Olson send in

5   hopes of receiving her winnings?

6       A    Ms. Olson sent over a million dollars across 70

7   different mailings.

8       Q    Did Ms. Olson document the payments that she made?

9       A    She did.

10      Q    And how did she go about doing that?

11      A    Ms. Olson kept copious notes of receipts of

12  packages sent, as well as documented all of her transactions

13  in an Excel spreadsheet.

14      Q    In what form did Ms. Olson send the money?

15      A    She sent the money via cashier's check through the

16  mail, packages of hard US currency through the mail, also she

17  sent wires through Western Union and, additionally, handed

18  over hard US currency to persons in face-to-face.

19      Q    Was she asked to send anything else by mail?

20      A    She was also asked to send iPhones.

21      Q    And did she do so?

22      A    Yes.  She sent two iPhones in July of 2018 and

23  another four iPhones in October of 2018 on consecutive days.

24      Q    What commercial carrier or carriers did Ms. Olson

25  use for these mailings?

1        A     Primarily, she used UPS and FedEx.

2        Q     Let's talk about the transaction where you stated

3   she handed over cash in person.  Can you describe the events

4   that led up to that transaction?

5        A     Yes.  During the summer of 2018, she was in contact

6   with an individual she knew as Frank White.  This individual

7   directed her to make mailings sending money to various

8   addresses at his request.  During the course of this scheme,

9   Ms. Olson began to doubt Mr. White and no longer trusted him.

10  He stated -- he asked her if she trusted the FBI, to which

11  she said she did, and he provided her a phone number to the

12  FBI and asked her to call it to confirm his credentials.

13       Q     And did she do so?

14       A     She did.

15       Q     And who answered the phone or what did she receive

16  when she called that number?

17       A     When she called the number, the person on the other

18  end answered the phone Federal Bureau of Investigation.  She

19  inquired as to Mr. White and whether or not he was working

20  with the FBI, to which the person on the other end confirmed

21  that he was.

22       Q     And after that phone call, what happened next?

23       A     Mr. White told Ms. Olson that two agents would be

24  showing up at her house -- or an agent -- an FBI agent would

25  be showing up at her house, along with a merchant banker to

1  pick up $65,000 of cash for which she still owed.

2      Q    And approximately when were they to appear at her

3  house?

4      A    In early October.

5      Q    And did, in fact, individuals go to her home in

6  early October?

7      A    Yes.  On October 2nd, two individuals showed up at

8  her house.  One individual, who she described as a large

9  black man, came to her door, displayed an FBI badge, stated

10 he was an FBI agent, gestured or motioned to the vehicle in

11 her driveway, where she could see a second person, stated

12 that that person was the merchant banker, as Mr. White had

13 communicated to Ms. Olson previously, and Ms. Olson turned

14 over a package that had $65,000 in cash in it.

15     Q    Did Ms. Olson later tell you how she packaged that

16 cash?

17     A    She did.

18     Q    Okay.

19     A    She stated that the cash had rubber bands around it

20 and that it was in a manila envelope.

21     Q    I'm going to jump ahead to after the defendant's

22 arrest.  What evidence, if any, did you find tying defendant

23 Luton to that cash?

24     A    Following a search warrant issued in the State of

25 Colorado, we reviewed Mr. Luton's phone that was seized from

8

1    him, and on that phone, we found a picture approximately 10

2    days later on October 12th, showing stacks of cash with

3    rubber bands around them and a manila envelope behind it.

4        Q    Was there any indication that that was not Mr.

5    Luton's phone?

6        A    No.  During our post-arrest interview, Mr. Luton

7    was advised of his Miranda Rights.  He waived his rights and

8    agreed to speak with us during that interview.  We brought up

9    his phone that had been seized off his person.  We introduced

10   that phone into the interview, asked Mr. Luton about consent

11   to view the phone, to which he agreed verbally, no less than

12   five times and we reviewed the phone with him.

13       Q    Now, you previously testified that Ms. Olson was

14   directed to mail iPhones.  Can you described the events

15   pertaining to those mailings?

16       A    Sure.  As previously stated, Ms. Olson mailed two

17   iPhones in July to an address in Connecticut at the request

18   of Mr. White.  In October, she sent four iPhones to 1307

19   Pacific Street in Brooklyn, New York, to an individual -- the

20   package was labeled to an individual -- individual named John

21   Anderson.

22       Q    Is there anything relevant about that Pacific

23   Street address in Brooklyn as it relates to Mr. Luton?

24       A    That is the same address that Mr. Luton provided to

25   us during his post-interview arrest.

1      Q     Did Ms. Olson keep records pertaining to the

2   iPhones that she mailed?

3      A     She did.  She kept the receipts of her purchase of

4   those iPhones, which included an IMEI, which is the

5   International Mobile Equipment Identifier, similar to a

6   serial number or a unique number identifying the phones that

7   she sent.

8      Q     And were you able to research using that IMEI?

9      A     Yes.  Using those IMEIs, Estes Park Police

10  Department issued Apple a search warrant related to those

11  phones, for all records related to them, and Apple returned

12  those records, showing, one, that the IMEIs were registered,

13  so that the phones had been registered.

14            And, I'm sort of jumping ahead here, the IMEI that

15  was on the Apple receipt also tied to the IMEI that we

16  recovered from Mr. Luton's phone when we cellebrited it or

17  forensically analyzed it.  So basically linking the phone

18  that Ms. Olson sent to that address was the same phone that

19  Mr. Luton had in his possession.

20      Q     At the time of his arrest?

21      A     At the time of his arrest, correct.

22      Q     Did you obtain any information regarding the

23  registration of those devices?

24      A     Yes.  Some of the other devices were -- and at

25  least one of them was registered with a phone number

1    beginning area code 702.  This phone number is the same phone

2    number that Ms. Olson provided to us for the Frank White

3    individual that had been communicating with her related to

4    this lottery scheme.

5         Q    Was there any information discovered on Mr. Luton's

6    phone relating to the late night visit to Ms. Olson's home on

7    October 2nd of 2018?

8         A    Yes.  The phone that we seized off of Mr. Luton,

9    following the arrest, had information dating back before Ms.

10   Olson had sent the phone to that address, indicating to us

11   that Mr. Luton had backed up his previous phone or

12   transferred information from his previous phone to the

13   existing iPhone.

14             When reviewing that data, pursuant to a search

15   warrant that Estes Park had acquired the day post his arrest,

16   we saw geo-location information indicating that Mr. Luton's

17   previous phone had been at Ms. Olson's residence the evening

18   of October 2nd.

19        Q    Okay.  Switching gears here.  At any point, was Ms.

20   Olson directed to mail money to Michigan?

21        A    Yes.  Between March 26th and April 16th, Ms. Olson

22   mailed cashier's checks totaling $102,000 to a Sandra

23   Pitcher.

24        Q    Okay.  And what, if anything, did the bank records

25   reveal after the funds were deposited in Ms. Pitcher's

1  account?

2      A    In April of 2018, following Ms. Pitcher depositing

3  these cashier's checks, she in the subsequent days requested

4  cashier's checks be cut on those accounts and sent to Leonard

5  Luton and those cashier's checks were drawn on almost the

6  same amount that she had deposited.

7      Q    I'll direct your attention to the cashier's check

8  sent on April 16th.  What occurred with respect to that

9  cashier's check?

10     A    On April 16th, Ms. Olson sent a cashier's check for

11  $45,000 to Ms. Pitcher.  On April 20th, Ms. Pitcher's bank

12  contacted the Grandville Police Department, because they

13  believed that she was involved in fraudulent activity.  The

14  Grandville Police Department reported to -- or responded to

15  the bank and contacted Ms. Pitcher as she was in the process

16  of trying to withdraw $30,000 in cash.

17     Q    And why did -- did she give an explanation as to

18  why she needed that cash?

19     A    Yes.  During the interview with the officers there,

20  she stated that she had won a $5 million lottery and that she

21  needed to remit money for taxes.

22     Q    And how old is Ms. Pitcher?

23     A    She is 57.

24     Q    Did she -- 57?

25     A    Sorry.  67.  Thank you.

1        Q    Okay.

2        A    She was born in 1952.

3        Q    Okay.  Did she indicate who she was communicating

4   with regarding her lottery winnings?

5        A    Yes.  She stated that she was speaking with an

6   individual known as David, last name unknown, and David

7   utilized the same (702)726-2033 phone number, which Ms. Olson

8   was using to communicate with Mr. White -- or Mr. White was

9   using to communicate with Ms. Olson.

10       Q    Okay.  I would like to direct your attention to the

11  events leading up to the defendant's arrest on January 22nd

12  of this year.  What happened on that date?

13       A    On January -- in the morning of January 22nd, Ms.

14  Olson contacted the Estes Park Police Department and stated

15  that Mr. White had told her that more agents would be coming

16  to her house to receive $40,000 -- approximately $40,000 that

17  Ms. Olson still owed related to this lottery scheme.

18       Q    And did individuals eventually show up at her house

19  on January 22nd?

20       A    Yes.  In the afternoon, a vehicle arrived and Mr.

21  Luton and Ms. Byfield were apprehended at Ms. Olson's

22  residence.

23       Q    And where exactly were they apprehended?

24       A    Ms. Byfield was arrested near the front door and

25  Mr. Luton was contacted in the driver's seat of the vehicle

1    in the driveway.

2         Q    After their arrest, were they both separately

3    interviewed?

4         A    Yes, they were.

5         Q    Were they advised of their rights before they were

6    interviewed?

7         A    Yes, they were.

8         Q    And did they agree to speak with you?

9         A    Yes, they did.

10        Q    Did they sign Advised of Rights Forms?

11        A    Yes, they did.

12        Q    And what did defendant Luton say in his interview?

13        A    Mr. Luton stated that he was on a road trip with

14   his girlfriend, heading to Chicago, and that a friend of his,

15   named -- he referred to him Raejae (ph) Dobson from Jamaica

16   has asked if he would pick up a package in Colorado on behalf

17   of Mr. Dobson.

18        Q    Did he explain how he knew Mr. Dobson?  Did you

19   state that?

20        A    He stated that he knew Mr. Dobson from Jamaica and

21   that they had grown up in the same town, for lack of a better

22   word.

23        Q    Did he state whether he was told by Mr. Dobson what

24   he would be picking up in Colorado?

25        A    Mr. Luton claimed that he did not know what was in

1   the package.

2       Q    Did he state whether he had picked up packages from

3   Mr. Dobson on other occasions?

4       A    He stated that he had.

5       Q    And what -- did he indicate to you what he would do

6   with those packages?

7       A    After receiving packages, Mr. Luton would turn the

8   packages over to Mr. Dobson's brother, who he knew as Greg,

9   who lived in New York.

10      Q    I'd like to turn your attention, Agent, now to

11  defendant Byfield.  You testified that she was arrested at

12  Ms. Olson's front door?

13      A    That's correct.

14      Q    And that she agreed to speak with you, correct?

15      A    That is correct.

16      Q    Did you ask her why she was at Ms. Olson's front

17  door?

18      A    Yes, we did.

19      Q    And what did she say?

20      A    She said that she was not sure why they were in

21  Colorado or why she had been asked by Mr. Luton to go to the

22  front door, but that she had agreed to do so.

23      Q    Did she state whether she had ever gone on such

24  trips with Mr. Luton in the past?

25      A    Yes.  She said that they had been on road trips

1    together, sometimes requiring them to spend nights in a

2    hotel.

3         Q    What, if any, is the significance of that?

4         A    We believe that Ms. Byfield had accompanied Mr.

5    Luton on other trips to visit other victims across the

6    country to receive similar packages.

7         Q    Did you ask to see Ms. Byfield's phone?

8         A    Yes, we did.

9         Q    And what did she say?

10         A    Ms. Byfield consented to that and also signed the

11    consent to search form.

12         Q    Did you later obtain a state search warrant?

13         A    We did, the following day.

14         Q    The following day?

15         A    Yes.

16         Q    What, if any, evidence did you find on Ms.

17    Byfield's phone?

18         A    Ms. Byfield had some photographs of Western Union

19    receipts showing transfers from who she identified as her

20    cousin to other persons in Jamaica.

21         Q    Did you ask Ms. Byfield about those receipts?

22         A    We did.

23         Q    And what did she state?

24         A    Ms. Byfield stated that she utilized her cousin to

25    send money to Jamaica because she had been banned from using

1    Western Union.

2         Q    Did she explain why she had been banned?

3         A    She stated that Western Union had flagged her

4    account as suspicious and/or fraudulent and had banned her

5    from sending money due to her routine money transfers to

6    Jamaica.

7         Q    In your experience, Agent, do you know that to be

8    true or that to be the practice of Western Union?

9         A    That fact, in and of itself, would not preclude

10   somebody from using Western Union as that is their business.

11   They want people to send money.

12        Q    Did Ms. Byfield tell you from whom she received the

13   money to wire?

14        A    Yes.  She said that Mr. Luton provided her with the

15   money.

16        Q    Okay.  Did you, in fact, find any text messages

17   corroborating her statement?

18        A    Some of the photographs were sent via -- following

19   money being sent through Ms. Byfield's cousin to Jamaica, Ms.

20   Byfield would take photographs of the receipts and then text

21   them to Mr. Luton.

22        Q    Okay.  Did you see, on Mr. Luton's phone, text

23   messages between Ms. -- Mr. Luton and Ms. Byfield regarding

24   payments and wire transfers?

25        A    Yes.  We -- when reviewing Mr. Luton's phone, we

1    saw that the address Ms. -- there was an address in Brooklyn,

2    New York, on Tompkins Avenue that Ms. Byfield indicated was

3    her father's address where she had not lived for

4    approximately ten years.  In our review of Mr. Byfield's --

5    Mr. Luton's phone, we saw Mr. Luton text Ms. Byfield that he

6    was going to be visiting her father on November 7th.

7         Q    And what's the significance of November 7th?

8         A    On November 7th and November 8th, Ms. Olson, our

9    victim, wired -- or sent $15,000 on November 6th and $20,000

10   -- $20,000 on November 7th to that same Tompkins Avenue

11   address.

12        Q    Which is Ms. Byfield's father's address?

13        A    That is correct.

14        Q    Did you ask Ms. Byfield about those mailings?

15        A    Yes.  She did not have any information regarding

16   them.

17        Q    After you submitted your affidavit, did you

18   discover additional information tying Byfield and Luton to

19   Byfield's father?

20        A    Yes.  On November 7th, Mr. Luton sent Ms. Byfield a

21   text message stating that he was going to go visit her

22   father.

23        Q    Okay.  I believe you already had testified to that.

24        A    Yeah.

25        Q    My apologies.

1      A    Can I throw in one piece on that address?

2      Q    Lead -- I'll try to not lead you there, but I'll

3  ask you the question.  Related to that address, were there

4  any text messages between Luton and Dobson pertaining to that

5  address?

6      A    Yes.  On March -- or, sorry, on November 7th, Mr.

7  Luton sent Mr. Dobson a text message with that same Tompkins

8  Avenue address, along with the name Tom White.  Ms. Olson --

9  her spreadsheet showed the shipment on November 7th to a Tom

10 White at that address.

11     Q    Did the tracking information for those shipments

12 from Ms. Olson correspond to those text messages?

13     A    Yes.  Mr. Dobson, on the 7th -- on November 7th and

14 November 8th, sent Mr. Luton tracking numbers associated with

15 Ms. Olson's shipment of her packages to that address so that

16 Mr. Luton, presumably, could follow the shipments.

17          MS. PALUCH:  Thank you.  No further questions, Your

18 Honor.

19          THE COURT:  All right.  Thank you.  Ms. Suelau?

20 Are you going to take a turn cross-examining?

21          MS. SUELAU:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23 BY MS. SUELAU:

24     Q    Good morning, Agent Hoyland.

25     A    Good morning.

1     Q    Turning to Sandra Olson's accounts at Key Bank --

2     A    Uh-huh.

3     Q    To your knowledge, did Ms. Olson open those

4 accounts herself in person?

5     A    That is my understanding, yes.

6     Q    And do you know if she withdrew the money from

7 those accounts herself in person?

8     A    I would have to assume that she did, but I do not

9 know for a fact.  I'm not sure how else she would have

10 withdrawn the money, though.

11    Q    So you don't have any evidence that someone else

12 either opened her account or withdrew money from that

13 account?

14    A    I do not.  What I do have is that the bank at one

15 point had called Estes Park Police Department concerned about

16 Ms. Olson's activity at that bank, as well as some other

17 banks where she had opened accounts, and then, subsequently,

18 the banks closed them.

19    Q    And how many bank accounts did Ms. Olson open?

20    A    In total, I do not know.  I know of at least the

21 Bank of Estes Park, the Key Bank account, and, I believe,

22 there was some other accounts where she transferred money

23 into those accounts from investment accounts, but I -- my

24 understanding is those accounts were already open.

25    Q    Had Key Bank had correspondence with the Bank of

1   Estes Park?

2        A    I -- that, I do not know.  I know that the bank had

3   reached out to Estes Park Police Department to report

4   possible elder fraud.

5        Q    But Key Bank -- you're saying Key Bank gave Estes

6   Park Police Department information about fraud at other

7   banks, in addition to Key Bank?

8        A    My -- I guess I do not know that for a fact.  I

9   meant to say that there was other banks for which Ms. Olson

10  had opened accounts, where the bank itself had subsequently

11  closed them and informed Estes Park about their concerns.

12       Q    So Estes Park Police Department had reports from

13  other banks in addition to Key Bank?

14       A    That's correct.  That's my understanding, yes.

15       Q    Ms. Olson stated that she got a letter about her

16  lottery winnings from a Mr. Antonio Mores?

17       A    That's correct.

18       Q    Have you -- have you located or attempted to locate

19  Mr. Mores?

20       A    We have not.

21       Q    You don't have any information about who Mr. Mores

22  might be?

23       A    Unfortunately, we do not.

24       Q    Okay.  Do you have a copy of that letter or were

25  you shown a copy of that letter or did Ms. Olson merely tell

1   you about that letter?

2       A    That -- a copy of that letter was viewed by Estes

3   Park Police Department.

4       Q    So they have a copy of that letter or they viewed a

5   copy of that letter?

6       A    Correct.

7       Q    You don't know which?

8       A    Oh, I believe they have a photograph of the letter.

9   Ms. Olson still retains the hard copy of it and our

10  anticipation is that we will seize that and put that into

11  evidence.

12      Q    And that letter stated that she should remit 5

13  percent of her total winnings to a Mr. Antonio Mores?

14      A    Correct.

15      Q    Now -- I'm not a math whiz, which is why I became a

16  lawyer, but one million dollars is more than 5 percent of 2.8

17  million; is that correct?

18      A    That is correct.

19      Q    So she transferred more than what was asked in the

20  letter?

21      A    That is correct.

22      Q    The person that she -- that Ms. Olson talked to

23  after she received that letter was named Frank White; is that

24  correct?

25      A    That's correct.

1       Q    Okay.  Do you -- have you made efforts to identify

2   Mr. White?

3       A    Yes.  We believe that the Raejae Dobson individual,

4   who Mr. Luton referred to as Bird in his interview with us,

5   we believe that he is Mr. Frank White.

6       Q    And what has led you to believe that?

7       A    A mixture of the text message information that I

8   spoke of earlier with Mr. Luton, providing addresses and

9   names to Mr. Dobson via text message, Mr. Dobson then

10  providing those to Ms. Olson -- or somehow -- Ms. Olson

11  getting those same names and phone -- or addresses and then

12  Mr. Dobson sending tracking information back to Mr. Luton

13  from Ms. Olson's shipments.

14           Additionally, one of the phones that Ms. Olson had

15  sent to Mr. Luton, in October, was registered with the phone

16  number that Mr. White had been contacting Ms. Olson on.  That

17  IP address came back to Jamaica and the name on that account,

18  per Apple, is Raejae Jodson, which is a misspelling of his

19  last name.

20      Q    You just stated that Ms. Olson sent Mr. Luton

21  iPhones in October.  Now, that's not -- did she send them to

22  Mr. Luton by name?

23      A    No.  She did not.

24      Q    Did she send them to Mr. Luton's address?

25      A    Yes.

1        Q     And what address was that?

2        A     It was 1307 Pacific Street, Apartment -- I want to

3   say it was 6D, but I -- admittedly, I cannot remember the

4   apartment number off the top of my head, and it was addressed

5   to a John Anderson.

6        Q     Do other people reside in that apartment, besides

7   Mr. Luton?

8        A     They do.

9        Q     And who were those other people?

10        A     I do not know their names.

11        Q     Okay.  Do you know if someone named John Anderson

12   resides in that apartment?

13        A     I do not.

14        Q     Okay.

15        A     When you say apartment, you mean the entire

16   complex, I presume, right?  Or do you mean the actual

17   apartment itself?

18        Q     I mean the entire complex.

19        A     Yeah, I do not know if there's other John

20   Andersons.

21        Q     As to 6D specifically, do you know who resides in

22   that apartment besides Mr. Luton?

23        A     Yes.  His mother and his brother.

24        Q     Ms. Olson provided the Estes Park Police Department

25   with a spreadsheet; is that correct?

1       A    That's correct.

2       Q    Was that created on Excel or a program like that?

3       A    On a similar -- and it appears to be a similar

4    program.  I have a hard copy of the document.

5       Q    Okay.  And that was just created by her on her

6    computer?

7       A    I would assume so.  I don't know if she has a

8    computer to do it or if she enlisted help from her son to put

9    it together.  She's -- she's 80 so I don't know her computer

10   skills.

11      Q    So you don't know what her -- the input process

12   was?

13      A    Unfortunately, I do not.

14      Q    Okay.  Now, you stated that there was other

15   documentation to support what was in that spreadsheet.  Was

16   each transaction in that spreadsheet verified by other

17   documentation?

18      A    I do not know the answer to that.  I know that I

19   have spot checked many of them, because it's a mixture of

20   bank receipts showing withdrawals, as well as FedEx and UPS

21   receipts showing shipments, so every data point in that

22   spreadsheet I have not confirmed.

23      Q    Okay.

24      A    And Ms. Olson herself stated that there was

25   information on there -- there was information missing from

1    that spreadsheet that she could not remember, so our belief

2    is that there is more identifying information that is not

3    contained in the spreadsheet.

4        Q    More than 70 transactions?

5        A    Either more than 70 transactions or certain

6    transactions do not have an address, for instance, as to

7    where she shipped to or doesn't have the method of shipment.

8    So I would say it's an incomplete spreadsheet in the sense

9    that it's not -- there's not a -- the totality of data that

10   could be on that spreadsheet is not contained on it.

11       Q    One moment.  You also spoke about a Sandra Pitcher

12   in -- in Michigan; is that correct?

13       A    That's correct.

14       Q    Now Ms. Pitcher came to the Grandville -- or Grand

15   River Bank's attention and Grand River Bank reported her, Ms.

16   Pitcher specifically, to the Grandville Police Department; is

17   that correct?

18       A    That is correct.

19       Q    And the Grandville bank believed that Ms. Pitcher

20   was involved in fraudulent activity; is that correct?

21       A    The Grand River Bank?  Yes, that's correct.

22       Q    Okay.  And when Ms. -- when the police interviewed

23   Ms. Pitcher, she stated that it -- she was paying money to

24   pay taxes; is that correct?

25       A    Yes.  She was under the belief that she had won a

1    $5 million lottery and needed to remit -- payments for taxes

2    before receiving her winnings.

3        Q    You stated earlier that Ms. Pitcher was sending --

4    withdrawing money in similar amounts to what she was

5    depositing; is that correct?

6        A    Yes.  In at least a couple instances in April.

7        Q    Okay.  But how many different deposits were there?

8        A    I do not -- so Ms. Pitcher -- Ms. Olson, on her

9    spreadsheet labeled approximately four or five cashier's

10   checks that she had sent to Ms. Pitcher during that window of

11   March 26th to April 16th.  I do not know if she consolidated

12   some of those deposits or those checks into one deposit or if

13   she deposited each of them separately.  We do not have

14   complete banking records from Ms. Pitcher.

15       Q    Well, one of the records that you do have shows

16   that she opened an account using a $45,000 cashier's check;

17   is that correct?

18       A    That is -- that is correct.

19       Q    And then she withdrew $30,000?

20       A    She was in the process of withdrawing the $30,000

21   in cash when the Grandville Police showed up at the bank to

22   speak with her.

23       Q    So there's a difference between some of her

24   deposits and her withdrawals; is that correct?

25       A    That is correct.

1      Q      Ms. Pitcher stated that she had been communicating

2   with a David.  Have you been able to identify David?

3      A      We have not been able to identify anybody -- anyone

4   by that name, but the phone number that was used is the same

5   as the phone number being used by Frank White or the

6   individual representing themselves as Frank White.

7      Q      Did she ever identify David's last name?

8      A      She did not.

9      Q      At some point one of the Grandville Police

10  Department's investigators, am I correct, spoke to David on

11  the phone?

12     A      Yes.  So the day they contacted her at the bank,

13  they then followed up and interviewed her at her residence.

14  During that interview, they -- she asked if she could call

15  David, who could then explain the situation to the detective

16  -- I presume a detective, the investigator.  During that, she

17  put her phone on speakerphone and the investigator could hear

18  David speaking to Ms. Pitcher about it.

19     Q      And David did not say that it -- that the money was

20  related to lottery winnings; is that correct?

21     A      That is correct.  He said that it was for business

22  investments and chastised Ms. Pitcher for involving the

23  police.  Mr. David, last name unknown, then heard Ms. Pitcher

24  speaking with one of the investigators while she thought they

25  were on hold.  The investigator then claimed to be her

1   grandson instead of a law enforcement officer, which is when

2   the individual going under the name David stated that this

3   was for business purposes, not a lottery scheme and offered

4   the police officer/grandson $500 for his troubles.

5        Q    Okay.  In your affidavit, you state that

6   (inaudible) knows that individuals who orchestrate these type

7   of wire and mail frauds often target older persons who are

8   more likely to believe fact patterns which are illogical and

9   then you go on to talk about badgering phone calls.  How do

10  you know -- how do you know that information?

11       A    I've worked similar schemes -- or similar cases,

12  such as this, in my career.

13       Q    So --

14       A    And I --

15       Q    Is it fair to say that information came from

16  interviewing victims of these schemes?

17       A    That is correct --

18       Q    And --

19       A    So -- sorry.

20       Q    Continue.

21       A    I was going to say, often in these schemes what

22  you'll find is that you'll have an older individual who,

23  unfortunately, starts to believe, you know, that they've won

24  the lottery and they need to remit this money.  Once they're

25  no longer able to send that money or they have no more money

1    to send, the fraudsters often try and manipulate those people

2    into becoming what are referred to as money mules.

3    Individuals who receive money from other victims and then

4    forward it along to the end recipient to further muddy the

5    paper trail, if you will, for the bad guys.

6         Q    So that -- what you just related to me comes from

7    knowledge from prior investigations?

8         A    That's correct, yes.

9         Q    Okay.  Excuse me.  In interviewing Ms. Pitcher --

10   sorry -- there was a text message that had an account and

11   routine number; is that correct?

12        A    Yes.  The -- the text itself stated the word

13   "routine."  I believe it meant to say routing.

14        Q    Okay.

15        A    That account number resolved back to a Bank of

16   America account.  It stated Ms. -- the text message stated

17   Leonard Luton within it, and when reviewing his phone, we

18   found Mr. Luton had bank accounts at Bank of America with the

19   same ending digits of an account number.

20        Q    How did you get that information from Mr. -- Mr.

21   Luton's phone?

22        A    It was through a search warrant that Estes Park

23   Police wrote and a judge in Larimer County signed off on it

24   the day following the arrest.

25        Q    I'm sorry, my question was unclear.  I mean, like,

1   physically --

2        A    Oh.

3        Q    -- from when you opened the phone, how did you get

4   to that he has a Bank of America account and this is the

5   routing number?

6        A    I see.  So after we got the search warrant for the

7   phone, we forensically imaged the phone using Cellebrite,

8   which is a common tool for doing those things, and then we

9   resumed -- we reviewed the report that the Cellebrite

10  creates, which outlines text messages, phone calls, pictures,

11  web searching, geo-location data, all the different apps that

12  are on the phone.  It's basically an investigative report of

13  the phone.  So we stumbled -- stumbled -- we came across that

14  information related to his account through a review of that

15  phone and that Cellebrite report.

16       Q    Are you -- are you aware of more of the intricacies

17  of the process that Cellebrite uses to get that information?

18       A    I would say that I am by no means an expert.  I

19  understand that you -- you plug it into a Cellebrite device.

20  You have to do some -- you have to press some buttons on the

21  phone to get it to recognize the device.  The device's

22  software then downloads all the information, but I did not

23  Cellebrite, using it as a verb, that phone in this case.

24       Q    Okay.  Do you -- do you know if you or anybody

25  contacted Bank of America to verify the information from Mr.

1 Luton's phone?

2    A    We have not, to my knowledge, and I'm -- I --

3 thinking back, I'm not sure a bank would verify an account

4 and an account name without a subpoena.  Like, if I called

5 them up, I don't think they would give me that information

6 anyways.

7    Q    Have you subpoenaed Bank of America as part of this

8 investigation?

9    A    Yes.  Sorry I hesitated because I didn't know about

10 grand jury stuff.

11    Q    At some point -- I'm sorry.  I want to turn back to

12 bandwidth.com.  Some of the phone numbers, especially the

13 phone number that Mr. White used to contact Ms. Olson, were

14 traced back to bandwidth.com.  Can you explain what

15 bandwidth.com is -- what that means?

16    A    Sure.  Bandwidth.com is a -- they have a couple of

17 different business lines, but their primary -- one of their

18 primary business lines is Voice Over IP calling.  So phone

19 calls over the internet.  It allows individuals to make long

20 distance calls, across countries, without paying fees,

21 essentially.  So anyone can get a -- an account.  Bandwidth

22 is typically a reseller of Voice Over IP phone numbers to

23 messaging apps and other types of applications, but they're

24 -- it will require further legal process to attempt to

25 identify who the true owner of that phone number is.

1       Q      So the phone number only linked back eventually to

2  bandwidth.com, but you don't know who that phone number

3  actually belongs to?

4       A      Resolves to, that is correct.

5       Q      Okay.

6       A      I know from previous cases and working a variety of

7  different criminal cases that Voice Over IP numbers provide

8  some anonymity, which criminals tend to value, and it is more

9  difficult to identify who the true owner of phone numbers are

10  using methods such as that.

11       Q      Okay.  I want to talk about when Ms. -- when Mr.

12  White directed Ms. Olson to call the FBI.  The phone number

13  that was provided for her to call the FBI, have you linked

14  that phone number to any individual?

15       A      We have not yet, no.

16       Q      Okay.  Do you know if that phone number linked back

17  to bandwidth.com or --

18       A      I believe -- I believe it came back to

19  bandwidth.com, but I am -- I hedge my answer -- I'm not 100

20  percent sure.  What I do know is that it is not an FBI

21  number.

22       Q      Okay.  And how are you able to verify that?

23       A      We -- we have a listing of our FBI numbers, our

24  main office numbers, and that's not one of them.

25       Q      Was that number linked to Mr. Luton?

1      A    It was not.

2      Q    Okay.  Did Ms. Olson describe at all the individual

3  who answered the phone when she called the FBI?

4      A    If she did, I do not recall any information she

5  provided.

6      Q    She didn't say whether it was a man or a woman?

7      A    I don't want to -- I don't want to guess.

8  Unfortunately, I do not remember.

9      Q    Okay.  At some point in your -- in your complaint,

10  you've stated that you spoke to someone whose accent sounded

11  Jamaican.  Are you particular -- do you have a particular

12  familiarity with Jamaican accents?

13      A    No more than anyone does of just dealing with the

14  public and people who come from -- or maybe originate from

15  different countries.  So --

16      Q    Okay.

17      A    I'm not a speech expert or language expert if -- if

18  that's what you're implying or asking.

19      Q    Are you aware that other islands in the vicinity of

20  Jamaica might share a similar linguistic quality?

21      A    That's probably quite likely, yes.

22      Q    But you wouldn't consider yourself a linguistic

23  expert --

24      A    No.

25      Q    Just --

1    A    I mean, I saw Cool Runnings growing up.  That's

2    about the extent of my Jamaican knowledge, but the individual

3    that I heard sounded what I would deem as Jamaican.

4    Q    Okay.  I want to turn to October 2nd when the

5    merchant banker and the FBI agent came to Ms. Olson's home.

6    Your report states that she described the person as a large,

7    black male?

8    A    Yes, she did.

9    Q    Did she give any other description?

10   A    I believe she said he was skinny.

11   Q    Did she provide any other identifying information?

12   A    She did not.  You know, she's an 80 year old, sort

13   of frail woman who's not very large herself and it was 11

14   o'clock and night in October.  So even her being able to

15   provide that information I thought was pretty good.

16   Q    Did she note an accent or anything like that?

17   A    I don't recall.

18   Q    Did she describe the person sitting in the car with

19   the agent?

20   A    She said it was another male.

21   Q    Did she give -- so did she say he's black or he's

22   white or he's Hispanic or --

23   A    I -- again, unfortunately, I do not recall.  I

24   remember that her description of the individual in the car

25   was much less detailed than the individual who came to her

1   door.

2          Q    Less detailed than black and skinny?

3          A    Yes.

4          Q    Okay.  And now I want to talk about the morning of

5   Mr. Luton's arrest, January 22nd.  Mr. Luton was driving the

6   car; is that correct?

7          A    I would presume so.  He was in the driver's seat.

8   I know Ms. Byfield stated that she slept most of the trip

9   from New York, so --

10         Q    Do you know what kind of car they were in, other

11  than that it was white?

12         A    They were in a Honda CRV.

13         Q    Do you know who that car is registered to?

14         A    It is registered to Zavion Miller.

15         Q    Do you know Mr. Miller's relationship to Mr. Luton?

16         A    Mr. Luton stated it was a friend of his.  He

17  referred to him as Babu (ph), which I presume is a nickname,

18  and that he had purchased the car from Mr. Miller.

19         Q    Did he say how recently he'd purchased the car?

20         A    Sometime within the last year.  I believe he

21  actually gave us a couple months -- a date, you know -- a

22  smaller than just a -- within the last year, but I can't

23  remember what it was.

24         Q    Have you contacted Mr. Miller?

25              MS. PALUCH:  Your Honor, this is outside the scope

1    of direct.

2           THE COURT:  Sustained.  Can you move on, Ms.

3    Suelau?

4        Q    (By Ms. Suelau) You arrested Ms. Byfield at the

5    front door; is that correct?

6        A    Yes.

7        Q    And Mr. Luton was in the car?

8        A    Correct.

9        Q    Did Ms. Olson have the opportunity to see either

10   Mr. Luton or Ms. Byfield?

11       A    I -- I do not believe she did, no.

12       Q    Has Ms. Olson ever identified Mr. Luton in any way

13   as recognizing his physical description?

14          MS. PALUCH:  Again, Your Honor, objection; outside

15   the scope.

16          THE COURT:  Overruled.

17       A    She has not been provided the opportunity to do so.

18       Q    (By Ms. Suelau) When Mr. Luton was arrested, what

19   did he have in his possession?

20       A    I mean, he had a cell phone, he had a wallet, there

21   was items in the vehicle.

22       Q    Did he have a badge on him, an FBI badge?

23       A    He did not.

24       Q    Were -- have you had the opportunity to search that

25   car?

1        A    Yes.

2        Q    And did you find an FBI badge in the search of that

3    car?

4        A    We did not.

5        Q    After Mr. Luton was arrested, is it -- am I correct

6    that Ms. Olson continued to get phone calls from Mr. White?

7        A    For the rest of the evening and into the next day,

8    that is correct.

9        Q    And what did -- what did Mr. White say to Mr.

10   Olson?

11       A    That he was unable to get ahold of his agents and

12   that he would be sending another one from Loveland that

13   night.  That never happened and that changed into he would

14   send an agent the next morning and that never happened and

15   then it morphed into they wanted Ms. Olson to leave her

16   residence and go meet their agent somewhere outside of her

17   house.  That also never transpired.

18       Q    Could you tell from those phone calls whether the

19   agent that they were referring to was the same agent who was

20   supposed to come the night before?

21       A    I think the assumption was that it was the same

22   individual, but I do not know.

23       Q    So did Mr. White ever specifically say, My agents

24   came to your house and now I can't contact them?

25       A    He said that they were on their way and that Ms.

1    Olson should go outside with the money when they get there.

2    Mr. Luton told us, during our interview post-arrest, that he

3    was on the phone with Raejae Dobson when he was contacted by

4    police and arrested.

5         Q    Did he give you any more information about that

6    phone call with Raejae?

7         A    Not -- nothing that -- nothing that seems to be

8    material that I can recall.  I think they were -- he had a

9    Bluetooth headset on that he was using to communicate and

10   that he -- Mr. Luton stated that he thought -- he was asking

11   Mr. Dobson, you know, why the cops were there and why he was

12   being arrested and that, during his arrest, his phone was

13   still on.  So, presumably, Mr. Dobson could hear what was

14   going on.

15        Q    Did he say why he thought he was going to -- why he

16   thought he was going to Ms. Olson's house?

17        A    Why -- did Mr. Luton state that?

18        Q    Yes.

19        A    He said he was just picking up a package for Mr.

20   Dobson and that Mr. Dobson was going to pay him $500 for his

21   troubles.

22        Q    Did he tell you he knew what was in that package?

23        A    He stated he did not.

24        Q    Did he tell you anything else about his

25   relationship with Raejae Dobson?

1     A     That they'd been friends for a long time; they grew

2  up in a similar town.  Towards the end of the interview, when

3  he realized that he was likely going to be going to jail that

4  night, he began to tell us that he thought Mr. -- that he was

5  going to -- that he was being asked to do these things by Mr.

6  Dobson; and that if he didn't, Mr. Dobson would hurt his

7  family.

8     Q     What do you mean, realized he was going to jail?

9  Was he told, You're going to jail tonight?  Or are you

10 speculating that he thought he was going to jail tonight?

11    A     Yeah.  We had -- we had discussed that he was going

12 to be going to jail that night.

13    Q     Okay.  Did he tell you that he owed Mr. Dobson

14 money for his flight from Jamaica to the United States?

15    A     He did not.

16    Q     Did he tell you that he owed Mr. Dobson money for

17 help with his green card application?

18    A     No.

19    Q     Did he tell you that he was concerned that Mr.

20 Dobson knows where his son lives?

21    A     That was part of his -- his statement is that he

22 had a two-year-old son in Jamaica and he was concerned that

23 harm may come of his son, should he not cooperate.

24    Q     Should he not cooperate with law enforcement or

25 should he not cooperate with Mr. Dobson?

1        A      With Mr. Dobson.

2        Q      Were all these statements recorded?

3        A      Yes.  The video -- the interview was audio- and

4    video-recorded.  And Mr. Dobson, while he made those

5    statements -- or, I'm sorry, Mr. Luton, while he made those

6    statements, we continued to review his phone, you know, in

7    his presence with his consent and there was no text messages

8    or any other information to indicate that he was being

9    threatened to do this.

10       Q      By --

11       A      And that --

12       Q      By Mr. Dobson?

13       A      Correct.  Or, really, anyone else.

14              And that was also confirmed after the fact.  After

15   we had an opportunity to review a majority of Mr. Luton's

16   phone, we have not found any indication or evidence that

17   there are any threats against him or his family in Jamaica.

18       Q      Sorry.  You stated that, in his phone, you did find

19   a picture of cash in an envelope; is that correct?

20       A      The cash was outside the manila envelope, with

21   rubber bands around it, dated 10/12/2018.

22       Q      And that was 10 days after cash was picked up from

23   Ms. Olson?

24       A      That is correct.

25       Q      Now another agent, I believe a Detective Roberts,

41

1    guessed that that -- the amount in that photo was $65,000; is

2    that correct?

3         A    Detective Robertson opined that it was similar to

4    what $65,000 would look like if it was in rubber bands, yes.

5         Q    Was he -- was he aware, before he made that guess,

6    that Ms. Olson had given somebody $65,000?

7         A    Yes.

8         Q    Do you know if he has any special training in

9    guessing currency amounts?

10        A    I do not.

11        Q    Could you tell, from that photograph, what each --

12   you know, each dollar bill -- was it a dollar or ten

13   dollars --

14        A    Like the denominations?

15        Q    Yes.

16        A    Yeah.  Yeah, the -- they looked like they were $100

17   bills wrapped in rubber bands and there was a significant

18   amount of them.

19        Q    Okay.  And -- but you're not sure if all of the

20   currency in that photograph was $100 bills?

21        A    No.  You would only be able to see the top one.

22        Q    Okay.  So you know the top bill was a $100 bill,

23   but you --

24        A    Correct, yeah.  But I couldn't see the other ones,

25   right.

1        Q     Okay.  In your interview of Mr. Luton, was anybody

2   else present, besides Detective Robertson?

3        A     No.

4        Q     Did Detective Robertson write a report during or

5   after that interview?

6        A     Yes.

7        Q     Did you write a report during or after that

8   interview?

9        A     I have not, no.

10       Q     Was Detective Robertson taking notes or writing a

11  report during that interview?

12       A     During the interview, we were both writing notes.

13       Q     Did any other officers, between Mr. Luton's arrest

14  and his interview, have an opportunity to speak to Mr. Luton?

15       A     He was transported to the police department, placed

16  in a holding cell and then transported from a holding cell to

17  an interview room by others outside of Mr. -- or Detective

18  Robertson and I, so he would have had contact with other law

19  enforcement officers but, to my knowledge, no one attempted

20  to speak with him.

21       Q     Do you know those law enforcement officers by name?

22       A     I do not.

23       Q     Okay.  How much time passed between Mr. Luton's

24  arrest and his interview by you and Detective Robertson?

25       A     A few hours.

1    Q    And how long did your interview of Mr. Luton last?

2    A    90 minutes, maybe two hours.

3    Q    Just so I'm clear:  The couple hours that you

4    estimated previously was just between his arrest and when he

5    was brought into the interview room?

6    A    Correct.  I believe he was arrested around 4

7    o'clock and we began interviewing Ms. Byfield around, I want

8    to say, 7:00 - 7:30 and then began interviewing Mr. Luton,

9    say, around 9:00 -- 8:30 - 9:00 and those are, again,

10   complete estimates.  I don't have the time-stamps of when the

11   interview began.

12   Q    Okay.  Mr. Luton verbally -- you said, in your

13   complaint, Mr. Lubon -- Luton verbally consented to letting

14   you go through his iPhone, following his arrest.  Did that

15   consent occur after he was brought to the police department

16   or after he was brought into the interview room?

17   A    It was subsequent to the interview.  So we did

18   advice of rights, he signed those and agreed to speak with us

19   during the course of the interview.

20        His telephone became a topic.  He consented to us

21   all reviewing the phone together.  He verbally consented, I

22   think I stated before, no less than five times; however, he

23   refused to sign the Consent Form, stating that he thought we

24   were tricking him.

25   Q    He wouldn't sign the Consent Form because he

44

1    thought you were tricking him?

2        A    Right.  But he was fine with verbally consenting to

3    us reviewing it and we discussed that.  So after he said, I

4    think you're tricking me with signing this form, we asked him

5    Well, can we still review the phone together?  Oh, yeah,

6    that's fine.

7        Q    Who had possession of the phone when the interview

8    began?  Mr. Luton or were you already in possession of the

9    phone?

10       A    It was -- Estes Park PD was in possession of it and

11   it had been placed in a Faraday box to prohibit cell signals

12   from going out or coming back in, basically trying to keep

13   the phone isolated.

14       Q    Was that taken from him at the time that he was

15   arrested at Ms. Olson's home?

16       A    That's my understanding, yes.

17       Q    One moment, I believe I'm --

18            Did you ask Mr. Luton if he knew an Antonio Mores

19   (ph)?

20       A    No, we did not.

21       Q    Did you ask him if he knew a Frank White?

22       A    I don't believe I did.  What I do know is that,

23   with his permission, we looked through his contact list and I

24   typed in that 702 phone number that was communicating with

25   Ms. Olson and it was not present.

1    Q    So -- meaning he did not have a contact associated

2    with that phone number?

3    A    That's correct.

4    Q    Did you ask him if he knew Sandra Pitcher (ph)?

5    A    I do not think we did.

6    Q    Did you ask him if he knew Ms. Olson?

7    A    Yes, and he said he did not.  He, in fact, stated

8    he had no idea who lived at the residence that he was at when

9    he was arrested, so Ms. Olson's residence.

10   Q    Did he state whether or not Ms. Byfield knew who

11   lived at the residence?

12   A    I don't recall if he made any statement regarding

13   Ms. Byfield's knowledge of the residence.

14        MS. SUELAU:  Your Honor, I don't believe that I

15   have any further questions but if I could just reserve asking

16   more questions if something new comes up in Ms. Byfield's

17   questioning.

18        THE COURT:  All right.  So long as it's limited to

19   what we've covered and targeted to whether or not there's

20   probable cause.

21        MS. SUELAU:  Right.  Thank you.

22        SPECIAL AGENT HOYLAND:  Thank you.

23                CROSS-EXAMINATION

24   BY MS. FISHER-BYRIALSEN:

25   Q    Good morning, Agent.  How are you?

1        A    I'm well.  How are you?

2        Q    I'm going to try not to repeat stuff that's already

3   been asked.  But if I do, I apologize.

4             You testified that Ms. Byfield was arrested at the

5   door of Ms. Olson's residence; is that correct?

6        A    Yes.  Near the front door.

7        Q    Okay.  And Mr. Luton was in the car?

8        A    Correct.

9        Q    And do you have any evidence that she knew what she

10   was picking up?

11        A    Ms. Byfield stated that she had no idea.

12        Q    Do you have -- other than her statements, do you

13   have any evidence that she would have known what she was

14   picking up?

15        A    We do not.

16        Q    Okay.  And is it correct that Ms. Byfield never had

17   any -- or Ms. Olson never had any contact with Ms. Byfield

18   before?

19        A    To our knowledge, there has been no telephonic

20   contact, but Ms. Olson did send money to an address that

21   comes back to Ms. Byfield's New York State ID.

22        Q    And what address is that?

23        A    The  443 Tompkins Avenue address where she's stated

24   her father lives.

25        Q    And you've compared that to Ms. Byfield's ID?

1        A    Yes.

2        Q    And you have her ID, currently, in custody?

3        A    It -- sorry.  The printout that New York DMV gave

4    us --

5        Q    Okay.

6        A    -- listed her address as 443.

7        Q    Okay.

8        A    I believe her driver's -- well, she doesn't have a

9    driver's license.  I believe her State ID, she said that was

10   a different address.

11       Q    Okay.  And you have her State ID?

12       A    Estes Park does, yes.

13       Q    Okay.  So her State ID that she's currently using

14   does not have the Tompkins Avenue address; is that correct?

15       A    I do not believe so, no.

16       Q    And so the State ID that she currently has with her

17   address on it, were there any packages sent to that address?

18       A    No, there was not, to our knowledge.

19       Q    Now you -- you testified in the beginning of your

20   testimony that this alleged lottery fraud commenced by

21   letters being written to elderly people stating that they'd

22   won the lottery?

23       A    That's how Ms. Olson first learned of this.

24       Q    Do you have any evidence that Ms. Byfield knew

25   about those letters being sent out?

1        A      I do not.

2        Q      Did you ask her about it during her interview?

3        A      We discussed elderly folks being taken advantage of

4   in a similar sense of the scheme and how she would feel about

5   that if it had happened to somebody she cared about.  She

6   stated that she would be -- it would bother her, of course,

7   but she did not indicate that she was aware of this

8   particular scheme.

9        Q      So when you said you discussed it during the

10  interview, you're bringing it up to her attention?

11       A      Yes.

12       Q      Okay.  And -- and you're telling her about these

13  types of schemes during the interview?

14       A      Yes.

15       Q      Okay.  And -- and -- and she said she would feel

16  bad if that happened to somebody?

17       A      Something to that extent, yes.

18       Q      And is it correct that Mr. Luton told you that Mr.

19  Byfield is his girlfriend?

20       A      Yes.

21       Q      And what -- did she refer to him in the same

22  manner?

23       A      Yes.  That they were in a relationship.

24       Q      And Ms. Byfield informed you, during your

25  interview, that she didn't know why they were going on a road

1    trip to Colorado; is that correct?

2         A    Yes.

3         Q    Do you have any evidence indicating the contrary?

4         A    No.

5         Q    Do you have any evidence that Ms. Byfield knew what

6    was in the package that she was picking -- or that she went

7    to the door to allegedly pick up on January 22nd?

8         A    No.  She stated she did not know what was in the

9    package or why she was even going to the door.

10        Q    And, other than her statements, do you have any

11   other evidence that she would have known what was in the

12   package?

13        A    No, we do not.

14        Q    You testified that there was photographs in Ms.

15   Byfield's phone of Western Union receipts?

16        A    Correct.

17        Q    Okay.  What were they -- they for?  Do you

18   remember?

19        A    She stated that it was money being sent to Jamaica

20   that Mr. Luton had provided to her to send through her

21   cousin, Jamie Smith.

22        Q    Okay.  Okay.  I apologize.

23             I meant, what -- how -- what amounts were they for

24   and who were they to, if you know?

25        A    Mhm.  The amounts varied slightly.  I recall $950

1    being one of the more regular amounts.  Some amounts were in

2    the thousands.

3        Q    And how many Western Union photographs were there?

4        A    My recollection is that there was -- there's

5    definitely more than what we reviewed that day, during our

6    interview with her --

7        Q    Uh huh.

8        A    -- but we have not completed a full analysis of her

9    phone yet.

10       Q    Do you recall the day you reviewed it with her, how

11   many there were?

12       A    Detective Robertson and I went through, and I saw

13   at least six or seven.

14       Q    Okay.  When you say you're not through with the

15   review of her phone, what are you doing with the phone?

16       A    Still going through the Cellebrite report.

17       Q    But have you reviewed all the photographs on the

18   phone already?

19       A    No.

20       Q    No?  Okay.

21            So we spoke a little bit about one of the packages

22   -- or some packages going to a Tompkins Avenue.  I forget the

23   exact number, but a Tompkins Avenue in Brooklyn, right?

24       A    That is correct.

25       Q    And Ms. Byfield informed you, during her interview,

1    that she didn't live there, correct?

2        A    Yes.  She stated she had not lived there for

3    approximately 10 years, that her father lived there and that

4    she had a good relationship with her father.

5        Q    And her -- her State Driver's Permit confirms that

6    she has a different address than the Tompkins address?

7        A    Yes, I believe that it was different.

8        Q    And you have no evidence that Ms. Byfield knew that

9    packages were being sent to the Tompkins Avenue address; is

10   that right?

11       A    Well, she knew that Mr. Luton was on his way to

12   visit her father the same day that packages were sent by Ms.

13   Olson.

14       Q    But -- but -- so you have a message from Mr. Luton

15   -- Luton to Ms. Byfield saying, I'm going to visit your

16   father?

17       A    Correct.

18       Q    But it doesn't say anything about picking up a

19   package or anything like that?

20       A    No, it does not.

21       Q    Did anybody see who picked up the packages, as far

22   as you know?

23       A    At the --

24       Q    At Tompkins Avenue.

25       A    -- the Tompkins?  I do not know.

1    Q    And do you know what -- whose name the packages

2  were in that were sent to Tompkins Avenue?

3    A    The name was Tom White.

4    Q    Tom White.  You -- in your affidavit in paragraph

5  21, you wrote -- and I think you testified earlier as well --

6  that they -- that Byfield -- Ms. Byfield acknowledged that

7  they had taken other trips than the trip to Colorado where

8  they were arrested?

9    A    Correct.

10   Q    And that interview with Ms. Byfield, is that

11 recorded?

12   A    Yes, it is.

13   Q    And, in your affidavit, you write that she

14 eventually acknowledged that she traveled with Luton before

15 to pick up packages -- unknown packages and had spent nights

16 in hotels during those trips.  Can you tell me exactly what

17 she said about that?

18   A    Her verbatim statement, I cannot, but what I put in

19 the affidavit is my recollection of it.

20   Q    So how many times did she say that they left New

21 York?

22   A    I don't believe that she gave us a number.

23   Q    But did she say that they actually left the state

24 of New York?

25   A    I believe it was inferred that she had, because we

1    spoke about having to spend nights in hotels in different

2    parts of the country.

3        Q    So you are inferring that, but she never actually

4    said that?

5        A    I can't say one way or another.  You know, the --

6    the recording would clarify that.

7        Q    But you're certain she said that they -- that she

8    went with him to pick up unknown packages, as it says; that

9    that's -- that was the purpose of the trips and she knew that

10   that was the purpose; is that correct?

11       A    Yeah.  They would go on road trips together.  She

12   would accompany him and oftentimes, they would pick up

13   packages, yeah.

14       Q    So she used those words that "they would often pick

15   up packages"?

16       A    Again, I don't -- please don't misconstrue what I'm

17   saying as verbatim --

18       Q    I'm not, I understand.

19       A    -- statements by Ms. Byfield, but that was my

20   inference of our conversation.

21       Q    You testified earlier that the -- Ms. Olson was

22   given a number to call an "FBI Agent" I'm using quotation

23   marks, that I'm -- I believe that you're inferring that that

24   person was not actually an agent, because you checked that

25   the 347 number was not an FBI number; is that correct?

1      A    Yeah, it's not an office number.

2      Q    Well, did Ms. Olson tell you if the person that

3   answered on the F- -- the 347 number was a man or a woman?

4      A    I cannot recall if she -- what she said about the

5   individual's gender.

6      Q    Okay.  Did she say anything about that person

7   having an accent?

8      A    Similarly, I cannot recall if she made a statement

9   to the individual's accent that answered the phone.

10     Q    I know you testified earlier about the Excel sheet

11   that Ms. Olson kept with the money amounts that were

12   coming --

13     A    Mhm.

14     Q    -- when she was sending.

15          Other than the Excel sheet -- you know, you said

16   the Excel sheet added up to about a million dollars, right?

17     A    Yeah.  Close to it, yeah.

18     Q    How much of that have you been able to confirm with

19   receipts or bank transactions outside of the Excel sheet?

20   How much was the total amount?

21     A    I do not have a total amount that we've been able

22   to confirm, so --

23     Q    Have you engaged in that process?

24     A    We have started.  We have looked at the receipts --

25     Q    Okay.

1      A    -- showing her depositing money and withdrawing

2   money and so forth, but I have not tallied all of that up in

3   comparison to the spreadsheet.

4           MS. FISHER-BYRIALSEN:  One moment, Your Honor.

5      Q    (By Ms. Fisher-Byrialsen) Well, in your affidavit,

6   you state that, in the recorded interview of Ms. Byfield, she

7   said that she was having her cousin -- and correct me if I'm

8   wrong -- but her cousin do some Western Union transfers for

9   her because her account had been closed because, you used the

10  word, it was suspicious or fraudulent activity?

11     A    And that was the term that she used.

12     Q    That was -- those were the words that she used?

13  That her account was closed because of suspicious or

14  fraudulent activity?

15     A    Yeah.  And I can't remember which one, but it was

16  under the guise of her transactions were somehow illegal and

17  Western Union had opted to close her accounts and no longer

18  allowed her to remit money.

19     Q    Okay.  But she did use the words "suspicious or

20  fraudulent"?  One of those two?

21     A    That's my recollection, yeah.

22     Q    So she didn't say that they had just stopped her

23  account because -- they had disallowed her to use the account

24  anymore?  She didn't use those words?

25     A    No.  She provided -- she provided a reason for it.

1    Yeah.

2        Q    Has Ms. -- I think you testified about this in

3    terms of Mr. Luton, but I'm just going to ask in terms of Ms.

4    Byfield:  Has Ms. Olson been asked to identify Ms. Byfield in

5    any way?

6        A    She has not been provided that opportunity, no.

7            MS. FISHER-BYRIALSEN:  I have nothing further, Your

8    Honor.

9            THE COURT:  All right.  Ms. Paluch?

10           MS. PALUCH:  No redirect, Your Honor.

11           THE COURT:  All right.  Are you -- Agent, you can

12   step down.  Thank you.

13           Ms. Paluch, are you going to argue?

14           MS. PALUCH:  Briefly, Your Honor.

15           The Government has provided the Court with more

16   than sufficient evidence to find that probable cause exists

17   to believe that the offense of conspiracy to commit mail

18   fraud has been committed and that these two individuals --

19   these two defendants have committed it.

20           For that reason, we would ask that you set this

21   matter over and find probable cause exists.

22           THE COURT:  All right.

23           MS. PALUCH:  Thank you.

24           THE COURT:  Thank you.  Ms. Suelau?  Any argument?

25           MS. SUELAU:  Yes, Your Honor.

1          Your Honor, both Mr. Luton and Ms. Byfield stated,

2     when they were arrested, that they did not know whose home

3     they were going to and they did not know what they were doing

4     there.

5          There's no reason to think otherwise, nor is there

6     anything that connects them with anything to do with the

7     mail.  There is the evidence that they were at her house to

8     pick up this package and they both stated, We don't know

9     what's in that package.

10          There's also nothing from Ms. Olson stating that

11     Mr. -- that she'd had any prior contact with Mr. Luton; that

12     she either had communicated with him on the phone or sent

13     anything to him through the mail.

14          Now, the iPhones that were sent through the mail to

15     an address associated with him have not been linked in as

16     part of this larger conspiracy to send money to persons and

17     wire transfers and things like that.  So the Government is

18     not alleging that she sent phones to Mr. Luton; they're

19     alleging that she sent over a million dollars to Mr. Luton

20     and there's no bank records of Mr. Luton and nothing shows --

21     that shows that he actually had that money.

22          He didn't have money on him when his car was

23     searched.  He doesn't -- there's no records that he has, you

24     know, banking -- a bank with that actual money in it.  And

25     that would be required to find that there's probable cause

1    that she sent the money that actually ended up with him or

2    sent it to him.

3         Mr. Luton maintained, and maintains now, that he

4    did not know what was in the package that he picked up; that

5    he had a relationship with Mr. Dobson in which he owed him

6    money so he did not ask questions.

7         He's also not from the United States, so while it

8    seems farfetched for, perhaps, you and I to think we would go

9    to Colorado if we're going to Chicago, he didn't have

10   knowledge, as he told the officers, of how far that distance

11   was and he's only moved to the United States in the past two

12   years.  So that's not completely unforeseeable.

13        He's also not the man who's on the phone.  In fact,

14   the man who was on the phone continued to call long after Mr.

15   Luton was arrested, so -- nor does he even have the phone

16   number of the person who's on the phone.  It could be that

17   they're completely separate.

18        It seems likely that if he's connected to the

19   person calling and giving Ms. Olson directions, that he would

20   have that person's phone number.  He doesn't even have that

21   phone number.  For those reasons, we think that there's a

22   lack of probable cause that he engaged in mail fraud and he

23   -- the complaint against him should be dismissed.

24        THE COURT:  All right.  Thank you.

25        MS. FISHER-BYRIALSEN:  Your Honor, we respectfully

1   disagree with the Government and believe that there's no

2   probable cause that Ms. Byfield knowingly participated in or

3   attempted to participate in a conspiracy to commit mail

4   fraud.

5         It seems that there are three things that the

6   Government is sort of hanging its hat on:  That Ms. Byfield

7   got in a car with Mr. Luton and drove to Colorado, but had no

8   idea why they were going, what they were going to do; that

9   they then arrived at Ms. Olson's residence and she was told

10  to go get a package at the door, but she had no idea what was

11  in the package or who Ms. Olson was.

12        And the third thing they argue is that she -- the

13  Tompkins Avenue address is somehow connected to her, but her

14  current ID has a different address on it.  She told them

15  she's not lived at the Tompkins Avenue for over 10 years.

16  Her father does live there.  And although Mr. Luton sent her

17  a message to say, I'm going to go visit your father on a date

18  that the package arrives doesn't imply any knowledge to her

19  that she knew a package was arriving there.

20        I think that the Government's evidence against Ms.

21  Byfield is much too scant to establish probable cause and

22  we'd ask that you dismiss the complaint against her.

23        THE COURT:  All right.  Ms. Paluch, anything

24  further?

25        MS. PALUCH:  Your Honor, the Tompkins Avenue

1  address is not some prior address at which the defendant is

2  no longer living; it is the address of her father.  Two

3  payments, totaling $35,000 are sent to that address.

4       There is communication between her boyfriend,

5  Luton, to Dobson providing that address, providing UPS

6  tracking numbers for Ms. Olson's packages to that address.

7       To imply that this defendant, Ms. Byfield, would

8  have absolutely no knowledge defies reason.  She's at the

9  front door of the victim's house when the victim is told that

10  people are coming to get this money.

11       To claim, I have absolutely no reason why I've

12  driven across the country, I have no knowledge whatsoever of

13  what I'm doing at someone's front door, the mailings directly

14  from our victim to her dad's house, this is a conspiracy.  We

15  don't have to prove that she knows everything, every actor,

16  every purpose of the conspiracy; we just have to simply show

17  that she has enough knowledge of the objective here to be a

18  part of this mail fraud.

19       And we have established that clearly by probable

20  cause for both defendants.  Thank you.

21       THE COURT:  Thank you.  Pending before the Court

22  today is in 19-mj-25 and 19-mj-26, United States of America

23  versus Luton and Byfield are the parties arguments and

24  evidence, with respect to a preliminary hearing under Rule

25  5.1 of the Federal Rules of Criminal Procedure:  If a

1   defendant is charged with an offense, other than a petty

2   offense, a magistrate judge must conduct a preliminary

3   hearing unless the defendant waives the hearing.  The

4   defendant is indicted, the Government files an Information --

5   the government files an Information charging the defendant

6   with a misdemeanor or the defendant is charged with a

7   misdemeanor and consents to trial before a magistrate judge.

8           Because none of those prerequisites have been

9   satisfied, the parties proceeded to a preliminary hearing on

10  February 20th, 2019.

11          With respect to the preliminary hearing, at a

12  preliminary hearing, a defendant may cross-examine adverse

13  witnesses and may introduce evidence, but may not object to

14  the evidence on the ground that it was unlawfully acquired.

15  And if the magistrate judge finds probable cause to believe

16  an offense has been committed and the defendant committed it,

17  a magistrate judge must promptly require the defendant to

18  appear for further proceedings.

19          The Court has listened to the -- the evidence

20  presented by Agent Hoyland and reviewed the affidavits in

21  support of the complaint in this matter and finds that there

22  is probable cause to sustain these charges against these

23  defendants at this time.

24          In making this finding, the Court notes as follows:

25          There were mailings from Ms. Olson, the victim, to

1    the address at Tompkins Avenue.  The IM -- the IMEI from the

2    phones in Mr. Luton's possession are traceable to those same

3    phones that were mailed.

4             In addition, there were -- there are -- there is

5    sufficient evidence, at this point in the record, to tie

6    defendant Byfield to the 445 Tompkins Avenue address.  And,

7    in addition, there are photographs of money transfers from

8    Ms. Byfield, through her cousin, to Jamaica that are

9    inconsistent with the policies and procedures of Western

10   Union, as testified to by Agent Hoyland.

11            Accordingly, the Court finds that there is

12   sufficient probable cause at this point.

13            Ms. Paluch, when is the Government ready to set a

14   status conference in this case and/or go to an arraignment?

15            MS. PALUCH:  We would ask that that be set for

16   March 7th or March 8th, Your Honor.

17            THE COURT:  All right.  Ms. Suelau or Ms.

18   Fisher-Byrialsen?

19            MS. FISHER-BYRIALSEN:  (inaudible) the 7th is fine.

20            THE COURT:  Ms. Suelau, does the 7th work for you?

21            MS. SUELAU:  It does, Your Honor.

22            THE COURT:  And any preference between morning or

23   afternoon, Counsel?

24            MS. SUELAU:  Afternoon, Your Honor.

25            THE COURT:  Okay.  Madam Deputy, is that Judge

1    Hagerty?

2            DEPUTY:  It is, Your Honor.

3            THE COURT:  All right.  So you will all -- you all

4    will proceed to a status conference before Judge Hagerty on

5    March 7th at 2:00 p.m.

6            Defendants will be remanded to the custody of the

7    United States Marshals until that time.

8            Anything further on this matter?

9            MS. PALUCH:  No, Your Honor.  Thank you.

10            MS. FISHER-BYRIALSEN:  No thank you, ma'am.

11            MS. SUELAU:  No, Your Honor, not from Mr. Luton.

12            (Whereupon, the within hearing was then in

13    conclusion at 12:06 p.m.)

14

15

16    I certify that the foregoing is a correct transcript to the

17    best of my ability to hear and understand the audio recording

18    and based on the quality of the audio recording from the

19    above-entitled matter.

20

21    /s/ Dyann Labo                    April 19, 2019

22    Signature of Transcriber           Date

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

64

<pre>
 1

 2

 3                      I N D E X

 4   Plaintiff's Witnesses                Page

 5   KEVIN HOYLAND
          Direct by Ms. Paluch              3
 6        Cross by Ms. Suelau              18
          Cross by Ms. Fisher-Byrialsen    45
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com