**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No.  19-cr-00098-CMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

LEONARD LUTON,

    Defendant.

_____

**GOVERNMENT'S MEMORANDUM
REGARDING NOTICED DEFENSE WITNESSES**
_____

The United States of America, by and through Assistant United States Attorneys Martha A. Paluch, and Sarah H. Weiss, hereby provides a memorandum regarding recently discovered legal issues pertaining to the defendant's two proposed witnesses, A.L. and N.M.[1]  This memorandum is submitted pursuant to the Court's e-mail, dated February 11, 2020, requesting further information regarding the government's concerns regarding these witnesses.

---

[1] Because no witness lists have been filed publicly in this case, the government refers to these witnesses by their initials out of an abundance of caution.

1. On the morning of Thursday, January 30, 2020, defense counsel provided a preliminary list of its defense witnesses to the government.[2] That list included the names of three individuals, Carlene Hosang, A.L., and N.M. At that point, only one of these three names was familiar to the government, specifically, Carlene Hosang.[3]

2. Later that afternoon, the Court held a pre-trial conference. At the pre-trial conference, the government outlined its concerns regarding Ms. Hosang's testimony at trial. At the conclusion of the conference, the Court ordered appointment of CJA counsel for Ms. Hosang and scheduled a hearing to determine the admissibility of her testimony at trial. [*See* Dkt. 93.]

3. That hearing was held on February 5, 2020. At the hearing, CJA-appointed counsel for Ms. Hosang represented that she had been advised of her Fifth Amendment rights and that she would not testify on the defendant's behalf at trial. [*See* Dkt. 97.]

4. In the interim, the government forwarded the names of the defendant's other two remaining proposed defense witnesses to Special Agents working this investigation to conduct preliminary background checks.

---

[2] Although the Court's Practice Standards do not require defense counsel to provide its witness list until the morning of jury selection, defense counsel provided its list to the government early as a professional courtesy.

[3] The government has not redacted Ms. Hosang's name given that it appears elsewhere on the public docket.

2

5. In summary, the FBI's investigation since January 30th has consisted of the following:

   a. The FBI ran Accurint records searches on both individuals, as well as criminal history checks, public records searches, and social media searches. These initial searches revealed one phone number for N.M. and multiple possible phone numbers for A.L. Based on these searches, N.M. is believed to reside in Connecticut, and A.L. is believed to have resided in or to currently reside in Florida.

   b. Shortly thereafter, the FBI also began searches and a review of the contents of the defendant's 90 gigabyte cell phone for communications between the defendant, N.M., and A.L.

   c. On Saturday, February 3, 2020, government counsel also reached out to an agent with Immigrations and Customs Enforcement ("ICE") to determine basic information on the witnesses' immigration statuses.

   d. On Wednesday, February 5, 2020, the FBI provided government counsel with eight extractions from the defendant's Cellebrite report containing pertinent conversations between the defendant and N.M. The FBI was not able to definitively determine whether there were any contacts between the defendant and A.L. from the defendant's cellphone.

   e. On February 5, 2020, the FBI obtained a certified judgment and conviction related to N.M., which qualifies as admissible impeachment

3

       material pursuant to the Federal Rules of Evidence. That certified record was delivered to the U.S. Attorney's Office the following day.

f. On February 6, 2020, government counsel reviewed summaries of certain jail calls between the defendant and various individuals which had been collected earlier in this case, and which were produced to defense counsel in keeping with the normal course of discovery. One of those calls referenced N.M. and N.M.'s phone number, and it indicated that she had been or would be in communication with the defendant during the period of his pre-trial confinement. [*See* INV_1739-1751.]

g. As a result, on Thursday, February 6, 2020, government counsel inquired with officials at the Bureau of Prisons ("BOP") Englewood Federal Correctional Institution as to whether the defendant's jail call records reflected any recent calls between the defendant and the phone numbers believed to be associated with N.M. and A.L.

h. Later that same day, government counsel received word from the BOP that a review of its jail call records revealed 17 calls with the N.M. phone number between the dates of June 13, 2019 and February 6, 2020. Of those 17 calls, the BOP had retained recordings of the five most recent calls.

i. Government counsel formally requested a CD with the call logs and recordings of the five available calls, which the BOP prepared and an employee of the United States Attorney's Office picked up around the

       close of business on Thursday, February 6.

6. Since that time, the government primarily has been engaged in its preparations for the presentation of its case-in-chief at trial, which commenced on the morning of February 10, 2020.

7. However, while simultaneously preparing its case-in-chief, government counsel also began a preliminary review of the five jail calls with N.M. over the course of last weekend. (February 8 and 9.) Four of the jail calls are 15 minutes in length, and one is approximately 1 minute in length. Some of the discussions appear to be in coded language and the quality of the tapes is generally uneven. The government is still determining what, exactly, has been said in those jail calls. However, in continuing its preparations for cross-examination, the government has isolated at least one portion of one call that calls N.M.'s credibility into question and the government believes is relevant impeachment material.

8. To paraphrase and summarize that excerpt, on October 4, 2019, N.M. received a phone call from the defendant. The call lasts about 15 minutes, and N.M. is driving during the call. In pertinent part, N.M. discusses that she is headed "to work." She discusses "stock options"[4] which have been "left on the truck," and that she will not be bringing them back "until it gets dark." She goes on to say that she, "Can't get a break," to which the defendant sympathizes. She

---

[4] In another call, on October 4, 2019, N.M. similarly references "stock members," calling them assholes and stating that she wishes that they would "retire early."

mentions being angry with "A___"[5] and that she is "going to give it to him." From there, N.M. describes not wanting to "go through" others anymore, and that she no longer wants to be the "third party," she wants to be the "fourth party." She says she wants her money to go "to the source," and that she doesn't want others "to know what [she's] about." Then, N.M. says, "Give the lady my number and let her call me. If I have to go through you all then fuck it that makes no sense." The defendant responds, that is what happened to him, and he states, "I am innocent." N.M. responds that others don't understand. She references the defendant's incarceration and a family member's incarceration and she comments, others don't understand, "this is America, not Jamaica."

9. Based on the government's investigation thus far, the government believes that N.M's words are coded language and that they may refer to a similar fraudulent scheme to the one at issue in this case, or to other criminal activity.

10. The government's suspicions regarding this jail call are corroborated in the Cellebrite extractions related to N.M.'s text messages with the defendant:[6]

    a. On November 17, 2017, N.M. asks the defendant how much it costs to send a letter via FedEx to Jamaica. She notes that her check is for $130 and $100 of that is "pardner money." She asks the defendant to send it

---

[5] The government has redacted this name out of caution, but notes that it is the same first name as A.L.

[6] Additional texts between N.M. and the defendant confirm the defendant loaning N.M. small amounts of money and her asking him to buy her sneakers.

      for her and she will pay him back.

  b. On October 15, 2017, the defendant asks N.M. if she "used the paper already." Later on in the conversation, N.M. asks whether she can "do it online without a wu [western union] card." The defendant asks whether N.M. can "collect," and she responds in the affirmative. Later, the defendant says, "That's the info … Ohh okay just say the tracking?"

  c. Between February 9 through 12, 2018, N.M. asks the defendant, "You still didn't get the number?" The defendant responds in the negative. Later, the defendant texts, "cash a check," "cashier's check," "10000$." N.M. responds, "guess it's not a federal holiday after all." The defendant responds, "Lol guess not."

  d. On December 14, 2018, N.M. texts the defendant inquiring about whether he is in Jamaica again, which the defendant confirms. N.M. goes on to say, "U could have told me. U was going. Guess you didn't want to carry anything for anyone." The defendant responds, "What ure [sic] talking about I came to a funeral ok." N.M. replies, "You could have still said u was going! O well. All the time u go to Jamaica your [sic] secretive anyway."

11. Based on the similarities between these text messages and those introduced in this trial, the government believes these text messages may also involve criminal activity.

12. As to A.L., the government is in possession of two banking reports related to

money wire activity that is similar to the crimes at issue in the defendant's trial.

   a. One report concerns a U.S. customer of a money wire service who was interviewed in July of 2016. The customer is noted to have been the subject of investigative review in the past, and that the interview determined that the customer may be involved in a scam. The report indicates that between June and July of 2016, the customer sent 10 money wires totaling in excess of $9,500 to Jamaica. Four of those transactions pertained to money wired to A.L. in Jamaica, for a total of $3,455.

   b. The other report notes that between August and September 2016, a customer located in the United States sent 12 money transfers totaling in excess of $13,000 from the United States in Jamaica. During the same time period, the customer was also receiving money transfers totaling $2,500 from New York, NY. The report notes that the customer has been the subject of six similar reports of structured transactions between 2014 and 2016. Of the 12 money transfers to Jamaica at issue in the report, it notes two transactions totaling $2,261 which were sent to A.L. in Jamaica.

13. The government cannot confirm at this time whether the A.L. referenced in the previous paragraph is the same A.L. listed on the defendant's witness list. Moreover, most of the evidence described above predates the charges in this case.

14. At the hearing concerning Ms. Hosang, the Court provided a detailed recitation of the law concerning whether defense witnesses ought to be apprised of their constitutional rights prior to testifying on behalf of a defendant. In brief, "[a]s a general rule a court has discretion to warn a witness about the possibility of incriminating himself or herself." *United States v. Smith*, 997 F.2d 674, 680 (10th Cir. 1993) (citation and internal quotation omitted). In this regard, it is proper for a trial court judge or a prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely, see *United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C. Cir. 1996), or of the implications of inculpating oneself by testing truthfully. *United States v. Serrano*, 406 F.3d 1208, 1216 (10th Cir. 2005) (finding no error in prosecutor's notification to the court that witness's testimony could subject witness to possible prosecution or to judge's subsequent appointment of counsel to advise the witness of their constitutional rights).
15. Given these recently discovered impeachment materials, the government seeks guidance as to whether A.L. and N.M. should be appointed counsel to advise them of their Fifth Amendment rights prior to testifying.

DATED this 11th day of February, 2020.

    JASON R. DUNN
    United States Attorney

    s/*Sarah H. Weiss* _____
    Sarah H. Weiss
    Martha A. Paluch
    Assistant United States Attorneys
    1801 California Street, Suite 1600
    Denver, Colorado  80202
    Telephone:(303) 454-0100
    Fax: (303) 454-0402
    martha.paluch@usdoj.gov
    sarah.weiss@usdoj.gov
    Government Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of February, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

    s/*Sarah H. Weiss*
    Sarah H. Weiss
    Assistant U.S. Attorney
    United States Attorney's Office