# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Action No. 19-cr-00098-CMA-1

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**LEONARD LUTON,**

**Defendant.**

_____

### REPORTER'S PARTIAL TRANSCRIPT
### (Jury Trial Day 2 -- Testimony of S. Olson)

_____

Proceedings before the HONORABLE CHRISTINE M. ARGUELLO, Judge, United States District Court, for the District of Colorado, commencing at 8:40 a.m. on the 11th day of February, 2020, Alfred A. Arraj United States Courthouse, Denver, Colorado.

### A P P E A R A N C E S

**FOR THE PLAINTIFF:**
MARTHA A. PALUCH and SARAH H. WEISS, U.S. Attorney's Office, 1801 California St., Suite 1600, Denver, CO 80202

**FOR THE DEFENDANT:**
MARK EDWARD SCABAVEA, Attorney at Law, 301 Sheridan Blvd.,

Lakewood, CO 80226

# I N D E X

**WITNESSES:**                                                    **PAGE**

                         **SANDRA OLSON**
DIRECT EXAMINATION (Cont'd) BY MS. PALUCH                          40
CROSS-EXAMINATION BY MR. SCABAVEA                                  45

1        **FEBRUARY 11, 2020**

2            (Proceedings commence at 8:40 a.m.)

3            (Outside the presence of the jury.)

4            THE COURT:  All right.  You may be seated.

5            We are off to a late start today.  I have just, so

6    you all know, I have had staff call the Marshal's Office

7    to tell them we are pushing my 3 o'clock to 3:30.  We will

8    go through to 3:15 today to make up the 45 minutes.

9            (In the presence of the jury.)

10           THE COURT:  The record will reflect that counsel

11   and the parties are present.

12           All right.  You may be seated.

13           Good morning.  Welcome back, ladies and gentlemen.

14   We are off to a late start, so I need to advise you that

15   we will not get out at 2:30 today, we will not get out

16   until about 315.  I had to push my -- we can't afford to

17   lose that much time in a trial, otherwise you all may very

18   well be here next week.

19           Ms. Paluch, you may proceed.

20           MS. PALUCH:  Thank you, Your Honor.

21                       **SANDRA OLSON**

22   having been previously duly sworn, testified as follows:

23                  **DIRECT EXAMINATION (Cont'd)**

24   **BY MS. PALUCH:**

25   Q.   Good morning, Ms. Olson.  When we left off yesterday,

1    we were listening to some recorded calls.  Do you recall

2    that?

3    A.   Yes.

4    Q.   We have three more recordings to play.

5         MS. PALUCH:  So I would ask that we start with

6    Government Exhibit 17.

7         (Exhibit 17 played in open court.)

8         JUROR:  We don't see anything on the screen.

9         MS. PALUCH:  If we can publish 17, please.

10        THE COURT:  Is it on the other screen?  Is it on

11   yours now?  Is it on now?

12        JUROR:  Yes.

13        THE COURT:  Can you turn it up just a bit?  I don't

14   want to blast your heads off, but I can barely hear it.

15        (Exhibit 17 played in open court.)

16        MS. PALUCH:  And if you can please play Government

17   Exhibit 18.

18        (Exhibit 18 played in open court.)

19        MS. PALUCH:  The last recording, Government Exhibit

20   19.

21        (Exhibit 19 played in open court.)

22   Q.   (BY MS. PALUCH)  So, Ms. Olson, those were messages

23   left on your home phone; is that correct?

24   A.   Yes.

25   Q.   Okay.  The conversations in these recorded calls that

1    we have listened to, these were all recorded once law

2    enforcement was involved in this case; is that correct?

3    A.   That's right.

4    Q.   Okay.  Were the conversations in these calls still

5    similar to the nature of the calls that you had with Frank

6    White during the period of this scheme?

7    A.   Yes.

8    Q.   All right.  Now I want to direct your attention,

9    ma'am, to January of 2019.  Did Frank White direct you to

10   mail any money during that month?

11   A.   Yes.

12   Q.   And could you please describe for the jury that

13   conversation.

14   A.   He wanted me to mail --

15   Q.   Talk closer to the mic if you could, ma'am.

16   A.   I am sorry.  He wanted me to mail money again, which

17   was a large amount, and I told him I wasn't going to mail

18   money of that amount.  And he was not very happy about it.

19   And I told him he could get a merchant banker to come

20   again and pick it up at my house.

21   Q.   And what was his response when you suggested that?

22   A.   He didn't want to do that.  He just kept insisting

23   that I had to send it in the mail, and I still refused.

24   Q.   And eventually what did Frank White decide to do?

25   A.   Well, eventually he decided that he would get a

1   merchant banker to come to the house.  And on a day that
2   he was supposed to come, I don't know what happened, but
3   it got cancelled.  And so then he called me and said that
4   they would be coming on another date.
5   Q.   And on that other day -- do you remember what day
6   this was in January that we are talking about?  Do you
7   remember the date?
8   A.   Not -- no.
9   Q.   But the day that Frank White gave you notice that
10  someone would be coming to your home, did, in fact,
11  individuals come to your home to pick up money?
12  A.   Yes.
13  Q.   And did people actually show up at your home on the
14  date that Frank White said they would?
15  A.   Yes.
16  Q.   And what happened when those individuals showed up?
17  A.   Well, Frank -- I was on -- the detective had told me
18  to stay on the phone with Frank, and so I did.  And we
19  were in a bedroom.  And, anyhow, I -- the doorbell rang,
20  but he told me not to go answer it.
21       And so we went to the front bedroom so we could see
22  out the window, and we saw a car sitting up on the street.
23  And there was a lady laying in my driveway.  And, anyhow,
24  Frank wanted to know what was going on.  And he said,
25  "Well, just go out and give them the money."  And I said,

1   "I can't, there is police all over the place."  And he
2   said, "What do you mean, police all over the place?"  And
3   I just played dumb and said, "I don't know really what is
4   going on."
5   Q.   Okay.  And were, in fact, to your knowledge, people
6   arrested at your home that day?
7   A.   Yes.
8   Q.   Now, earlier in your testimony, ma'am, you talked
9   about saving your receipts from your mailings; is that
10  correct?
11  A.   Yes.
12  Q.   All right.  Did you create some sort of a summary of
13  the payments you made in this case?
14  A.   Yes, I did.
15  Q.   Could you explain for the jury how you went about
16  creating that summary?
17  A.   Well, the receipts I had gotten from UPS and FedEx, I
18  had kept putting them in a folder.  And I finally got them
19  out and I started putting them in order according to the
20  dates on them, and writing them down on a sheet of paper.
21       And, anyhow, I called my son and told him what I
22  had done, and he said, well, why don't you bring it over.
23  So I took it over to their house, and we did up a
24  spreadsheet.
25  Q.   Did that spreadsheet total the amount of payments you

1    made in order to receive the lottery winnings you thought

2    you had won?  Did it total the amount that you had paid

3    over the course of that scheme?

4    A.   Yes.

5    Q.   And approximately what was that total?

6    A.   Almost a million dollar.

7             MS. PALUCH:  Your Honor, may I have one moment?

8             THE COURT:  You may.

9             MS. PALUCH:  I have no further questions, Your

10   Honor.

11            THE COURT:  Mr. Scabavea?

12            MR. SCABAVEA:  Your Honor, may I have a few

13   moments, please?

14            THE COURT:  You may.

15            MR. SCABAVEA:  Thank you, Your Honor.

16                          **CROSS-EXAMINATION**

17   **BY MR. SCABAVEA:**

18   Q.   Good morning, Ms. Olson.

19   A.   Good morning.

20   Q.   How are you doing this morning?

21   A.   Fine.

22   Q.   This is the first time we have ever met; is that

23   correct?

24   A.   Yes.

25   Q.   This is the first time I have ever talked to you?

```
 1   A.   Yes.
 2   Q.   I never questioned you regarding this case; is that
 3   correct?
 4   A.   No.
 5   Q.   I never went over to your house?
 6   A.   No.
 7   Q.   During your entire direct exam that you had in this
 8   court today, and yesterday, I never made one objection,
 9   did I?
10   A.   No.
11   Q.   I let you tell the jury exactly what was happening to
12   you regarding this Jamaican lottery scam; is that correct?
13   A.   Yes.
14   Q.   So, what happened to you was very unfortunate.  I am
15   sorry this happened to you.
16            Just a few more questions for you.  When Frank
17   White called you, did Frank White's name come up on the
18   caller ID?
19   A.   Did whose?
20   Q.   Did Frank White's name actually come up on your
21   caller ID?
22   A.   Yes.
23   Q.   Now, you previously testified that you changed your
24   number three times; is that correct?
25   A.   Yes.
```

1   Q.   Do you have any idea how Frank White was able to find

2   you with those different changed numbers?

3   A.   Not really.

4   Q.   Looking back, in October of 2018, some men came to

5   your residence; is that correct?

6   A.   Yes.

7   Q.   And those men, when they came, they came to collect

8   $65,000?

9   A.   Yes.

10  Q.   What time of day did they come to your residence?

11  A.   They were supposed to be there by 4:00, but they

12  didn't show up until around -- between 12:00 and 1 o'clock

13  in the evening.

14  Q.   So that was the nighttime; correct?

15  A.   Right.

16  Q.   Was the defendant, Mr. Leonard Luton, the person that

17  is sitting to my right, your left, that table over there,

18  was he the person that actually came up to your residence?

19  A.   I am not sure.

20  Q.   It said in the FBI report that it was a slim man that

21  came to your residence; is that correct?

22  A.   Well, yes, I did say that.  He was very tall, and I

23  just guessed that with the clothing that he had on, that

24  he had to maybe be slimmer.

25  Q.   You said this was at nighttime, right, when they came

 1   to your residence?

 2   A.   Yes.

 3   Q.   Do you remember what he was wearing?

 4   A.   Yes.  He had like a baseball cap on, kind of pulled

 5   down low over his eyes.  He had a red kind of knit shirt.

 6   And he had on black -- oh, they weren't shorts, but they

 7   weren't long pants.  And he had black tennis shoes on.

 8   Q.   Did you see his face?

 9   A.   Yes.

10   Q.   You said this was nighttime; correct?

11   A.   Yes.

12   Q.   Was the place very well lit?

13   A.   Was what?

14   Q.   Was your residence very well lit up?  Were you able

15   to see his face?

16   A.   Yes, because I had my porch light on.

17   Q.   How far was he away from you?

18   A.   About like where I am sitting here, till there.

19   Q.   Do you remember what kind of haircut he had?

20   A.   No.  Because of the hat he had on, I couldn't tell.

21   Q.   Now, this man is on trial for some very serious

22   crimes, you know that?

23   A.   Uh-huh.

24   Q.   How confident is your testimony today that that

25   person that came to your residence is the same person

1  sitting over there?

2  A.   I can't say that he definitely is.

3  Q.   You said "definitely."  Did I just hear you

4  correctly?

5  A.   By looking at him now, I don't know.

6  Q.   So your testimony is you are not sure?  You don't

7  know, is that fair to say?

8  A.   Uh-huh, yes.

9         MR. SCABAVEA:  Your Honor, may I have a few

10  moments, please?

11         THE COURT:  You may.

12         MR. SCABAVEA:  Thank you, Ms. Olson, nothing

13  further from the defense.

14         THE COURT:  Any redirect?

15         MS. PALUCH:  No, Your Honor.  Thank you.

16         THE COURT:  All right.  Thank you very much,

17  Ms. Olson, you may step down.

18         THE WITNESS:  Thank you.

19         (Further proceedings had but not transcribed per

20  request of ordering counsel.)

21

22

23

24

25

# R E P O R T E R ' S   C E R T I F I C A T E

    I, Darlene M. Martinez, Official Certified Shorthand Reporter for the United States District Court, District of Colorado, do hereby certify that the foregoing is a true and accurate transcript of the proceedings had as taken stenographically by me at the time and place aforementioned.


    Dated this <u>10th</u> day of <u>April</u>, 2020.


_____
s/Darlene M. Martinez
RMR, CRR