**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00098-CMA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**LEONARD LUTON,**

**Defendant.**

_____

**REPORTER'S TRANSCRIPT**
**(Sentencing Hearing)**
_____

          Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 2:00 p.m. on the 4th
day of August, 2021, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
MARTHA ANN PALUCH and SARAH HUNTER WEISS, U.S. Attorney's
Office, 1801 California St., Suite 1600, Denver, CO 80202

**FOR THE DEFENDANT:**
MARK EDWARD SCABAVEA, Attorney at Law, 301 Sheridan Blvd.,
Lakewood, CO 80226

```
 1                          AUGUST 4, 2021

 2           (Proceedings commence at 2:00 p.m.)

 3           THE COURT:  You may be seated.

 4           Court calls Criminal Case No. 19-cr-0098-CMA,

 5    encaptioned United States of America v. Leonard Luton,

 6    also known as Leonard L. Luton.

 7           Counsel, would you please enter your appearances.

 8           MS. PALUCH:  Good afternoon, Your Honor, Martha

 9    Paluch and Sarah Weiss, appearing on behalf of the United

10    States.  With us at counsel table is FBI Special Agent Amy

11    Howard and FBI forensic accountant Matt Morgan.

12           THE COURT:  Good afternoon.

13           MR. SCABAVEA:  Good afternoon, Your Honor, Mark

14    Scabavea on behalf of the Defendant, Leonard Luton, who is

15    present before the Court and in custody.

16           THE COURT:  Good afternoon.

17           And for the record, the Court also notes that

18    Officer Michelle Means, representing the United States

19    Probation Office, is also in attendance at this hearing.

20    Good afternoon.

21           PROBATION OFFICER:  Good afternoon, Your Honor.

22           THE COURT:  All right.  The record shows that after

23    a full jury trial on February 14, 2019, Mr. Luton was

24    found guilty and was convicted of Count 1; conspiracy to

25    commit mail fraud, in violation of 18 United States Code
```

1   Section 1349, and Counts 2 through 3 and 5 through 10;

2   aiding and abetting mail fraud, in violation of 18 United

3   States Code Section 1341 and Section 2.

4        We are here today for sentencing.  My understanding

5   is that the Government does intend to introduce evidence

6   relating to the objections made by the defendant to the

7   presentence report; is that correct?

8        MS. PALUCH:  It is correct, Your Honor.

9        THE COURT:  All right.  Let's go ahead and start,

10  then, with the evidence you intend to submit so we can get

11  that out of the way.

12        MS. PALUCH:  Thank you, Your Honor.  The United

13  States calls Mr. Matthew Morgan to the stand.

14        THE COURT:  Mr. Morgan, would you step forward.

15                      **MATTHEW MORGAN**

16  having been first duly sworn, testified as follows:

17        THE WITNESS:  Yes.

18        COURTROOM DEPUTY:  Please be seated, sir.

19        Please state your name, and spell your first and

20  last names for the record.

21        THE WITNESS:  My full name is Matthew Edward

22  Morgan.  The first name is spelled M-A-T-T-H-E-W.  The

23  last name is M-O-R-G-A-N.

24        THE COURT:  You may proceed.

25        MS. PALUCH:  Thank you, Your Honor.

1                        **DIRECT EXAMINATION**

2    **BY MS. PALUCH:**

3    Q.   Mr. Morgan, how are you employed?

4    A.   I work as a forensic accountant with the FBI.

5    Q.   Sir, did you testify in the trial in this case

6    regarding the loss incurred by Ms. Olson in this scheme?

7    A.   Yes, I did.

8    Q.   Please look at what has been marked as Government's

9    Exhibit 128.  It should be in a book next to you.

10        MS. PALUCH:  And, Your Honor, for ease of

11   reference, I am going to put that on the overhead.

12        THE COURT:  All right.

13   Q.   (BY MS. PALUCH)  Sir, can you identify this exhibit?

14   A.   This is a summary chart titled Summary of Mailings

15   and Wires Made by Sandra Olson.

16        THE COURT:  This was Exhibit 128 at the trial; is

17   that correct?

18        MS. PALUCH:  That's correct, Trial Exhibit 128.

19   Q.   (BY MS. PALUCH)  And can you identify what this

20   exhibit captures.

21   A.   This captures the payments, as well as the shipping,

22   the shipping costs that Ms. Olson incurred.  These are the

23   payments and shipping costs that we tied out to certified

24   bank records, shipping company records, as well as Western

25   Union documents.

1    Q.   And this was the trial exhibit that you prepared for

2    the trial; is that correct?

3    A.   That is correct.

4    Q.   And did this chart include all of the payments

5    uncovered, mailed or made by Ms. Olson?

6    A.   It did not.

7    Q.   And why is that?  What did it only include?

8    A.   It only included the transactions that we had

9    certified records for, which includes bank records,

10   Western Union records, and shipping costs or shipping

11   records.

12   Q.   Did you have evidence of additional mailings and fees

13   made by Ms. Olson that were not included in Exhibit 128?

14   A.   Yes.

15   Q.   And what was that evidence?

16   A.   Ms. Olson maintained receipts of her transactions or

17   her payments.  These receipts and payments were put

18   together into a spreadsheet, with the assistance of her

19   family, and that spreadsheet was provided to us.

20   Q.   Sir, I would like you to turn to Government's Exhibit

21   4 now, if you could.

22        MS. PALUCH:  Your Honor, Exhibit 4 in your book is

23   pretty small.  I have a larger version I am going to

24   display here on the screen that is a somewhat larger

25   Exhibit 4.

1   Q.   (BY MS. PALUCH)   Sir, can you identify what this

2   exhibit is?

3   A.   This is a spreadsheet from Ms. Olson.

4   Q.   Okay.  Now, according to her spreadsheet, how much

5   money did Ms. Olson lose in this scheme?

6   A.   999 dollars 79 -- excuse me, $999,793.75 for

7   payments, as well as shipping cost of $2,439.42.

8   Q.   And what other evidence of additional mailings, if

9   any, did you have?

10  A.   We had bank records where we could see cash

11  withdrawals that tied out to or agreed with the

12  transactions that Ms. Olson had included on her

13  spreadsheet.

14  Q.   And did you prepare a second chart which listed

15  additional mailings in addition to those listed in 128,

16  the trial exhibit?

17  A.   Yes, I did.

18  Q.   If you could please turn your attention to

19  Government's Exhibit 1.  Sir, can you identify this

20  exhibit.

21  A.   This is an exhibit that I created titled Summary of

22  Loss Attributed to Leonard Luton, and it includes the

23  additional payments.

24  Q.   Okay.  And how are those additional payments or

25  mailings identified?

1   A.   Those are identified on the rows highlighted in light

2   blue.

3   Q.   And looking at the first page of this chart, how many

4   entries are in blue?

5   A.   Just one.

6   Q.   And let's talk about that entry.  The date of this

7   entry we are looking at here is 3/21.  Do you see that,

8   sir?

9   A.   Yes.

10   Q.   Okay.  And why is that included on this chart?

11   A.   This is a transaction or a payment which occurred on

12   Sandra Olson's spreadsheet, but the date or amount agreed

13   to a transaction noted in the bank statements.

14   Q.   Why wasn't that included in the trial exhibits?

15   A.   We did not include it because we did not have an

16   address or name of who it went to.

17   Q.   Let's turn to page 2 of this exhibit.  And, sir, on

18   this page, how many entries -- and I apologize for not

19   getting the whole chart there on the screen, but how many

20   entries are in blue on that page?

21   A.   There are five transactions, five entries.

22   Q.   Okay.  Can you please speak to those five entries?

23   A.   As I just testified, these five entries were noted on

24   Ms. Olson's spreadsheet.  These transactions were tied out

25   to bank statements based upon the date and the amount.

```
 1   However, we did not have the name or the address of those
 2   transactions.
 3   Q.   Okay.  And so the record is clear, are you referring
 4   to transactions on this page dated 5/22/18, 5/30, 5/30
 5   6/1, and 7/2, all of 2018?
 6   A.   Yes.
 7   Q.   All right.  Sir, turning to the third page of this
 8   exhibit, are there additional entries like what we have
 9   just discussed, where you explained you had mailings on
10   her chart and you had bank support but no name or address?
11   A.   Yes.
12   Q.   And which ones are those, if you could state the
13   dates for the record?
14   A.   Yes, the second 7/9/2018 transaction.  The 8/2/2018
15   transactions, both of those.  The one 8/10/2018
16   transaction.  And then the last 8/20/2018 transaction
17   highlighted in blue.
18   Q.   Okay.  That leaves one entry in blue to explain, and
19   that is the first entry dated 7/9/2018, with a recipient.
20   And the name of recipient was listed as Frank White.  Can
21   you explain why that entry is highlighted in blue?
22   A.   For this entry, on that date, the bank -- the bank
23   records indicated that there was a $4,000 withdrawal.  For
24   the -- for this document, we adjusted it to $5,000,
25   because for the previous dates we observed the money had
```

1   been withdrawn and had not been identified with any other

2   transactions.  So she had cash on hand.

3   Q.   And did Ms. Olson, in fact, report a $5,000 mailing

4   on that date?

5   A.   That's correct, yes.

6   Q.   And so the record is clear, the 7/9 transaction is

7   included in the Trial Exhibit 128; correct?

8   A.   That's correct.

9   Q.   And the only difference is it is in blue because it

10  is 5,000?

11  A.   Yes, that's correct.

12  Q.   All right.  Thank you, sir.

13       I would like you to turn to the last page.  And do

14  you see two entries on this page in blue?  And can you

15  please explain those, starting with the entry on

16  10/2/2018.

17  A.   The entry that entry is 10/2/2018 for $25,000.  We

18  had bank records to indicate that she had cash on hand of

19  25,000.

20  Q.   Okay.  And then let's turn to the last entry on 11/8,

21  if you could.

22  A.   Can I add one more thing to the last one?

23  Q.   You certainly can.

24  A.   There is a comment that says "No match w/bs," which

25  is shortened for bank statement.  And what we observed is

1   on that date, there is not a $25,000 transaction, but the

2   dates preceding that had enough withdrawals that covered

3   that 25,000.

4   Q.   Thank you.

5        And, sir, directing your attention to the last

6   entry in blue on this exhibit, 11/8, can you please speak

7   to that $20,000 entry.

8   A.   Similar to the previous one, there were transactions

9   to indicate that she had cash on hand of $20,000, as well

10   as there was a notation that this went to a Tom White, at

11   this particular address, which we were aware of, and he is

12   a known individual in this scheme.

13   Q.   Okay.  Now, staying with this last page, what was the

14   total amount of loss that you attributed for Ms. Olson as

15   a result of this scheme?

16   A.   The total is $971,455.41.

17   Q.   And what all is included in that amount?

18   A.   That is the total of all payments, as well as the

19   shipping costs.

20   Q.   And are those shipping costs notated here; the

21   $2,039.24?

22   A.   That would be -- the shipping costs are the $265.42.

23   Q.   I see.  So this is what you added here, the 265, to

24   get to the 971 total?

25   A.   Yes.

1    Q.    Okay.  And how did that compare to Ms. Olson's total,

2    and that is referring you back to Exhibit 4?

3    A.    This is less than Ms. Olson's total, which was

4    $999,793.75.

5    Q.    Okay.  Now, I would like you to explain that

6    difference and, to do so, I am going to refer you back to

7    Ms. Olson's chart.  And I am going to, if I can get this

8    -- I am going to refer you first to an entry dated 5/10 of

9    2018.  Do you see this entry here, 5/10/2018?

10   A.    Yes.

11   Q.    Can you read that entry into the record?

12   A.    Yes.  On 5/10/2018, there is a notation saying "UPS

13   returned to Bank of EP," which is Bank of Estes Park, for

14   negative $24,825.

15   Q.    Okay.  So it is indicating that that amount was

16   returned to Ms. Olson through her bank; is that correct?

17   A.    That is correct.

18   Q.    Did you calculate the numbers on this spreadsheet and

19   determine whether, in fact, that 24,000 amount was

20   deducted from her total?

21   A.    That is not included in Exhibit 1, however, it was

22   included in her total.

23   Q.    It was included in her total.  So when you did your

24   calculation, did you take that 24,000 out?

25   A.    It is not included.

1   Q.   In your total?

2   A.   Correct.

3   Q.   Okay.  Next, I want to direct your attention to an

4   entry dated 3/27 of 2018.  Can you speak to that entry?

5   There are a number on that page.

6   A.   Yeah, the very first 3/27/2018 is listed as $3,006

7   cash.  Through our process of review, we determined that

8   that was a duplicate of an additional 3/27/2018

9   transaction; the fourth one down, which is $5,000.  So we

10  only accounted for one of those.

11  Q.   Okay.  So did that result in you deducting $5,000

12  from the total?

13  A.   Yes, that's correct.

14  Q.   All right.  Sir, next I want to direct your attention

15  to an entry dated 3/30 of 2018.  It is an entry for

16  $48,310.  Do you see that, sir?

17  A.   Yes, sir.

18  Q.   Can you speak to that?

19  A.   That is a check that was determined to be a

20  fraudulent check, and the Bank of Estes Park determined

21  that and did a corrected transaction to her account.  So

22  that was not included in Exhibit 1.

23  Q.   Okay.  So now let's go back to Ms. Olson's chart, if

24  we can.  And I want to direct your attention to an entry

25  on 8/31/18.  Do you see an entry there for Verizon?

1   A.   Yes.

2   Q.   Can you please speak to that?

3   A.   This Verizon wireless charge for $2,158 was not

4   identified or tied out to a credit card statement, so it

5   was not included in Exhibit 1.

6   Q.   And let me find that again.  This is the $2,158

7   credit card charge?

8   A.   That's correct.

9   Q.   And please state your answer to that again.

10  A.   That is a transaction that we did not identify in the

11  credit card statements, so we did not include it in

12  Exhibit 1.

13  Q.   Okay.  Now, were those the only adjustments you made

14  to Ms. Olson's chart?

15  A.   Yes.

16  Q.   In addition to the loss suffered by Ms. Olson, have

17  you become aware of a loss amount for any other victim?

18  A.   Yes.  Ms. Picher had a loss of $3,500.

19  Q.   Okay.  And if the Court finds that $3,500 loss amount

20  by a preponderance of the evidence, what is the total

21  amount of loss attributable to this defendant?

22  A.   It would be $974,955.41.

23       MS. PALUCH:  Does the Court have any questions for

24  the loss amount before I turn to restitution?

25       THE COURT:  No.  I understand that.

1          I do have some questions on restitution, though,

2     but I will let you put on your evidence.

3          MS. PALUCH:  Thank you, Your Honor.

4     Q.   (BY MS. PALUCH)  Mr. Morgan, in addition to the

5     approximately $24,000 that was returned to Ms. Olson by

6     UPS, were any other funds returned to Ms. Olson?

7     A.   Yes.  There are two entries on Exhibit 4 that were

8     returned to Ms. Olson.

9     Q.   Okay.  Let's look back at Ms. Olson's chart, which is

10    Government Exhibit 4.  And I am going to direct you to

11    those dates on 4/16; is that correct?

12    A.   That's correct.

13    Q.   Can you speak to those entries.

14    A.   Yes.  These are cashier's check.  The first entry

15    says $45,002, with a notation, "cash/returned."  The

16    second one is $45,000 -- $45,006, noted "cash."  Then

17    farther down it says "returned," so the total is $90,008.

18    These are cashier's check returned by a bank from

19    Michigan.

20    Q.   And so did you subtract those amounts from your loss

21    calculation as to how much money Ms. Olson is due?

22    A.   Yes.  They are included in the restitution -- or they

23    are subtracted from the restitution.

24    Q.   Okay.  So did you prepare a chart detailing the

25    amount of funds Ms. Olson is due in restitution after

1   taking out those two checks?

2   A.   Yes, I did.

3   Q.   Okay.  I would like to turn your attention to

4   Government's Exhibit 2.  First, sir, can you state --

5   first, can you identify this exhibit?

6   A.   This is a chart that I created.

7   Q.   And, for the record, can you state the title of that

8   chart?

9   A.   It is Restitution for SO, which is Sandra Olson.

10  Q.   Okay.  Turning to the last page of this chart, what

11  is the total amount that you determined Ms. Olson is due

12  in restitution?

13  A.   The total amount is $881,447.41.

14  Q.   Okay.  And the difference between your Exhibits 1 and

15  2, is it solely that 90,000, approximately, that you

16  deducted?

17  A.   That's correct.

18       MS. PALUCH:  Does the Court have questions about

19  restitution before I move to forfeiture?

20       THE COURT:  No.  You answered the question I had,

21  which is where the $90,008 was that was deducted.  So you

22  answered my question.

23       MS. PALUCH:  Thank you, Your Honor.

24  Q.   (BY MS. PALUCH)  All right.  Let's turn to

25  forfeiture.

1              Did you do a separate calculation as to the amount

2     of funds that we are attributing to this defendant and

3     which we are requesting a money judgment for.

4     A.    Yes.

5     Q.    All right.  I would like to show you Government's

6     Exhibit 3.  Can you identify this exhibit, sir?

7     A.    This exhibit is titled Forfeiture Amount Attributed

8     to Leonard Luton, which I created.

9     Q.    Okay.  And which mailings did you include in the

10    forfeiture amount?

11    A.    These are mailings that went to Sandra Picher.  These

12    are mailings that went to the defendant.  These are

13    mailings that went to the addresses of the defendant's

14    friends.  And these are mailings that went to locations

15    that were identified by SA Hoyland on the date of

16    delivery.

17    Q.    And what is the total amount of money mailed to those

18    individuals or addresses, as you have described, that we

19    are seeking in forfeiture?

20    A.    $484,123.16.

21              MS. PALUCH:  Does the Court having any questions

22    regarding forfeiture?

23              THE COURT:  Not from Mr. Morgan, but from you,

24    because in your filing you said that this included the

25    proceeds from Count 4, but I did not see that on the

```
 1    chart, because Count 4, those proceeds were recovered.

 2    And I just wanted to clarify that this number does not

 3    include anything from Count 4.

 4            MS. PALUCH:  It does not, Your Honor.

 5            THE COURT:  All right.

 6            MS. PALUCH:  Thank you.  No further questions.

 7            THE COURT:  Mr. Scabavea?

 8            MR. SCABAVEA:  Your Honor, may I have a few

 9    moments, please?

10            THE COURT:  You may.

11            MR. SCABAVEA:  Thank you.

12            THE COURT:  Do you want to move these exhibits into

13    evidence so we have a complete record?

14            MS. PALUCH:  I would move those into evidence.

15    Thank you for that.

16            THE COURT:  Mr. Scabavea, any objection?

17            MR. SCABAVEA:  No objection.

18            THE COURT:  All of the exhibits mentioned today,

19    which would be Exhibit 128, from trial, which is already

20    in; Exhibit 1; Exhibit 2; Exhibit 3; and Exhibit 4 are

21    admitted.

22            (Exhibit Nos. 128, 1-4 are admitted.)

23            MS. PALUCH:  Your Honor, there are two additional

24    you will see in your exhibit book.  There are two victim

25    impact statements.  We obtained attestations on those
```

1    statements.  We have included those as exhibits.  Both

2    Ms. Olson and her son, Mike Olson, are here to speak, and

3    I would ask those b moved as part of the record, as well.

4         THE COURT:  Any objection?

5         MR. SCABAVEA:  No objection, Your Honor.  I just

6    have a point of clarification.  For the declaration of

7    victim's loss, I see that the X -- there has been an X,

8    but then the initials by them, they become insolvent.  Is

9    she saying "no" there?

10        MS. PALUCH:  That's correct.

11        Your Honor, when Ms. Olson reviewed that, I think

12   there was some confusion as to what "insolvent" meant, so

13   after discussing that with her, she chose to X that out

14   and put her initials next to it.

15        THE COURT:  All right.  So exhibits -- these are

16   not marked, but the attestations to the victim impact

17   statements, which are submitted by the Government, will be

18   admitted into evidence.

19        MS. PALUCH:  Thank you, Your Honor.

20        MR. SCABAVEA:  May I proceed Your Honor?

21        THE COURT:  You may.

22                    **CROSS-EXAMINATION**

23   **BY MR. SCABAVEA:**

24   Q.   Good afternoon, Mr. Morgan.  How are you doing?

25   A.   I am doing well, thank you.

1   Q.   I am going to ask you to go ahead and flip your book

2   to Exhibit 1 in the book in front of you.  Are you with

3   me?

4   A.   I am.

5   Q.   I am just going to move just down the chart here kind

6   of slowly and just ask you questions about each of these

7   entries.  Make sense?

8   A.   Sure.

9   Q.   A little bit tedious, but, you know, I have to go

10  through it.  So I am looking at the first ones, the ones

11  highlighted in blue.  So a thousand dollars.  How was the

12  defendant involved in this?

13  A.   These were transactions, as I stated earlier, that

14  Ms. Olson had provided a document that she had made these

15  payments based upon the overall scheme, our understanding

16  of the scheme, and these tied out to the bank statements.

17  Q.   Okay.  So, is there any evidence here that the

18  defendant had anything to do with this first transaction,

19  that you know of?

20  A.   As I just stated, it is a transaction -- it is a bank

21  transaction, and the bank records indicated that funds

22  were withdrawn and sent, as per Ms. Olson's spreadsheet.

23  Q.   Okay.  So just from her?

24  A.   Yes.

25  Q.   Okay.  We are going to move down one at a time, and

1   basically I have the same question.  So I will go kind of

2   slowly here and see where it takes us.  Make sense?  So

3   the second one, 3/22/18, how was the defendant involved in

4   this transaction?

5   A.   We had evidence that of this transaction -- well, let

6   me take a look at it again.

7   Q.   Sure.  No problem.  Take your time.

8   A.   All right.  So, this is information, we have evidence

9   from the bank statement in the Bates stamp column, we have

10   the bank statement with the bank stamp of "_4" and then

11   the cashier's check was "_8."  That went to Jane Therault

12   -- and I probably said that incorrectly -- with the $6 fee

13   that was observed from the bank statement.

14         And this is, as well, it was communicated through

15   the spreadsheet that we received from Ms. Olson that was

16   documented with her receipts.

17         MS. PALUCH:  Your Honor, if I could, I would point

18   out that Mr. Morgan is the forensic accountant.  Agent

19   Howard is the lead case agent in the case.  To the extent

20   Mr. Scabavea intends to go through every entry on the

21   Government's exhibit and ask how this defendant is tied to

22   that entry, that wasn't the purpose of today's hearing.

23         Today's hearing was to calculate the loss.  We have

24   explained how -- what was the methodology used here.  The

25   spreadsheet was used.  He was asked to look for support in

1   the bank records to support these entries.  And that is

2   what Mr. Morgan has testified to.

3        Every aspect of every name on this chart and how

4   that person is related to this defendant, is not

5   information that Mr. Morgan was tasked -- that was not

6   part of his job responsibility her.

7        THE COURT:  All right.  And I assume that all of

8   these to which he tasked, relate to the scheme to defraud.

9        MS. PALUCH:  Absolutely, Your Honor.  And what we

10  have done is 128 is what was proven at trial.  That was

11  submitted to the jury.  What we did today is we

12  highlighted in blue anything in addition to what was

13  presented or proven beyond a reasonable doubt at trial.

14       To the extent Mr. Scabavea wants to cross-examine

15  on the entries that are new today, that are in blue, they

16  are not new because we submitted them to the Court way in

17  advance in the filing.  But the blue categories are

18  something that wasn't presented at trial.

19       But, to take today's hearing and go through every

20  single entry, I did not understand that that was the

21  purpose of this hearing.

22       THE COURT:  It is not the purpose of this hearing.

23       Mr. Scabavea, what is your response?

24       MR. SCABAVEA:  Your Honor, as far as that goes, I

25  did hear during the testimony earlier today that he said

1     that the money went to his friends.  I assume he meant

2     "defendant's friends," so I wanted to clarify that and

3     just go where he meant by that.

4          THE COURT:  All right.  Well, you can ask that, but

5     we are not going to go through this one entry at a time.

6     This hearing is set for 2 hours.  If you needed more time,

7     you should have asked for more time.

8          But, Ms. Paluch is absolutely right, everything on

9     Exhibit 1 was proven at trial.  That was the time it

10    should have been questioned.  The jury found beyond a

11    reasonable doubt that these were correct, except for the

12    blue ones.  If you want to ask about the blue ones, you

13    may ask about that, but we ar not going to through these

14    entry by entry.

15         MR. SCABAVEA:  Yes, Your Honor.  I will go just for

16    the blue ones, then.  Thank you.

17    Q.   (BY MR. SCABAVEA)  Okay.  Mr. Morgan, we are going to

18    jump to page 2, then, on this document.  And we are just

19    going to go down the blue ones, and I am just going to ask

20    you the same questions.

21         So, for the 5/22 entry, what indication is there

22    that the defendant was involved in this transaction?

23    A.   I can just testify to the amounts.  So, these amounts

24    tie back to the spreadsheet that Ms. Olson provided to us,

25    which was created based upon her receipts of the payments

1    that she made, as well as the shipping costs that she

2    incurred.

3          So this one was included for $2,000, as noted, as I

4    observed in the bank statement, as well as the bank

5    support of the withdrawal, and the comments section with a

6    notation that I put in there, just to help me out with

7    remembering what it was; that that specific amount agrees

8    with that bank statement withdrawal on that date.

9    Q.   Thank you.  And I am just going to make this even

10   easier.  I am just going to ask you this question with

11   respect to all blue entries here, and just say, what

12   knowledge do you have that the defendant was involved in

13   any of these blue entries?

14   A.   My response would be the same.  This is all based

15   upon what we received from Ms. Olson's recordkeeping and

16   how it ties out to the bank statement.

17        MR. SCABAVEA:  Thank you, Mr. Morgan.

18        I will pass the witness, Your Honor.

19        MS. PALUCH:  Just briefly, Your Honor.

20                     **REDIRECT EXAMINATION**

21   **BY MS. PALUCH:**

22   Q.   In addition to the bank statements, Mr. Morgan, there

23   were entries on here that tied to Frank White, as well as

24   to an address that was used in the scheme, and

25   particularly that is the entries on 7/9 and 11/8.  Do you

1    recall testifying to that today?

2    A.   Yeah, 7/9 and 11/8.

3    Q.   Correct.  So it is more than the bank statements, we

4    have names tied to the scheme?

5    A.   I am sorry, that's correct, yes.

6            MS. PALUCH:  Thank you.

7            No further questions, Your Honor.

8            THE COURT:  All right.  Thank you very much, sir.

9    You may step down.

10           THE WITNESS:  Thank you.

11           THE COURT:  Does the Government have any other

12   witnesses?

13           MS. PALUCH:  No, Your Honor.

14           THE COURT:  All right.  Does the defendant have

15   anything to put on?

16           MR. SCABAVEA:  No, Your Honor.  Thank you.

17           THE COURT:  All right.  Let's move on, then, to the

18   sentencing.

19           Rather than, Mr. Scabavea, have you and Mr. Luton

20   stand up, I am going to go ahead and rule on the

21   objections, because those are fairly lengthy.

22           MR. SCABAVEA:  Yes, Your Honor.

23           THE COURT:  So, I have received and reviewed the

24   full presentence investigation report dated March 30,

25   2020, as revised on May 14, 2021, including all addenda

1    thereto.  That includes the victim impact statements and

2    the letters and transcripts that were filed by the

3    defendant yesterday.

4         I have also reviewed Document No. 124, the

5    defendant's objections to the presentence report.

6         125, the Government's response to those objections.

7         116, the Government's response to the presentence

8    report, indicating no objection.

9         No. 108.  The Government's sentencing statement.

10         No. 143, the defendant's sentencing statement and

11    motion for a sentence below the advisory guideline range.

12         No. 142, the Government's statement re loss,

13    restitution, and forfeiture.

14         No. 145, the Government's response to the

15    defendant's sentencing statement and motion for a below

16    advisory guideline sentence.

17         And I have reviewed Document Nos. 133 and 136,

18    which were the defendant's ex parte or pro se letters to

19    the Court, which were stricken.  Even though they were

20    stricken because they were pro se filings by a represented

21    party, I went ahead and read those, as well.

22         Are there any documents that I failed to identify

23    that I should have reviewed in preparation for this

24    hearing?

25         MS. PALUCH:  No, Your Honor.

1          MR. SCABAVEA:  No, Your Honor.

2          THE COURT:  Mr. Scabavea, have you had enough time

3     to review the presentence report with Mr. Luton?

4          MR. SCABAVEA:  Yes, Your Honor, I have.

5          THE COURT:  And did you explain the contents of

6     that report to him?

7          MR. SCABAVEA:  Yes, Your Honor, I did.

8          THE COURT:  Do you have any concerns about his

9     ability to understand the contents of the report?

10          MR. SCABAVEA:  No, Your Honor, I do not.

11          THE COURT:  All right.  Mr. Luton, did you get a

12     copy of the presentence report?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  Did you review it?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  Did Mr. Scabavea explain its contents

17     to you?

18          THE DEFENDANT:  In some form, yes, Your Honor.

19          THE COURT:  Do you understand the contents of the

20     report?

21          THE DEFENDANT:  Not in full aspect, but more or

22     less.

23          THE COURT:  I am sorry, I can't understand you.

24          THE DEFENDANT:  Excuse me.  Not in full aspect, but

25     I understand it.

1          THE COURT:  You understand it?

2          THE DEFENDANT:  Yeah, to some amount.

3          THE COURT:  All right.  Let's talk about the

4    objections.

5          Mr. Scabavea, you submitted Document No. 124,

6    objecting to the presentence report.  You also included

7    objections in your filing at 143.  I have read those

8    objections, the probation office's response, and the

9    Government's responses thereto.  I will address those

10   objections in a few minutes, but there are any additional

11   objections you would like to make at this time?

12         MR. SCABAVEA:  No, Your Honor.

13         THE COURT:  Ms. Paluch, does the Government wish to

14   make any objection at this time?

15         MS. PALUCH:  No, Your Honor.

16         THE COURT:  In Documents 124 and 143, the defendant

17   makes objection to multiple paragraphs in the presentence

18   report.

19         As the Government noted, the sentencing facts for

20   purposes of sentencing need only be proven by a

21   preponderance of the evidence standard.  In other words,

22   the Government must show it is more likely than not that

23   the factual matters on which it bears the burden are true.

24   That is from *United States v. Olsen*, 519 F.3d 1096, Tenth

25   Circuit, 2008.

1           The first objection is to paragraph 9 of the

2     presentence report, which states that "the defendant's

3     co-conspirator, Rajay Dobson (Dobson), calling himself

4     Frank White, convinced the victim, SO, that she won a

5     lottery scheme."  The defendant asserts there is no

6     evidence introduced at trial that established that Dobson

7     was, indeed, Frank White.

8           That objection is overruled.  At trial, the

9     Government presented overwhelming evidence from which the

10    jury unanimously found beyond a reasonable doubt, linked

11    the defendant with Dobson, also known as Frank White.

12          Dobson identified himself as "Frank White" in his

13    numerous calls to SO.  And during those calls, Frank White

14    convinced her to mail cashier's check, cash, and

15    cellphones to receive her "winnings."

16          The Court incorporates by reference the paragraph

17    summarizing this evidence as set forth in Document No.

18    125, at pages 2 and 3, which proves that Rajay Dobson is

19    the same individual who identified himself as Frank White

20    in his communications with SO, and that Rajay Dobson and

21    Leonard Luton conspired to defraud SO.

22          The remaining challenges are to sentencing

23    enhancements.  The first challenge is to the total loss

24    caused by this fraudulent scheme.  The defendant objects

25    to a loss that totaled $994,793.75.  I understand today

1    that that number is a little bit different based on the

2    evidence presented.  It was $971,455.41 for Ms. Olson -- I

3    am sorry, for SO, and $3,500 for Sandra Picher, the other

4    victim, the one to whom she sent the cashier's checks and

5    other things, for a total of $974,955.41.

6          The defendant objects because that amount -- any

7    amount actually greater than 550,00, but less than 1.5

8    million, results in a 14-level increase in offense level

9    under United States Sentencing Guideline Section

10   2B1.1(b)(1)(H), because the defendant asserts that the

11   loss was, at most, $144,234, which would only result in a

12   10-level increase.

13         In this case, the defendant was convicted by a jury

14   of conspiring with Rajay Dobson to defraud SO.  The

15   defendant is correct, a defendant's liability for loss in

16   a scheme for purposes of 2B1.1(b)(1) is limited to what

17   the Government proves by a preponderance of the evidence

18   is part of the ongoing fraudulent scheme and the loss

19   associated with that scheme.

20         In a conspiracy such as that for which the jury

21   found Mr. Luton liable, the loss amount includes the loss

22   attributable to the acts of all co-conspirators that were

23   reasonably foreseeable and part of the criminal activity

24   that the defendant agreed to jointly undertake.

25         First, the Court will note that the defendant does

1    admit at least $144,234 that were set forth in Counts 2,

2    3, 5, and 6.  He admits that they are attributable to him.

3            The evidence at trial established that between

4    February of 2018 and January 22nd of 2019, the defendant's

5    co-conspirator, Rajay Dobson, calling himself Frank White,

6    convinced SO, from Estes Park, Colorado, that she had won

7    a $2.81 million lottery and a Mercedes Benz.

8            White told SO she needed to mail cash, cashier's

9    checks and cellphones via UPS and Fed-Ex to pay the fees

10   required in order to receive her prizes.  White directed

11   SO to mail these payments to the defendant's mailing

12   address and to the addresses of his friends and

13   associates.

14           White also directed SO to mail some of the

15   cashier's checks and wire funds to a woman with the

16   initial SP, who lived in Grandville, Michigan.  SO

17   followed his directions in total, and SO sent more than

18   $150,000 to SP.  Those amounts were confirmed by both bank

19   and Western Union records.

20           I will note that although the Government, in its

21   filing, indicated that -- well, Count 4 would count toward

22   the loss, it does not count toward restitution or toward

23   the forfeiture, but that includes the $45,000 that was

24   sent to SP that was actually recovered by the Grandville

25   Police Department.  And the fact that the police

1    fortuitously intercepted that mailing does not change the

2    fact that that amount is properly included for purposes of

3    the loss calculation in this case.

4        SP was involved in this same scheme.  She had been

5    told that she had won a lottery and, in her case, the

6    prize was $5 million.  She was told that in order to

7    receive her winnings she needed to receive money from

8    others and send it on.  She received those instructions

9    from a man calling himself David.

10       David told SP that once she deposited the funds

11   received from SO, she was to obtain a cashier's check made

12   payable to defendant Luton.  And the screen shots from

13   SP's phone confirm that she received a text message from

14   David providing her with defendant Leonard Luton's name,

15   his bank account, and routing information.

16       The cashier's checks written by SO that weren't

17   intercepted were cashed by SP and then deposited by her

18   into the same account listed in the text messages she

19   received from David; that was defendant Luton's bank

20   account, and his bank account records also confirm that

21   these amounts were deposited into a Bank of America

22   account in the defendant's names and for which he was the

23   only signatory.

24       Thus, the defendant is tied to this aspect of the

25   conspiracy, and those moneys are attributable to him as

1     loss amounts for purposes of the advisory guideline.

2          In addition, at trial, Special Agent Amy Howard

3     testified regarding the amounts associated with the

4     remaining counts, and the Court accepts that testimony for

5     purposes of this hearing here today.  I am not going to

6     repeat that testimony.  I think it is sufficient that I

7     incorporate it by reference.  And it was clear that the

8     defendant was tied into those amounts, as well.

9          In his post-arrest interview, the defendant

10    explained to the agents that he was at SO's home when he

11    was apprehended at the direction of his friend, Rajay

12    Dobson, who had asked the defendant to travel from the

13    defendant's home in Brooklyn, New York, to SO's residence

14    in Estes Park, to pick up a package.

15         At that time, he denied being part of the October

16    hand-to-hand transaction, and he denied ever having been

17    to Colorado before.  The Cellebrite extraction of his

18    phone, however, provided numerous or multiple phone

19    numbers for Dobson, and the defendant confirmed two of

20    those numbers during his post-arrest interview.

21         The defendant, Dobson, and others communicated with

22    each other via text messages and other messaging services

23    about the addresses where particular packages SO mailed

24    would arrive and the tracking numbers associated with

25    those mailings.

 1          The call detail records of the defendant's phone

 2   confirms his presence at the address where a particular

 3   package was schedule to arrive around the time of the

 4   expected delivery.

 5          The Government presented, through the expert

 6   testimony of Special Agent Kevin Hoyland, 19 instances

 7   where this occurred with respect to packages mailed by SO

 8   as directed by White.  Voicemail messages left by Dobson

 9   and retrieved from the defendant's phone indicated the two

10   discussed the distribution of funds between themselves and

11   others.

12          At trial, the Government also proved, through the

13   testimony of FBI forensic accountant Matt Morgan, that

14   through this lottery scheme the defendant and Dobson

15   defrauded SO out of approximately $700,000.  Today, the

16   testimony of accountant Matt Morgan established that total

17   loss amount is, now, I believe $971,455.41 --

18          MS. PALUCH:  Correct, Your Honor.

19          THE COURT:  -- as shown in Exhibit 1.

20          So the defendant's objection is overruled.  The

21   evidence presented at trial and at this hearing today

22   proves by a preponderance of the evidence that this

23   conspiracy in which the defendant was a co-conspirator

24   caused SO a loss totaling $971,455.41.

25          Therefore, an increase of 14 levels in the offense

1    level pursuant to United States Sentencing Guideline

2    Section 2B1.1(b)(1)(H) is appropriate because the amount

3    is more than $550,00 but less than 1.5 million.

4        All right.  The next objection is in Document No.

5    124.  Mr. Scabavea, you state "the presentence report

6    states that defendant obstructed justice.  For the reasons

7    stated in defendant's sentencing statement, the defendant

8    objects."  However, in your sentencing statement, Document

9    No. 143, there is absolutely no mention of this objection.

10   May I assume that you abandoned that objection?

11       MR. SCABAVEA:  That is correct, Your Honor.

12       THE COURT:  Very good.  So we will skip over that

13   objection as having been abandoned.  I wish you would have

14   let me know because I spent a lot of time researching that

15   and addressing it, but it is no longer an issue.

16       The next objection is that the defendant's crimes

17   caused a substantial -- defendant objects to the probation

18   officer's increase of 2 offense levels under United States

19   Sentencing Guideline Section 2B1.1(b)(2)(A)(iii); that the

20   defendant's crimes caused a substantial financial hardship

21   to his victim, SO.

22       SO testified at trial that she worked for 50 years

23   as school librarian before she retired.  In her detailed

24   victim impact statement she explained that the almost $1

25   million that she lost in this scheme constituted most of

1    her and her husband's life savings.

2          She also described the stress she endures trying to

3    meet her financial obligations, saying "since these people

4    have stolen most of my husband's and my life's savings my

5    financial future is uncertain.  I now must go on a tight

6    budget.  I now have a fixed income and very little savings

7    that I now will live on until the day I die.  I don't know

8    how I will pay property taxes if they keep increasing.  If

9    anything ever happens to my health or when I have to

10   replace my car, or a major household repair, or appliance

11   breaks down or anything major, it's uncertain how I will

12   pay for all the costs.  I will probably have to sell the

13   home that my husband and I built to retire in to pay for

14   expenses as I get older which was not ever the plan."

15         And then today the Government did submit as

16   exhibits attestations in which Ms. Olson indicates that as

17   a result of this offense, she has suffered substantial

18   loss of retirement, education, or other savings or

19   investment funds, and she has suffered substantial harm to

20   her ability to obtain credit.

21         The defendant argues that SO meets none of the

22   substantial financial hardship factors outlined in United

23   States Sentencing Guideline Section 2B1.1, comment note

24   4(f).  That is untrue.

25         As indicated here -- I think, actually, before I

1    got the statements, the attestation statements, I think

2    that, yes, she has attested to two of those; suffered

3    substantial loss of a retirement fund or investment fund

4    and has suffered substantial harm to her ability to obtain

5    credit.  Therefore, the defendant's objection is

6    overruled.

7         The evidence supports a finding by a preponderance

8    of the evidence that the defendant's crime caused SO to

9    suffer a substantial financial hardship, as that is set

10   forth in *United States v. McClaflin*, 939 F.3d 1113, Tenth

11   Circuit, 2019.

12        Therefore, the 2-level increase in offense level

13   under United States Sentencing Guideline Section

14   2B1.1(b)(2)(A)(iii) was appropriately assessed.

15        The next objection is to the Government's assertion

16   that a substantial part of the scheme was committed

17   outside of the United States, which results in an increase

18   of 2 offense levels under United States Sentencing

19   Guideline Section 2B1.1(b)(10)(B).  The defendant claims

20   that all of the co-conspirators in the scheme, with the

21   lone exception of Mr. Dobson, were actually physically

22   present in the United States when they committed the

23   actions in furtherance of the scheme and, therefore, this

24   2-level enhancement should not be imposed.

25        As the Government indicates, this conspiracy

1    begins, ends, and at all times throughout, has significant

2    events taking place in Jamaica.  The evidence at trial

3    proves that Dobson, a man the defendant grew up with in

4    Jamaica, was the person calling SO.  The defendant

5    testified that Dobson lived in Jamaica and hadn't been

6    back to the United States since 2017.  He also testified

7    that he set up the MagicJack phone used to call SO, and

8    that he texted this number to Dobson.

9           Defendant also testified that he texted addresses

10   for receipt of packages to Dobson, and that Dobson texted

11   to him names and the tracking numbers for the packages so

12   he would know when and where to go and what to pick up.

13          The defendant testified he had been picking up

14   packages for Dobson for the past year, which was the

15   approximate same time period that Dobson had been

16   directing SO to mail packages related to this lottery

17   fraud.

18          The defendant also admitted to coordinating with

19   others in the United States in order to wire money back to

20   Jamaica.  All of Dobson's conspiratorial conduct may have

21   taken place in Jamaica, and those efforts to defraud SO

22   were successful because of Dobson's constant

23   communications and coordinations from Jamaica with the

24   defendant back in the United States.

25          Therefore, the Court overrules the defendant's

1    objections.  The Court finds that the evidence proves by a

2    preponderance of the evidence that a substantial part of

3    this scheme was committed outside the United States.

4    Therefore, the 2-level increase, pursuant to United States

5    Sentencing Guideline Section 2B1.1(b)(10)(B) was

6    appropriately applied.

7         The next objection is to the Government's assertion

8    that SO was a vulnerable victim and that the defendant

9    should have known that SO was vulnerable, which resulted

10   in an increase of 2 offense levels pursuant to United

11   States Sentencing Guideline Section 3A1.1(b)(1).

12        The testimony at trial established by a

13   preponderance of the evidence -- I am sorry, the testimony

14   at trial did establish beyond a reasonable doubt, and for

15   purposes of this hearing, definitely establishes by a

16   preponderance of the evidence, that SO was vulnerable for

17   a number of reasons, not just that she was elderly, but

18   that she was elderly woman who had recently lost her

19   husband, who lived alone, and was lonely.

20        The Government provided expert testimony from

21   Dr. Doug Shadel about the vulnerability about individuals

22   who had just lost a spouse, regardless of their age, and

23   during the months after such a devastating event, how they

24   are essentially in a fog.

25        Dr. Shadel explained that the cognitive ability of

1    individuals who've suffered such a loss is diminished

2    during this time frame, and this explains why fraudsters,

3    such as Mr. Dobson, often prey on such individuals.  And

4    it was precisely for these reasons that Dobson and the

5    defendant targeted SO as a victim in this fraudulent

6    scheme.

7          Dobson filled a void in SO's life, and he groomed

8    her for this fraud by calling SO repeatedly and

9    emotionally manipulating her, sometimes multiple times a

10   day, for almost a year.

11         Therefore, the defendant's objection is overruled.

12   The Court finds that SO was a vulnerable victim, and the

13   defendant knew she was vulnerable, which is precisely why

14   they chose her as a victim.  Thus the 2-level increase in

15   offense level pursuant to United States Sentencing

16   Guideline Section 3A1.1(b)(1) was appropriately applied.

17         Defendant also asserts that he should be entitled

18   to a 2-level decrease in the offense level for his minor

19   role pursuant to United States Sentencing Guideline

20   3B1.2(b).

21         As the Government noted, it is the defendant's

22   burden to prove by a preponderance of the evidence that he

23   was "substantially less culpable than the average

24   participant."  That's from *United States v. Nkome*,

25   N-K-O-M-E, 987 F.3d 1262, Tenth Circuit, 2021.

1         The guidelines set forth a non-exhaustive list of

2    five factors to consider in determining whether a minor

3    role adjustment is appropriate.  I am not going to recite

4    them all here.  But the first is the degree to which the

5    defendant understood the scope and structure of this

6    criminal activity.

7         The defendant admits that he knew the scope of the

8    activity, but he denied that he knew its full extent, and

9    that he merely assisted in executing the plan.  However,

10   the evidence presented at trial indicates that he did much

11   more than just assist the plan.  He retrieved the packages

12   sent to him by the victim, SO.  He drove cross country

13   from New York to Colorado to SO's home to pick up large

14   sums of cash.  He set up bank accounts into which money

15   and checks could be deposited and from which he could

16   transfer money to Jamaica.  It is clear that he understood

17   exactly how this conspiracy worked, and he was involved in

18   it for almost a year.

19        Although Mr. Dobson may have been the mastermind

20   and the smooth-talker who lured in the victim, defendant's

21   role was crucial and critical to the completion of the

22   fraud.  The evidence at trial established that Mr. Luton

23   and Dobson were longtime friends who spoke to each other

24   up to five times a day.

25        The second factor is the degree to which the

1    defendant participated in planning and organizing the

2    criminal activity.  The Court has just gone through how he

3    was involved, and would supplement that by saying that he

4    was the one who provided the names and addresses to Dobson

5    as to where -- the locations that would receive the

6    packages so he could instruct SO to send them there.  All

7    of those names and addresses were, by the defendant's own

8    admission, friends and associates of his.

9         There were voluminous text messages exchanged

10    between the defendant and Mr. Dobson about the addresses

11    and tracking numbers for retrieval of the packages mailed

12    by SO, and that establishes the defendant's planning and

13    organizing of this conspiracy.

14         Those same facts also establish the third element,

15    which is that the defendant had some degree of

16    decisionmaking authority and responsibility for activities

17    here in the United States.  In particular, he identified

18    safe locations for the packages from SO to be sent.

19         And the fourth factor -- it also establishes the

20    fourth factor, that the acts of the defendant performed

21    and the responsibility and discretion the defendant had in

22    performing the acts were pretty substantial for everything

23    that happened here in the United States.

24         The fifth element is the benefit to the defendant.

25    He claims that he only marginally benefited from this

1    scheme, but the Court does not buy that for a minute.  As

2    the Government noted, the wire transfers of money sent to

3    Jamaica do not account for the total amount of money that

4    was taken from SO.

5        The defendant indicated that he picked up packages

6    and was paid for picking up packages, and that he picked

7    up between three and 400 packages in the past few years.

8    He picked up a substantial number of packages in this

9    case, and he said that sometimes he would receive up to

10   $5,000 for a package depending on how far he had to

11   travel.

12       The Court finds that the defendant has failed to

13   meet his burden of proving that he is substantially less

14   culpable than the average participant in a lottery scheme

15   in general, and in this case, as compared to the role

16   played by Dobson specifically.

17       As such, the Court finds that he is not entitled to

18   a 2-level decrease in offense level pursuant to United

19   States Sentencing Guideline Section 3B1.2.

20       All right.  Those are my rulings.  I think I have

21   taken care of all of the objection.

22       Mr. Scabavea, do you wish to make any statements

23   for the record or for purposes of appeal?

24       MR. SCABAVEA:  Yes, Your Honor.  Thank you.

25       THE COURT:  You may.

1          MR. SCABAVEA:  Your Honor, I would just like to

2     make some statements regarding the 3553(a) factors of the

3     defendant.

4          THE COURT:  All right.  No, these are just

5     objections -- this is making a record as to my rulings on

6     your objections.  We will get to the 3553(a) factors

7     later.  I haven't yet reached that portion of the

8     sentencing yet.

9          MR. SCABAVEA:  I understand, Your Honor.

10          THE COURT:  So, at this point, it is what do you

11     wish to put on the record, if anything, regarding my

12     rulings for purposes of appeal?

13          MR. SCABAVEA:  For all of the enhancements, yes,

14     Your Honor, I do.  Thank you.

15          I will start off by saying we do not know -- the

16     things we do not in this case.  We don't know specifically

17     who was calling SO.  It wasn't the defendant.  We do not

18     know who received almost a million dollars and where it

19     went.  We do not know how many people were involved in

20     this scheme.  And we know that -- we do not know who was

21     the mastermind of the scheme, but it wasn't the defendant.

22          We do know there was no real evidence the defendant

23     profited in any way from the scheme.  We do know that

24     there were many individuals involved in the scheme.  And

25     we do know that the defendant is the only one charged or

1    convicted in the scheme.  All of the blame and all of the

2    loss should not just be pinned on him.

3         THE COURT:  Actually, he isn't the only one

4    charged, his co-defendant was charged and he was convicted

5    with Judge Jackson.

6         MR. SCABAVEA:  Of misprison, Your Honor?  I think

7    that is right.  So, I am corrected, there was one person

8    that was convicted of a substantially less crime.

9         Regarding loss, the 14-level increase, there was no

10   evidence that indicates the defendant even knew about the

11   lottery scheme.  There is evidence he had packages sent to

12   his and other addresses.  There is evidence that he

13   collected money and was apprehended while picking up about

14   a thousand dollars.  There was evidence that he called one

15   of the alleged co-conspirators frequently.  But where is

16   the evidence that he knew about the lottery scheme?

17        Defendant does not necessarily concede to the

18   144,234 loss mailings.  Defendant states such losses are

19   arguably attributed to him.  These losses are stated in

20   the defendant's sentencing memorandum.

21        The legal framework submitted by the Government and

22   by defendant which attributes losses to him share some

23   similarities.  Most importantly, those are defendant's

24   pooling of the resources or profits; two, knowledge of the

25   scope of the scheme and; three, foreseeability of the

1    conspirator's conduct.

2            This is where the Government's argument fails.

3    Arguably, other than the 144,234 -- and I will just refer

4    to 144,000 from here on out for simplicity -- loss

5    mailings, the defendant's conduct in the scheme does not

6    satisfy these requirements.

7            Regarding defendant's pooling of the resources or

8    profits, other than the 144,000 loss mailings, there is no

9    evidence the defendant actually received any of the other

10   money.  The Government's argument that Stacy Byfield wired

11   money to Jamaica at the behest of the defendant does not

12   prove that the money that she was sending was the proceeds

13   of the scheme.  In fact, defendant testified that he sent

14   money to Jamaica to his family and children on a regular

15   basis.

16           THE COURT:  Slow down.  Slow down.  Ms. Martinez

17   has to take it down.

18           MR. SCABAVEA:  Oh, I am sorry, I am talking too

19   fast.  I will slow down.

20           THE COURT:  Are you essentially reading your

21   objections, because those are in the record.  We don't

22   need to have them read.

23           MR. SCABAVEA:  This expounds on it a little bit

24   more, Your Honor.

25           THE COURT:  Okay.

1          MR. SCABAVEA:  It is up to the Court.  I'd defer to

2     the Court.

3          THE COURT:  You don't have to put on the record

4     something you have already submitted, I am just giving you

5     an opportunity to address my rulings and make your record.

6     But we don't need to take up time just reading what has

7     already been submitted to the Court.

8          MR. SCABAVEA:  Yes, Your Honor.

9          As far as what we disagree with, as far as the

10    Court's rulings, I am going to go ahead and go to the

11    substantial financial hardship, and that is that the Court

12    found that SO suffered substantial loss of retirement,

13    education, or other savings.  I argued before that the

14    defendant was only responsible for 144,000 of the loss,

15    which would be 14 percent, so that would not be a

16    substantial amount.

17         And, also, the Government, besides checking the box

18    that says that she is unable to obtain credit, there is no

19    arguments as to that.

20         Regarding the substantial part of the scheme

21    outside of the United States, which he received a plus 2

22    level, the entire scheme; the victims, the money, the bank

23    account, the location of the conspirators, all with the

24    possible exception of Dobson, were all in the United

25    States.  Because one single conspirator has been operating

1    out of Jamaica does not make a substantial part of the

2    scheme outside of the United States.  I should also note

3    that probation agreed with this argument.

4         Regarding the vulnerable victim, I would just like

5    to add that as in the *United States v. Lee*, as I filed,

6    973 F.2d 832, specifically at 834, that the victim's age

7    and vulnerability was not necessarily what caused the

8    scheme to work.

9         And that case says that there has to be a nexus

10   between -- there must be a nexus between the vulnerability

11   and the scheme's success.  As we noted before, the scheme

12   worked against SP, the other person in Michigan, but she

13   had none of these attributes.  She was not elderly, and

14   she also did not recently suffer the loss of a loved one,

15   but it worked on her.

16        So this kind of scheme, I argue, anybody can fall

17   for this kind of scene regardless of what those two

18   factors are.

19        THE COURT:  I don't disagree with that, but if it

20   were a prosecution for somebody who is not vulnerable,

21   this wouldn't apply.  If they are particularly vulnerable,

22   which I found she was, SO was, then this does apply.

23        MR. SCABAVEA:  Yes, Your Honor.  Just for argument,

24   any kind of person would fall for this type of scheme,

25   regardless.

1          THE COURT:  Well, not any kind, but people who are

2     easily persuaded.

3          MR. SCABAVEA:  Yes, Your Honor.

4          And also, all kinds of people would potentially

5     fall for a scheme where they thought they won the lottery,

6     irrespective of their status.

7          Regarding the minor role, I would just like to

8     point out that the Government kind of wants it both ways

9     with this.  The Government, first they argue that -- back

10    in the Government's argument for the substantial part of

11    the scheme occurring outside the United States, the

12    Government actually said, "carving Dobson out is a huge

13    exception, one that would, if credited, certainly swallow

14    the whole of the conspiracy."

15         So they are saying right there, this is a mission

16    on the part of the Government that Dobson is the most

17    culpable conspirator in the conspiracy, but then they

18    later state in their role -- in their argument against

19    minor role, that the Government submits that "this

20    defendant is equally, if not more, culpable than Dobson."

21         So the Government wants it both ways here.  On one

22    hand and they are saying that Dobson is the must culpable

23    person, and the other one they are saying, no, now

24    defendant is actually more culpable.  And so you can't

25    have it both ways.

1          And for the reasons I argued in my filings, the

2   mastermind, who is probably Dobson, is significantly more

3   culpable than the defendant.  He was the one doing all

4   of the -- he was the one doing all of the talking and

5   everything else.  And he was running -- as he was

6   convicted of, running the money.

7          THE COURT:  Right.  But he couldn't have completed

8   it if it hadn't been for Mr. Luton.  He could have talked

9   all he wanted them into doing it, but until somebody came

10   around who would pick up the money or go pick it up where

11   it was mailed and come personally to her home, he could

12   not have completed the scheme.

13          So I don't think it is inconsistent to say that,

14   yes, Dobson was the mastermind, that he was the

15   smooth-talker and that is greatly culpable, but that

16   doesn't lessen than the culpability of Mr. Luton.

17          MR. SCABAVEA:  Yes, Your Honor.  And my argument to

18   that is just that maybe he was indispensable, and he was

19   far less culpable than what he was doing.  That is why I

20   thought minor role was applicable.  Instead of maybe minus

21   4, the minus 2.  And without the 3553(a) factors, that is

22   my response to all of the objections, Your Honor.

23          THE COURT:  All right.  Thank you very much.

24          Ms. Paluch, does the Government wish to make any

25   record, or do you stand by your written submissions?

1          MS. PALUCH:  We stand by the submissions, Your

2    Honor, thank you.

3          THE COURT:  All right.  So the total offense level

4    in this case is 29, the defendant's Criminal History

5    Category is a I, that results in an advisory guideline

6    range of 87 to 108 months of imprisonment, 1 to 3 years of

7    supervised release, and a fine in the range of $30,000 to

8    $250,000.

9          As part my protocol for determining whether this

10   range is a range that is sufficient, but not greater than

11   necessary, to achieve the objectives of sentencing, I have

12   reviewed the presentence report, considered the sentencing

13   guidelines, and the factors set forth at 18 United States

14   Code Section 3553.

15         Before I get into my analysis of the facts and

16   application of the 3553(a) factors, I understand that the

17   victim, SO, and her son, MO, do wish to be heard; is that

18   correct?

19         MS. PALUCH:  It is correct, Your Honor.

20         THE COURT:  All right.  They may come forward.

21         Just state and spell your name for the record, and

22   then you may speak clearly into the microphone.

23         VICTIM S. OLSON:  My name is Sandra Olson.

24   S-A-N-D-R-A O-L-S-O-N.

25         THE COURT:  You may proceed.

```
 1          VICTIM S. OLSON:  Because of what Leonard Luton and
 2     his partner did to me, I am still having trouble trusting
 3     people.  I keep my doors locked all of the time and worry
 4     about strange cars in my neighborhood.  I am nervous when
 5     my doorbell rings.  I had to change my phone number
 6     several times.
 7          I live on a very tight budget and worry that
 8     eventually I will have to sell my home in to order to pay
 9     for the other things.  I am not able to do a lot of the
10     things I would like to do, and there are still times I
11     lose sleep over all of it.
12          I am hoping that Leonard will be given the longest
13     possible sentence.  If believe if he was remorseful, he
14     would give up more about his friend and tell where the
15     money that was stolen from me really is.  God knows what
16     he has done.  I am a Christian, and I don't hate him, but
17     I believe he should pay for what he has done to me and
18     probably many others.  I hope he will ask for the Lord's
19     forgiveness.
20          THE COURT:  Thank you, Ms. Olson.
21          VICTIM M. OLSON:  I am Mike Olson, M-I-C-H-A-E-L
22     O-L-S-O-N.
23          Your Honor, Leonard is a despicable human being to
24     prey on vulnerable people.  There is no way that my mom is
25     his only victim.  There are probably hundreds.  I am glad
```

1    he got caught.  If he had any remorse he would give up his

2    friends that were involved and tell us where he's hidden

3    my mom's money.

4         My mom and dad worked really hard for what they

5    had, and when my dad died, at least he knew that my mom's

6    finances would be taken care of.  Now, because of Leonard,

7    that is not the case.

8         She is now on a very tight budget and has to be

9    very careful how she spends her money.  She is not able to

10   do the things that she would like to.  At age 82, she

11   still mows her own grass and shovels snow because she is

12   worried she will run out of money.

13        My mom used to be extremely healthy, but because of

14   the harassment and stress Leonard put on her, she now has

15   anxiety and worries and stress-related issues.

16        Today Leonard stands before you, Your Honor, and I

17   hope you give him the strongest sentence possible.  One

18   day he will stand before God in Heaven and he will account

19   for all his crimes.

20        THE COURT:  Thank you, sir.

21        The defendant has filed Document No. 143, his

22   sentencing statement and motion for a below-guideline

23   sentence of 24 months or time-served.  He argues that he

24   is a hard worker who works a number of jobs to support his

25   children and family who reside in Jamaica.

1        He also indicates that this conviction will cause

2   him to lose his permanent residency and that he will

3   deported to Jamaica, where his life will be in danger.

4        In Document No. 145, the Government argues that

5   none of these arguments support a variant sentence.   The

6   Government is correct that "the defendant's legal status

7   in this country, that was a critical component to

8   achieving one of the fraud's end goals; the illegal

9   exportation of a portion of SO's funds to Dobson in

10  Jamaica."

11       The evidence at trial proved beyond a reasonable

12  doubt that between February 2018 and January 2019, the

13  defendant and his co-defendant, Dobson, participated in a

14  fraudulent lottery scheme which resulted in the loss of

15  almost $1 million to SO, who was an elderly woman who had

16  just experienced the trauma of the death of her husband.

17       Mr. Luton's co-defendant, Mr. Dobson, was the

18  smooth-talking part of the duo who called SO numerous

19  times and convinced her that she had won a large lottery

20  and a vehicle.   Via these phone calls, sometimes more than

21  one per day, Mr. Dobson groomed SO and persuaded her to

22  mail, cash cashier's checks, and cellphones to pay the

23  "fees" required to receive her prizes.

24       These payments were mailed to the defendant Luton's

25  mailing address in New York, as well as to the addresses

1    of his friends and acquaintances, and the money was

2    ultimately deposited into bank accounts held in

3    Mr. Luton's name.

4         Mr. Luton traveled from New York to Colorado on two

5    occasions; in October of 2018 and January of 2019, to

6    obtain money from SO.

7         On January 22, 2019, the defendant Luton and his

8    girlfriend arrived at SO's home with the intent of

9    obtaining $39,000 in cash from her, and they were arrested

10   at her home.

11        It is evident from SO's testimony at trial and from

12   her victim impact statement, as well as that of her son,

13   that this crime has had a devastating financial, physical,

14   and emotional toll on SO.

15        Mr. Luton was granted the privilege of legal

16   residency in the United States.  This is a dream that

17   numerous people seek.  Instead of pursuing the American

18   dream through legal means, however, Mr. Luton used his

19   legal status to perpetrate this fraud against a very

20   vulnerable woman for purposes of financially benefitting

21   himself and his co-conspirator friend back in Jamaica.

22        Mr. Luton's involvement was not a one-time

23   incident.  For almost a year, Mr. Luton was involved in

24   picking up numerous packages of cash, cashier's checks,

25   and cellphones mailed by SO.  He twice traveled cross

1    country from New York to Colorado.  He deposited checks

2    into his bank account, and he directed money to be sent to

3    his co-defendant in Jamaica, Mr. Dobson.

4         The Court has really seen no acceptance of

5    responsibility or any expression of remorse for the harm

6    that Mr. Luton has caused to SO.  Instead, Mr. Luton has

7    repeatedly lied to everyone; the agents during his

8    post-arrest interview, this Court, and to the jury from

9    the witness stand, under oath.  In his sentencing

10   statement he has totally minimized his conduct and the

11   harm he caused SO.

12        Based on my review of this case and after

13   consideration of the 3553(a) factors, I am inclined to

14   deny the defendant's motion for a variant sentence.  I,

15   frankly, do not see any basis for any variance, and I am

16   inclined to impose a sentence at the top of the advisory

17   guideline range of 108 months imprisonment on each count,

18   to run concurrently; 3 years of supervised release;

19   restitution, but no fine.

20        With that being said, Mr. Scabavea, I will hear

21   from you, then I will hear from Ms. Paluch, and then

22   finally I will hear Mr. Luton if he wishes to make a

23   statement to me on his own behalf.

24        You may proceed.

25        MR. SCABAVEA:  Thank you, Your Honor.  I just want

1    to address the 3553(a) factors a little bit more.

2              First, regarding the history and characteristics of

3    the defendant, this defendant, Mr. Luton, has never been

4    convicted of a crime in his entire life.  As you have

5    stated, as the has Court stated, he legally immigrated to

6    the United States and obtained permanent residence on his

7    own, which is a feat that very few people do by themselves

8    because of the complicated process.

9              He is known in his community in New York as a

10   helpful and caring person.  He had a lot of people look up

11   to him in his community, and he is well liked.

12             In his time during his incarceration, he has

13   completed many classes and has sought to help out as much

14   as he can, especially during the pandemic.  He volunteered

15   to be an orderly, which was, quite frankly, dangerous

16   during the pandemic, and so he placed others in that

17   confinement situation before himself.

18             He currently lives now in a situation where he is

19   only allowed to be free from his cell or pod area for only

20   2 hours a day.  For the past 31 months, he has been housed

21   at FDC Englewood with cartel members and violent

22   offenders.  His safety has always been in peril.

23             At the conclusion of his confinement, as I stated

24   in my papers, the defendant's nightmare will only have

25   just begun, as he will be taken to GEO, which is

1    immigration jail, he will lose his permanent residence and

2    be deported to Jamaica, where his life will be in peril,

3    as the Court has seen from the various statements.

4         This is just one of the main collateral

5    consequences that are unique to the defendant's situation.

6    Being deported from the United States, the defendant will

7    not be able to take care of his elderly mother, who is in

8    poor physical health, who he has supported for many, many

9    years.  He will lose association with his brothers in the

10   United States, including Andrei, who appeared as a witness

11   during this trial, and he will make far less money living

12   in Jamaica to support his family.

13        Therefore, we respectfully request a lower sentence

14   or a somewhat mitigating sentence under the 3553(a)

15   factors.  Thank you, Your Honor.

16        THE COURT:  Thank you.

17        Ms. Paluch?

18        MS. PALUCH:  Briefly, Your Honor.  Much of what I

19   was going to say you've already addressed in your

20   comments, so I won't go back over those.

21        A couple, just in response to defense counsel's

22   argument about the defendant never having been convicted

23   of a crime, two responses to that.  One is that is taking

24   into account by the guidelines by placing him in Criminal

25   History Category I.

1        And the second argument is it is not uncommon in

2    economic crimes for you to have defendants before you who

3    have never been convicted.   Dan Rudden and Karen McClaflin

4    are two individuals who come to mind.

5        As to the defendant, all indications that he is a

6    helpful and carrying individual, has a lot of friends, a

7    lot of people that love him and care for him.   I have no

8    doubt that he is very devoted to his family.   Had he been

9    as devoted, though, he would not have jeopardized those

10   relationships and his children by choosing to engage in

11   this crime over and over again.

12       And then just one last point I was going to make,

13   that I wanted to make, as the Court is well aware, this

14   conviction was February of 2020.   This sentence hearing

15   has been set over and over again.   And every time we got

16   close to sentencing, Mr. Morgan and I would meet again to

17   go over every entry and to go over, and you can see the

18   amount of time that he has spent on these charts.

19       And we had to do that to refresh our recollection

20   of which ones did we include, which ones do we not have

21   the support for.   But, but Ms. Olson and her family, they

22   didn't have to refresh their recollection, and that is

23   because they deal with the harm from this offense every

24   single day.

25       Every day, when they have to make financial

1    decisions, they are thinking of this defendant and Dobson

2    and what they did.  Every time the phone rings, every time

3    that doorbell rings, Ms. Olson is thinking about this

4    case.  And I think that is what we have to keep at the

5    forefront; this is a financial crime, where we had direct

6    harm to a woman.

7          The thought of her walking down her driveway to

8    look into that car in the middle of the night, it gives me

9    chills as I stand here.  How frightening for her, how

10   scary.  And the facts of this case are just egregious.

11         And, as the Court took all of that time to go

12   through all of the enhancements here, those enhancements

13   are there because of the nature of this offense.  And

14   that's why the Government submits that a sentence of 108

15   months of imprisonment is the appropriate one in this

16   case.  Thank you.

17         THE COURT:  Thank you.

18         Mr. Scabavea, Mr. Luton, would you please take the

19   podium.

20         Mr. Luton, do you wish to make a statement to me on

21   your own behalf before I impose sentence?

22         THE DEFENDANT:  Good afternoon.  Yes, Your Honor.

23         THE COURT:  Have you been vaccinated?  Sir, have

24   you been vaccinated?

25         THE DEFENDANT:  No, I haven't.

```
1              THE COURT:  You have to leave your mask on, then.
2              THE DEFENDANT:  Sorry.
3              THE COURT:  But speak as clearly as you can.
4              THE DEFENDANT:  I didn't hear you.
5              THE COURT:  Just speak as clearly as you can
6       through the mask.
7              THE DEFENDANT:  Yes, Your Honor.
8              Good afternoon to everyone here today.  Good
9       afternoon, and thank you all for being here.  Good
10      afternoon.
11             I came here today somewhat prepared with several
12      written plans on various topics and issues that I faced
13      through my trial and my incarceration to express to the
14      Court today, but that is really just telling you about
15      things you already know about me.  So, in reality, I
16      should be telling you about the one thing that you don't
17      really know, and that is me.
18             This part of the narrative is not an arrogant
19      description but just the truth about me.  I am not the
20      villain of character conceded by my conviction.  My name
21      is Leonard Luton.  I am an extremely proud father to three
22      beautiful kids and also a son to a wonderful mother and
23      father, plus a brother to eight siblings who I love
24      dearly.
25             My life can be summed up as work ethics, father,
```

1    son, brother, friend.  Just really, my character in

2    general has never been taken into consideration by the

3    courts as the ones who knew me, whether that be for a

4    moment, a short moment or an elongated period, would tell

5    you at the drop of a dime that I am nothing remotely close

6    to the person represented by these convictions.

7            I grew up extremely rough, I'm poor, not given the

8    basic necessities, as I was conceived out of wedlock, and

9    grew up for a short period of time with my mom, who soon

10   left me with my younger brother to seek a better life for

11   herself and my younger brother, but that only made me more

12   rounded and resilient, at age 7, I should say.

13           My nature as a person is to always fall back most

14   of the time.  I'd probably be like the most quiet person

15   in the room.  But should I need to say something to

16   express it, I definitely will.  I'm like a fallacious

17   person neither by saying, you know, I am this or I am

18   that, but because of my humility, until people get to know

19   me, that is what they derive from me.

20           My personality is like someone who is asleep most

21   of the time, not being lackadaisical, just not trying to

22   be the spokesperson of the room or the life of the party.

23   It is a weird dichotomy because I have the ability to be

24   any one of these personas if I wanted.

25           Since the beginning of my incarceration, as

1    Mr. Scabavea told you, I have had more than 500 hours of

2    educational classes and participated in numerous positive

3    activities, especially Bible study.  I am also part of the

4    sanitation team which kept the facility sanitized during

5    the ongoing pandemic, with the certifications, too.

6           Your Honor, before everything -- I am a man before

7    everything.  And, as a man, I'm not all perfect or

8    imperfect qualities.  I am created, so definitely I am no

9    angel.  Yet, what that means, I am not always right or I

10   am not always wrong, but it is always going to be the

11   truth.  And the truth is something you have never have to

12   protect because it is always there.

13          John Henrik Clarke said it best, that sometimes we

14   can talk about the right things in the wrong way.  As a

15   man, I am telling you today, Your Honor, that I don't

16   believe nor practice ruining anybody's life; never have,

17   never will.

18          I don't believe in being a thief; and that is

19   obviously 99 percent of my conviction.  And before I go

20   any further, too, I truly apologize for my convictions, to

21   both of you today giving up part of your time, because

22   time is the most important thing for all of us; we can

23   never get it back.  Anything else can be replenished, but

24   time cannot be replenished.

25          Like, so, then I ask myself, you know, how can I

1   stand here, you know, just being more remorseful and

2   empathetic about the situation, when the last 2-and-a-half

3   years, Your Honor, like, my mom has been in the hospital

4   for more than 6 months.  My father has been in the

5   hospital for more than 7 months.  My little son has a

6   heart problem, he has been in the hospital for, like, 4

7   months, Your Honor.

8           All right.  So I ask myself, you know, how can I

9   have these feelings separately, knowing that my entire

10  world also is tearing apart by this whole -- my

11  convictions.  I get letters from my kids' moms while I am

12  in jail saying my kids are hungry and they need clothes

13  and food and stuff like that, Your Honor, but I am going

14  to go past that.  Sorry about that.

15          They say I'm being convicted of a financial crime

16  with gains totalling nearly a million dollars, Your Honor,

17  and neither me nor no associate of mine have any physical

18  aspect to say, okay, this is an attribute of you

19  participating in some financial crime, Your Honor, of that

20  great magnitude, right.

21          And the factual nexus in the gain, like, what of

22  any one of us gain?  The amount of cash that this case is

23  saying, I could have easily fixed any one of my kids or my

24  family.  I could have taken, like, all my kids out of the

25  ghetto, I could have taken my mom out of the hospital with

1    all this.

2        Your Honor, I have a 2005 Honda Civic used car that

3    I bought.  My very first vehicle I ever bought as a man

4    for $2,500.  My very first vehicle I ever bought as a man.

5    That is me being a 45-year-old man, Your Honor.

6        I have never in my life indulged in robbing

7    somebody or creating a scheme to defraud people.  I don't

8    do that, Your Honor, and anybody who knows me would

9    testify and swear on their life that I don't do stuff like

10   that, Your Honor.  I am not no villain.  I am not no

11   criminal.  I have never been to jail in my life, Your

12   Honor, never.

13       But, I am sorry.  So, I ask myself, how can I be

14   here feeling these mixed feelings to express myself, but

15   the truth is that I have to be remorseful and empathetic,

16   Your Honor, because that is how I was taught, that is how

17   I grew.  I believe in loving every person.  Every person.

18   Doesn't matter, I love every person.  Anybody who knows me

19   said I show love for every single person.  I am the most

20   kindest person.  I will take the shoes off my feet and

21   give it to anybody, because that is how I grew up.

22       There is nothing in this entire ordeal that ever

23   portrayed who I really am or the type of person I am.

24   Most of this only says what the black and white have put

25   together to create, Your Honor.

1            All right.  I am almost finished, Your Honor.  This

2       part of my conviction, the true nature of my intentions

3       has never been to cause harm or grief to anyone at no

4       point in time.  So how could I share or express my true

5       intentions, would it be overshadowed by all of these

6       misguided inferences already placed in the minds of

7       everyone here today.

8            A series of events and motions, whether them being

9       stereotypical or misconstrued actions and not the real

10      things.  So I say to myself, just keep telling the truth

11      as you know it, but my truth only comes to be true truths

12      when it hurts me, Your Honor.  But my truth is to be a

13      liability to account for the lies.  So I have no idea how

14      me saying this about my truth sits with Your Honor, but I

15      sincerely hope that everyone understands that I have no

16      ill feelings or intentions to the family or families

17      affected ever, ever.

18           I would never do something like that, Your Honor.

19      I love them just as I love everybody here today, Your

20      Honor.  That is the type of person I am.

21           So, I know I am not leaving here anytime soon, so I

22      am asking each person, as they leave here today, not

23      because of what happened here, but when you leave here

24      today, perform one random act of love and generosity to a

25      perfect stranger, even if that person doesn't really care

for them, one's friend, maybe, or whoever, just tell them
that you forgive them for whatever it may be and that you
love them no matter what the circumstances.

Hate is a wasted emotion.  Hate is a very wasted
emotion.  Always remember that.  We are all God's
children.  So I implore you to make a positive difference,
because life is short.  Let go of hate.  Make
life-changing positive memories.  Remember, age changes
everybody, everybody, not just me, everybody.

So let history and God remember us all for being
true advocates of love, peace, and forgiveness.  And what
we love is so easily taken away by forces beyond our
control.  So let's cherish what we have before God.  Love
who you all, and may God bless you all today and keep you
safe.  I'm extremely sad.  I'm extremely sad.  Thank you.

THE COURT:  All right.  You may remain standing,
sir.  Remain standing at the podium.

THE DEFENDANT:  I'm sorry.

THE COURT:  As a result of the United States
Supreme Court's rulings in *United States v. Booker* and
*United States v. Fanfan*, the United States Sentencing
Commission Guidelines have become advisory to this Court.
Although this Court is not bound to apply those
guidelines, it has consulted them and taken them into
account along with the sentencing factors set forth at 18

1    United States Code Section 3553(a).

2        The Court makes the following findings concerning

3    the objections to the presentence report:  First, the loss

4    amount is more than $550,000 but less than $1.5 million,

5    therefore, an increase of 14 levels in the offense level

6    pursuant to United States Sentencing Guideline Section

7    2B1.1(b)(1)(H) was appropriately assessed.

8        Two, the 2-level increase in offense level under

9    United States Sentencing Guideline Section 3C1.1, for

10   obstruction of justice, was appropriately assessed.

11       Three, the 2-level increase in offense level under

12   United States Sentencing Guideline Section

13   2B1.1(b)(2)(A)(iii), for causing a substantial financial

14   hardship to the victim, SO, was appropriately assessed.

15       Four, the 2-level increase in offense level

16   pursuant to United States Sentencing Guideline Section

17   2B1.1(b)(10)(B), related to a substantial part of the

18   scheme being committed outside the United States, was

19   appropriately applied.

20       Five, the 2-level increase in offense level

21   pursuant to United States Sentencing Guideline Section

22   3A1.1(b)(1), for targeting a vulnerable victim, was

23   appropriately assessed.

24       Six, the defendant is not entitled to a 2-level

25   decrease in offense level pursuant to United States

1   Sentencing Guideline Section 3B1.2 because he failed to

2   meet his burden of proving by a preponderance of the

3   evidence that he was substantially less culpable than the

4   average participant.

5        The Court determines that no finding is necessary

6   concerning any remaining objections to the presentence

7   report because the controverted matters were not taken

8   into account in calculating the sentence nor will they

9   affect the sentence that this Court imposes.

10        Neither the Government nor the defendant has

11   challenged any other aspect of the presentence report,

12   therefore, the remaining factual statements and guideline

13   applications are adopted without objection as the Court's

14   finding of facts concerning sentencing.

15        The Court finds that the total offense level is 29.

16   The defendant's Criminal History Category is a I.  That

17   results in an advisory imprisonment range of 87 to 108

18   months and a fine range of $30,000 to $250,000.  The

19   supervised release range is 1 to 3 years.

20        For the reasons previously stated by the Court, the

21   Court finds that when the history and characteristics of

22   the defendant, as well as the nature and circumstances of

23   this offense are juxtaposed with the goals of sentencing,

24   pursuant to 18 United States Code Section 3553(a), a

25   variant sentence is not warranted in this case.

1    Therefore, the Court denies the defendant's motion for a

2    non-guideline sentence.

3           The Court finds no reason to depart or vary from

4    the guideline range, which does not exceed 24 months, and

5    will impose a sentence within that range.

6           Pursuant to the Sentencing Reform Act of 1984, it

7    is the Judgment of the Court that the defendant, Leonard

8    Luton, also known as Leonard L. Luton, is hereby committed

9    to the custody of the Bureau of Prisons to be imprisoned

10   for a term of 108 months on each of Counts 1 through 3 and

11   5 through 10, all such terms to run concurrently.

12          Upon release from imprisonment, he shall be placed

13   on supervised release for a terms of 3 years on each of

14   Counts 1 through 3 and 5 through 10, all such terms to run

15   concurrently.

16          Within 72 hours of release from the custody of the

17   Bureau of Prisons, he shall report in person to the

18   probation office in the district to which he is released.

19          While on supervised release he shall not commit

20   another federal, state, or local crime; he shall not

21   possess a firearm, as defined in 18 United States Code

22   Section 921; and shall comply with the standard conditions

23   that have been adopted by this Court.

24          He shall not unlawful possess a controlled

25   substance.  He shall refrain from any unlawful use of a

1   controlled substance.  The Court waives the mandatory drug

2   testing provisions of 18 United States Code Sections

3   3553(a)(5) or 3583(d) because the presentence report

4   indicates a low risk of future substance abuse by this

5   defendant.

6          He shall cooperate in the collection of DNA as

7   directed by the probation officer.  The Court finds the

8   following special conditions of supervision are reasonably

9   related to the factors set forth at 18 United States Code

10  Sections 3553(a) and 3583(d).

11         Further, based on the nature and circumstances of

12  this offense and the history and characteristics of this

13  particular defendant, these conditions do not constitute a

14  greater deprivation of liberty than reasonably necessary

15  to accomplish the goals of sentencing.

16         The defendant shall make restitution in the total

17  amount of 881 -- I am sorry, I just can't read numbers

18  today.  $881,447.41 to Victim SO and $3,500 to Victim SP.

19  $4,750 of the restitution amount due to SO is ordered

20  jointly and severally with defendant Stacy Byfield,

21  defendant in Case No. 19-cr-00207-RBJ.

22         Restitution is ordered to be directed to the

23  addresses provided to the Clerk of the Court by the

24  probation officer.  The Court has determined that the

25  defendant does not have the ability to pay interest, and

1   it is ordered that the interest requirement is waived for

2   the restitution.

3           Disbursement of restitution payments shall be made

4   on a pro rata basis to the victims.  Any disbursements

5   returned to the Clerk of the Court as unclaimed or

6   undeliverable shall be deposited into the Court's registry

7   and disbursed to the remaining victims on a pro rata

8   basis.

9           If not deported, the defendant shall not incur new

10   credit charges, open additional lines of credit, obtain or

11   enter into any financing agreement or other financial

12   arrangement without the approval of the probation officer

13   unless he is in compliance with the periodic payment

14   obligations imposed pursuant to this Judgment and

15   sentence.

16           If not deported, as directed by the probation

17   officer, he shall apply any moneys received from income

18   tax refunds, lottery winnings, inheritances, judgments,

19   and any anticipated or unexpected financial gains to the

20   outstanding court-ordered financial obligation in this

21   case.

22           If not deported, he shall make payment on the

23   restitution obligation that remains unpaid at the

24   commencement of supervised release.  Within 60 days of

25   release from confinement he shall meet with the probation

1    officer to develop a plan for the payment of restitution.

2           He shall work with the probation officer in

3    development of a monthly budget that will be reviewed with

4    the probation officer quarterly.  He shall document all

5    income, compensation, and financial support generated or

6    received from any source and provide such information to

7    the probation officer as requested.

8           The plan of payment will be based upon the

9    defendant's income and expenses, with the restitution

10   amount to be paid in monthly installment payments of at

11   least 10 percent of his gross monthly income.  Because

12   this sentence imposes restitution, it is a condition of

13   supervision that the defendant pay in accordance with this

14   order.

15          If the defendant has an outstanding financial

16   obligation, the probation department may share any

17   financial or employment documentation relevant to the

18   defendant with the Asset Recovery Division of the United

19   States Attorney's Office to assist in the collection of

20   the obligation.  The defendant must not conduct any

21   foreign financial transactions without the advanced

22   approval of the probation officer.

23          If he is deported, he must not thereafter re-enter

24   the United States illegally.  If he re-enters the United

25   States legally, he must report to the nearest United

1    States Probation Office within 72 hours of his return.

2         He shall pay a special assessment of $900.  The

3    Court finds that he does not have the ability to pay a

4    fine, so the Court will waive the fine in this case.  It

5    is ordered that the payment of the special assessment and

6    restitution obligations are due and payable immediately.

7    Any unpaid restitution balance upon release from

8    incarceration shall be paid in the monthly installment

9    payments that this Court has already outlined.

10        With respect to forfeiture, on June 8, 2020, the

11   Court entered a preliminary order of forfeiture for a

12   personal money judgment against defendant Leonard Luton

13   pursuant to 18 United States Code Section 981(a)(1)(C), 28

14   United States Code Section 2461(c), and Federal Rule of

15   Criminal Procedure 32.2.

16        This preliminary order was for an as yet

17   undetermined amount and subject to amendment at this

18   hearing today after the Court determines the amount of

19   proceeds obtained by the defendant.

20        Criminal forfeiture is mandatory in this case

21   pursuant to 18 United States Code Section 981(a)(1)(C), as

22   incorporated by 28 United States Code Section 2461.1.  The

23   Government's burden is to establish the amount of the

24   criminal forfeiture money judgment by a preponderance of

25   the evidence, pursuant to *United States v. Bader*, 678 F.3d

1    858, Tenth Circuit, 2012.

2         The Court may rely on evidence already in the

3    record, such as evidence introduced at trial, and any

4    additional evidence or information submitted by the

5    parties and accepted by the Court as relevant and

6    reliable.  This is pursuant to Federal Rule of Criminal

7    Procedure 32.2(b)(1)(B).

8         In this case, Mr. Luton was convicted of conspiracy

9    to commit mail fraud; in other words, a mail fraud scheme.

10   The testimony of Mr. Morgan today proved by a

11   preponderance of the evidence that the proceeds Mr. Luton

12   obtained, directly or indirectly, as a result of the mail

13   fraud scheme, totaled $484,123.16.  I believe that is the

14   correct number; right?

15        MS. PALUCH:  It is, Your Honor.

16        THE COURT:  I have so many numbers floating around

17   on this one.

18        Pursuant to Rule 32.2 of the Federal Rules of

19   Criminal Procedure, a Final Order of Forfeiture in the

20   amount of $484,123.16 is hereby entered against the

21   defendant.  This sum is comprised of amounts or items that

22   were mailed to SP or to the defendant's address or to

23   addresses of his friend and to addresses where Special

24   Agent Hoyland's report placed the defendant's cellphone on

25   the date of delivery.

1          All right.  Mr. Luton, I will tell what I tell

2     everybody else, I want you to know that my task of

3     sentencing is the hardest thing I have to do.  And I take

4     it very seriously because I understand that I have your

5     life, or at least part of it, in my hands, and I want to

6     be fair to you.

7          On the other hand, I have an obligation to the

8     public and to society and to people like Ms. Olson, to

9     protect her and others from these types of crimes.  And to

10    promote respect for the laws of the United States, I need

11    to impose a just punishment, but one that will deter you

12    and others from committing similar criminal conduct.

13         Now, you were involved in this scheme for over a

14    year.  And despite your denials or your protestations, you

15    knew what you were doing.  You went to her home and took

16    $65,000 in cash.  You went to her home a second time to

17    get $39,000 in cash.

18         THE DEFENDANT:  I never received any money, Your

19    Honor.

20         THE COURT:  Well, you took it.  You went, and --

21         THE DEFENDANT:  I never took any money.

22         THE COURT:  -- Mr. Dobson coaxed you.  And you

23    didn't get the $39,000 only because the law enforcement

24    intervened.

25         THE DEFENDANT:  I didn't get no money no time at

1     all, Your Honor.

2          THE COURT:  Well, it was deposited into your bank

3     account, and it was disbursed from there.

4          THE DEFENDANT:  65,000 was never deposited in my

5     account.

6          THE COURT:  You can argue with me all you want,

7     Mr. Luton --

8          THE DEFENDANT:  No, no, I am sorry, Your Honor.

9          THE COURT:  -- but the fact of the matter is that

10    is what the facts at trial proved.

11         So I don't have much sympathy when you take

12    advantage of someone who has worked hard all their life to

13    save up for their golden years, and you take that money

14    from them.

15         I do believe in this case that a

16    top-of-the-guideline sentence of 108 months on each count,

17    to be served concurrently, and with the 3 years of

18    supervised release with the special conditions of

19    supervision, does reflect the seriousness of this offense,

20    and it is a sufficient, but not greater than necessary,

21    sentence to achieve the objectives of sentencing.

22         Now, Mr. Luton, you are advised that if you desire

23    to appeal, a Notice of Appeal must be filed with the Clerk

24    of the Court within 14 days after entry of Judgment your

25    right to appeal will be lost.  If you are not able to

1    afford an attorney for an appeal, the Court will appoint

2    one to represent you.  And, if you request, the Clerk of

3    the Court must immediately prepare and file a Notice of

4    Appeal on your behalf.

5          Is there any other business to be brought to my

6    attention?

7          MS. PALUCH:  No, Your Honor.  Thank you.

8          MR. SCABAVEA:  No, Your Honor.  Thank you.

9          THE COURT:  All right.  Thank you very much to the

10   Deputy United States Marshals for your assistance.

11         Mr. Luton, I hope I never see you in my courtroom

12   again.  I hereby remand you to the custody of the United

13   States Marshal for the District of Colorado.

14         Court will be in recess.

15         (Proceedings conclude at 3:42 p.m.)

16

17

18

19

20

21

22

23

24

25

DARLENE M. MARTINEZ, RMR, CRR
United States District Court
For the District of Colorado

# R E P O R T E R ' S   C E R T I F I C A T E

I, Darlene M. Martinez, Official Certified Shorthand Reporter for the United States District Court, District of Colorado, do hereby certify that the foregoing is a true and accurate transcript of the proceedings had as taken stenographically by me at the time and place aforementioned.

Dated this 13th day of October, 2021.

_____

s/Darlene M. Martinez

RMR, CRR