**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00098-CMA-1

UNITED STATES OF AMERICA,

Plaintiff,

v.

LEONARD LUTON,

Defendant.
_____

REPORTER'S PARTIAL TRANSCRIPT
(Jury Trial Day 2, Testimony of Special Agent K. Hoyland)
_____

Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 1:27 p.m. on the 11th
Day of February, 2020, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
MARTHA A. PALUCH and SARAH H. WEISS, U.S. Attorney's
Office, 1801 California St., Suite 1600, Denver, CO 80202

**FOR THE DEFENDANT:**
MARK EDWARD SCABAVEA, Attorney at Law, 301 Sheridan Blvd.,
Lakewood, CO 80226

**I N D E X**

**WITNESSES:**                                                    **PAGE**

**SPECIAL AGENT KEVIN HOYLAND**
DIRECT EXAMINATION BY MS. PALUCH                               3
CROSS-EXAMINATION BY MR. SCABAVEA                             32

**E X H I B I T S**

**NO.**                                                      **ADMITTED**

126-C   .........................................       14
127   .........................................       13

1                        **FEBRUARY 11, 2020**

2              (Requested proceedings.)

3              THE COURT:  Government may call its next witness.

4              MS. PALUCH:  Yes, Your Honor.

5              The Government calls FBI Special Agent Kevin

6     Hoyland.

7              COURTROOM DEPUTY:  Can I have everybody's

8     attention, please.

9                  **SPECIAL AGENT KEVIN HOYLAND**

10    having been first duly sworn, testified as follows:

11             THE WITNESS:  I do.

12             COURTROOM DEPUTY:  Please be seated, sir.

13             Please state your name, and spell your first and

14    last names for the record.

15             THE WITNESS:  My first name is Kevin, K-E-V-I-N.

16    Last name is Hoyland, H-O-Y-L-A-N-D.

17             THE COURT:  You may proceed.

18             MS. PALUCH:  Thank you, Your Honor.

19                       **DIRECT EXAMINATION**

20    **BY MS. PALUCH:**

21    Q.   Good afternoon, sir.

22    A.   Good afternoon.

23    Q.   How are you employed?

24    A.   I am a special agent with the FBI.

25    Q.   And how long have you been a special agent with the

1    FBI?

2    A.    Approximately 7-and-a-half years.

3    Q.    What is your educational background?

4    A.    I have an undergrad degree in finance; an MBA, a

5    Master's of Business Administration; and I also am a CPA.

6    Q.    Where were you employed prior to being employed by

7    the FBI as a special agent?

8    A.    I worked at Dunkin' Donuts Corporate as the U.S.

9    finance manager.

10   Q.    Do you have any expertise or specialization as a

11   special agent?

12   A.    Yes, I do.  I'm part of the FBI's Cellular Analysis

13   Survey Team or the CAST team.

14   Q.    And can you please explain -- briefly explain for the

15   jury what the CAST team is?

16   A.    Sure.  The Cast team is a unit that was created

17   approximately 10 years ago within the FBI to try and make

18   meaningful sense of call detail records or records

19   provided by the phone companies.  And we use these records

20   to go back in time and see where a person's phone was

21   relative to cell towers.

22          There is approximately 60 folks in CAST, and 15 of

23   them are like myself, which is a national asset, which

24   means that I don't have a separate caseload like a normal

25   investigator, a normal agent would, all I do is phone

1    analysis.

2    Q.   And as part of CAST, have you received specialized

3    training?

4    A.   Yes, I have.

5    Q.   And could you please explain that training?

6    A.   I have received over 400 hours of classroom-specific

7    training from the FBI, as well as other government

8    agencies and companies that operate within the cellular

9    industry.  And then most importantly, the CAST unit and

10   myself receive training from the phone companies directly

11   every single year; so Sprint, Verizon, T-Mobile, AT&T,

12   they send engineers, as well as legal folks, to our

13   conference to talk about the new updates in their

14   networks.

15         And, to my knowledge, we are the only group in the

16   country to receive training directly from the phone

17   companies, themselves.

18   Q.   How long have you specialized in call detail record

19   analysis?

20   A.   I have been a certified member of CAST since 2016.

21   Q.   And how often do you analyze call detail records?

22   A.   Every day.

23   Q.   And are you familiar with the term "historical call

24   detail analysis"?

25   A.   Yes, I am.

1    Q.    Can you explain what that is?

2    A.    Sure.  So, historical call detail record analysis

3    involves taking those call detail records, which I

4    mentioned before, and taking information from that and

5    marrying it up with a tower list, which is also provided

6    by the phone company.

7         So, to take a step back, call detail records are no

8    different than billing records you may have received in

9    the past that have been mailed to you that show who you

10   called, when you called them, what date that occurred, how

11   long the call lasted.  But then most importantly, the call

12   detail records that we see also include the cell tower

13   that your phone utilized to make that call or receive that

14   text message.

15        So when we take that unique identifier of the cell

16   tower, we can then go to the tower list from the phone

17   company, which is just as it sounds, a list of all of the

18   cell towers the company has in the U.S., and we can see

19   where that cell tower is specifically located on the

20   earth.

21        From that, we can draw general conclusions as to

22   where the cellphone was relative to the tower at that time

23   when the phone call was made.

24   Q.    Have you given training in historical cell site

25   analysis?

1    A.    Yes.  I have trained over 300 state, local, and

2    federal law enforcement officers.

3    Q.    Have you testified in court on the subject, sir?

4    A.    Yes, I have.

5    Q.    And where have you testified?

6    A.    I have testified in state court in Colorado and

7    Nebraska and Wyoming and also federal court in Wyoming.

8    Q.    Can you briefly tell the jury how a cellphone

9    communicates with a cellular network?

10   A.    Sure.  So, a phone, as we all know, is really no

11   different than a handheld walkie talkie you may have

12   played with growing up.

13        So, radio frequency from your cellphone transmits

14   to a cell tower, and that radio frequency has information

15   stored on it.  So your phone, when it is sitting in your

16   hand, is constantly scanning its environment looking for

17   the cell towers in the area that would provide it the

18   cleanest and clearest signal.

19        So when you hit "send" on your phone, the phone

20   reaches out to that tower that is identified as the

21   cleanest and clearest and says, hey, tower, I have a phone

22   call I would like to make.  The tower says okay and

23   provides it resources.

24        That phone call or the radio frequency that leaves

25   your phone, goes into the cell tower, and then your call

1    transits to a cellular network until it finds the party

2    you are trying to talk to.  The cell tower on that end

3    pushes down that information via radio frequency to the

4    person you are calling, and then you guys can talk back

5    and forth.

6    Q.   This may be obvious to everyone, but so the record is

7    clear, could you briefly explain what a cell tower,

8    itself, is?

9    A.   Sure.  So a cell tower, itself, is as many of you

10   have seen, the big giant metal structures that have

11   antennas on the sides of them.  That is what receives the

12   signal from your phone and pushes information back down to

13   your phone.  There is a variety of different types of cell

14   towers.  Those big ones are the most obvious, but there

15   can be smaller ones that are more obscured.

16        But those devices are, again, what your phone needs

17   to connect to to pass a call through or receive a text

18   message.  And an important point to note is that your

19   phone is only going to see cell towers for your carrier.

20   So, if you have a Verizon phone and you are standing right

21   next to an AT&T tower, your phone won't see that tower, it

22   is only going to be looking for a Verizon tower.

23   Q.   When a person makes a call, what determines which

24   cellphone tower the phone uses, other than the subscriber?

25   A.   So, it is the cleanest and clearest tower.  So, most

1   commonly that is going to be the tower closest to the
2   phone.  But an analogy I like to use is if you are
3   standing in an office building and you are standing at a
4   window, and looking out that window there is a cell tower
5   one mile away and you have no obstruction between you and
6   the cell tower, you can see it just fine, but on the other
7   side of your office building, say a half mile away, there
8   is another cell tower that your phone could use, but the
9   radio frequency needs to go through the cement and steel
10  and office furniture and everything else to make it to
11  that cell tower that is only half mile away, it would
12  likely see the tower that is a mile away because it
13  provides a cleaner and clearer signal.
14  Q.   What records did the cellphone company keep based on
15  the activity you just described?
16  A.   So, they keep those call detail records for billing
17  purposes as well as network optimization reasons.
18  Q.   Did you complete a historical cell site analysis for
19  this case?
20  A.   Yes, I did.
21  Q.   And were you asked to review cellphone records for a
22  particular cell number?
23  A.   Yes, I was.
24  Q.   Do you recall that cell number?
25  A.   It was (347) 633-8544.

1   Q.   And whose number is that?

2   A.   That phone number was provided to me by Mr. Luton

3   during a post-arrest interview as his phone number.

4   Q.   All right.  Did you obtain the subscriber records for

5   that phone number?

6   A.   Yes, I did.

7   Q.   And in whose name was the phone registered?

8   A.   That phone was registered to a Lauren B. Malone at

9   1307 Pacific Street, Apartment 6D, in Brooklyn, New York.

10  Q.   And did your investigation reveal who Ms. Malone is?

11  A.   She is Mr. Luton's mother.

12  Q.   And the address that you listed, did your

13  investigation reveal whose that was?

14  A.   Yes.  That was provided by Mr. Luton as an address

15  where he received email.

16  Q.   Okay.  Now, let's back up to your special agent hat

17  here.  When we are talking about the arrest of this

18  defendant, was the investigation in this case what you

19  would characterize as a proactive investigation or a

20  reactive?

21  A.   It was reactive.

22  Q.   And can you explain for the jury why it was a

23  reactive investigation?

24  A.   When I was brought into it, the crime had already

25  occurred.  There had already been an investigation

1    initiated by the Estes Park Police Department.  And so I

2    was brought in afterwards to assist with that and then

3    subsequently look at the phone records, which by nature

4    are historical.

5    Q.   So, prior to the arrest of this defendant, would you

6    or anyone else working on this case have had any reason to

7    have this defendant under surveillance?

8    A.   No.

9    Q.   Okay.  All right.  Now, as part of your work in this

10   case, did you examine a Cellebrite extraction that was

11   performed on the defendant's phone?

12   A.   Yes, I did.

13   Q.   And have you reviewed Cellebrites on other phones in

14   the past?

15   A.   Yes, I have.

16   Q.   And can you characterize the size of the extraction

17   of this defendant's phone as compared to other extractions

18   you have reviewed?

19   A.   It was an extremely large one.  There was

20   approximately 90 gigabytes in there.  There was over

21   100,000 different images saved.  So it was quite large.

22   Q.   And what type of evidence was contained in addition

23   to the images?

24   A.   Text message content.  Phone logs.  Photos taken.

25   Videos taken.  Audio clips.  All different types of media.

1    Q.   And did you rely on that media in performing your

2    analysis?

3    A.   Yes, in part.

4    Q.   In the course of your work in this case, did you

5    become familiar with phone numbers associated with a

6    person named Rajay Dobson?

7    A.   Yes, I did.

8    Q.   Approximately how many numbers?

9    A.   There were four numbers.

10   Q.   And in looking at the extraction report of the

11   defendant's phone, did you come across text messages

12   between the defendant's phone and those numbers that were

13   associated with Dobson during the time of this scheme?

14   A.   I did.

15   Q.   And can you approximate how many text messages you

16   saw between the two men?

17   A.   From a period of February 2018 through January 2019,

18   across all four numbers, so the total, there was just

19   under a thousand text messages sent between the two, which

20   works out to about two-and-a-half messages a day.

21   Q.   What other records did you review in conducting your

22   analysis?

23   A.   Aside from the aforementioned Cellebrite and the call

24   detail records, there was the tower list; so anywhere the

25   towers were, information provided to me by the other

1    investigators working the investigation, and then just

2    locations of interest to the investigation.

3    Q.   Did you receive any records from T-Mobile?

4    A.   I did.

5    Q.   Can you please look at Government's Exhibit 127.

6          MS. PALUCH:   This is a stipulated exhibit, Your

7    Honor.   I would move for its admission and publication at

8    this time.   Actually I don't need to publish that.

9          THE COURT:   Exhibit 127?

10         MS. PALUCH:   127.

11         THE COURT:   All right.   127 is stipulated, it is

12   admitted.

13         (Exhibit No. 127 is admitted.)

14         MS. PALUCH:   Thank you.   You can take that down.

15   Q.   (BY MS. PALUCH)   Did you prepare a report in this

16   case?

17   A.   Yes, I did.

18   Q.   And could please look at Government's Exhibit 126.

19         MS. PALUCH:   Your Honor, this is also stipulated.

20   I move to admit and to publish.

21         Actually, if I can back up.   We agreed on a

22   composite.   So, at this point, I am just going to have the

23   witness identify 126, and I will move into evidence the

24   composite.   I apologize.

25         THE COURT:   All right.   I don't have a stipulation

1      -- is the composite 126-C?

2              MS. PALUCH:  It is, Your Honor.

3              THE COURT:  I don't have that as stipulated.

4              MS. PALUCH:  That is not listed.  I think we had

5      submitted that exhibit list before, but we have conferred

6      with Mr. Scabavea about the composite.

7              THE COURT:  Mr. Scabavea, do you have any objection

8      to 126-C being admitted?

9              MR. SCABAVEA:  No objection, Your Honor.

10             THE COURT:  126-C is admitted.

11             (Exhibit No. 126-C is admitted.)

12     Q.   (BY MS. PALUCH)  So, first, sir, if you can back up

13     and look in your book in front of you for 126.

14     A.   126, with no letters?

15     Q.   Yes.  We are going to go with 126 to start.  I just

16     need to you take a look at that and identify it, if you

17     can.

18     A.   That looks like my report.

19     Q.   Is that your original report?

20     A.   Yes.  All of the pages appear to be there.

21     Q.   As part of your report creation process, is your

22     report reviewed?

23     A.   Yes.  All CAST reports, as part of our process, are

24     peer reviewed.  So that involves me sending the call

25     detail records, the tower lists, and appropriate

1    information related to the investigation, to another CAST

2    asset like myself to recreate the analysis and see if

3    their conclusions and my conclusions are in sync, and that

4    was completed here.

5    Q.   And that was a successful peer review?

6    A.   Yes, it was.

7    Q.   Was a composite of your report prepared, which

8    included only the slides we will be addressing today?

9    A.   Yes, it was.

10   Q.   All right.  If you can please look at Government's

11   Exhibit 126-C and identify that exhibit for the record.

12        MS. PALUCH:  Your Honor, is this being published?

13        THE COURT:  This is the composite, yes.

14   Q.   (BY MS. PALUCH)  Generally, what does the composite

15   report show?

16   A.   The composite -- and just in general, CAST reports

17   show the general location of a device historically in

18   time; so what towers that phone utilized at particular

19   points in time, and then general conclusions that we can

20   draw as to where that phone had to have been at that time

21   to use those particular cell towers.

22   Q.   And, sir, were you asked to focus on the location of

23   the defendant's phone during key events in this case?

24   A.   I was.

25   Q.   And to be clear, your report addresses the location

1   of the phone, itself, and not of the defendant; is that

2   correct?

3   A.   Yes.  And that is an important distinction.  So, the

4   T-Mobile -- in this case, the T-Mobile call detail records

5   don't tell me or anyone who physically had the phone when

6   those phone calls were made or those text messages were

7   sent.  So, all I am able to say is that the device,

8   itself, was in these general areas at the times in

9   question that we will see on subsequent slides.

10  Q.   Okay.  If we can please turn to the next slide.

11  Could you please explain this diagram to the jury.

12  A.   Are we done with this one?

13  Q.   Yes.  Do you see it on the screen in front of you?

14  A.   Yes.

15  Q.   Okay.  So, this is a way to help describe how a cell

16  tower is broken up into different sectors.  So when you

17  see a cell tower, most commonly that tower itself has

18  three distinct sectors.  As you see on this exhibit, the

19  sector at the top, with the arrow pointing to zero

20  degrees, would be one sector.  Then another sector would

21  be pointing at 120, and the last being pointed at 240.

22       So what we see in the call detail records is not

23  only the cell tower the phone utilized, but also the

24  sector of that particular tower, which helps us narrow

25  down if it is on the north side of the tower, east side,

1    south side, so have you.

2         In this case, zero, 120, and 240, those are listed

3    as the orientation or the azimuth of each sector.  And

4    that information is also provided in a tower list.  So,

5    for every single tower we know how many sectors there are

6    and which directions they point in.

7    Q.   If you can please turn to the next slide.  And can

8    you describe for the jury what we are seeing here?

9    A.   This is just a brief slide to familiarize yourself

10   with a particular icon that you will see over and over

11   again on my subsequent slides.  So, the icon at the top

12   just indicates the particular tower that these cellphones

13   utilized on that cell tower.

14        So, as you see with those red arrows, the radio

15   frequency is emanating outward from that particular

16   sector.  And what I want to also highlight is the yellow

17   highlight in that sector is not actually the coverage area

18   of that particular sector, it is just a demonstrative to

19   help understand the direction that sector faces.

20   Q.   And go to the next slide, please.  Okay.  There is a

21   lot on this slide.  Generally, can you explain, first of

22   all, what is this an example of?

23   A.   So, this is an example of a T-Mobile call detail

24   record.

25        MS. PALUCH:  Okay.  And if you blow up the box,

1    please.

2    Q.    (BY MS. PALUCH)   I want to ask you about a couple of

3    the columns we are seeing here.   Do you see the column

4    labelled IMSI?

5    A.    Yes.

6    Q.    Would you please explain for the jury what that

7    refers to?

8    A.    So, the IMSI or IMSI is a unique identifier burned

9    onto a sim card, and that corresponds to a user's phone

10   number.   So, it is specific -- if you took a sim card out

11   and put it in another device, your IMSI would stay the

12   same.

13   Q.    Okay.   And could you please describe for the jury

14   what IMEI is?

15   A.    IMEI stand for International Mobile Equipment

16   Identifier.   And that is just a serial number of a mobile

17   device.   So, every phone that you have has a unique IMEI

18   that is recorded.

19   Q.    So that the jurors are familiar with the call detail

20   records, could you briefly describe what they are seeing

21   here, what is captured?

22   A.    Sure.   The format, no doubt, differs from a billing

23   statement, but the information, as I mentioned before, is

24   mostly contained on here.   So, who called who, when that

25   occurred, what date, the phone numbers being utilized, the

1   direction and type of call, if it is a text message or

2   phone call.

3          And then most importantly, towards the right we see

4   first LTE site ID, first LTE sector ID, and those columns

5   represent the cell tower identifier and the cell tower

6   sector that that phone utilized for those calls or text

7   messages.

8   Q.   Okay.  Go to the next slide.  Okay.  Can you explain

9   to the jury what you depicted in this slide.

10  A.   On this slide, it is activity from Mr. Luton's phone

11  on October 2, 2018.  And if you see in the top right,

12  there is a green icon representing the sector of that

13  particular T-Mobile cell tower that his phone utilized at

14  7:03 p.m. local time.

15         Additionally, in the center of the slide, I have a

16  screen shot from a movie recovered from Mr. Luton's phone

17  via Cellebrite.  So that movie shows the Lincoln Airport

18  exit along I-80, near Lincoln, Nebraska.  That video was

19  taken at 7:12 p.m. local time, or approximately 9 minutes

20  later.

21         As you see, there are two arrows coming off that

22  screen shot, which point to the approximate location on

23  the interstate where that sign is located.

24  Q.   And to be clear, were you asked to track the

25  defendant's cellphone during that early October timeframe?

1    A.    No.

2    Q.    Is that what you are doing here in this screen is

3    showing the location of the phone?

4    A.    Yeah.  All this is showing us is the location of his

5    phone based off the T-Mobile records and then information

6    retrieved from his device after it was in police custody.

7    Q.    And you mentioned that you reviewed text messages

8    from the Cellebrite report; correct?

9    A.    I did.

10   Q.    Did you see any text messages on the defendant's

11   phone pertaining to travel of the defendant in early

12   October of 2018?

13   A.    Yes.  On October 1st, there was a text message on

14   Mr. Luton's phone which indicated that -- he said that he

15   was going to be going on a trip that was going to last two

16   days, and that was sent on October 1st, as I mentioned.

17   So this would fall into that window.

18   Q.    (BY MS. PALUCH)  Next slide, please.  And can you

19   state what we are seeing here.

20   A.    Sure.  Again, the green icon represents the

21   particular sector of the tower that Mr. Luton's phone

22   utilized, this time at 12:29 in the morning on October

23   3rd.  He had received a text message at that time from

24   Mr. Dobson with an address, which when we looked it up,

25   returned to this Village Inn restaurant just west of the

1    cell tower.

2          MS. PALUCH:  One second, Your Honor.

3    Q.   (BY MS. PALUCH)  If we can back up and talk about

4    this slide.  If you can please explain this to the jury.

5    A.   Sure.  So, this slide would have preceded the first

6    one we looked at, and it shows the activity of Mr. Luton's

7    cellphone from October 1, 2018, through October 3, 2018.

8    Each of the red dots on this map represent T-Mobile cell

9    towers that Mr. Luton's phone utilized during this travel.

10          As you can see from some of the notes I have put on

11   here, his phone left the Brooklyn, New York, area at

12   approximately 11:00 p.m. on October 1st, began traveling

13   westward across the U.S., and arrived in Estes Park,

14   Colorado, at approximately 1:30 a.m. on October 3rd.  And

15   I have Ms. Olson's residence listed here for reference.

16   Q.   Okay.  Now, do you see that there is a break in the

17   red icons on your chart?

18   A.   Yes.

19   Q.   And what does that indicate?

20   A.   That just indicates that his phone had no activity

21   that could be mapped, no activity with the T-Mobile

22   network which could be mapped.  So that could either be

23   that the phone was off, the phone was in a bad coverage

24   area, there was just no activity, no text messages or

25   phone calls going back and forth.

1    Q.   Did you review any text messages pertaining to cell

2    coverage?

3    A.   Yes.  Around this time, a text message sent from

4    Mr. Luton's phone indicated at one time that he was in bad

5    coverage area.

6    Q.   Now, in the course of the investigation, did you

7    become aware that Ms. Olson purchased iPhones?

8    A.   Yes, I was.

9    Q.   And do you know the approximate dates on which she

10   made those purchases?

11   A.   She purchased two in July of 2018, then two more on

12   October 19th, as well as two more on October 29th.

13   Q.   Did you learn the IMEI for the phones she purchased

14   in October?

15   A.   Yes, I did.

16   Q.   All right.  And did any of those IMEIs from the

17   phones Ms. Olson purchased match any other device at issue

18   in this case?

19   A.   Yes.  One of the IMEIs from the phones that she had

20   sent matched Mr. Luton's device that was seized from him

21   post-arrest, as well as the IMEI in the T-Mobile call

22   detail records.

23   Q.   Okay.  When did that IMEI number first show up in the

24   call detail records, the IMEI for the defendant's phone?

25   A.   For the defendant's phone, that IMEI first appeared

1    in the T-Mobile records on October 31, 2018.

2    Q.   Was there any information from the IMSI of note

3    pertaining to that date?

4    A.   Yes.  When you looked at the days prior and after

5    that, the IMSI remained the same, which indicated to me

6    that the sim card, itself, was the same as it was in a

7    previous device; that the sim card had just been taken out

8    of one device and transferred to a new one.

9    Q.   Did you, in fact, come across evidence on the

10   defendant's phone that pre-dated Ms. Olson purchase of the

11   phone?

12   A.   We did.

13   Q.   All right.  And what did that indicate to you?

14   A.   That indicated that the phone had somehow been backed

15   up with other information from previous phones, and that

16   could be accomplished from either having data saved on the

17   sim card, itself, or downloaded from an iCloud backup or

18   any sort of account backup that one may have.

19   Q.   And through the course of the investigation, did you

20   become aware that the defendant repairs cellphones?

21   A.   Yes.

22   Q.   So, based on that knowledge, would changing out a sim

23   card be something that would follow?

24   A.   I mean, it's fairly easy to do.

25   Q.   Now, if we can please go to the next slide.  And I

1    think you need to jump past a couple we have already

2    discussed.  Okay.  What are we seeing on this slide, Agent

3    Hoyland?

4    A.   So, this is, again, the morning of October 3, 2018.

5    There are two different cell towers that Mr. Luton's phone

6    utilized from 1:30 in the morning until 1:45 in the

7    morning.  There is a total of three outgoing text messages

8    and two incoming calls.  All of that activity is with a

9    phone number associated with Mr. Dobson.

10   Q.   Next slide, please.  What is represented here?

11   A.   So, here, and in all of the subsequent slides, this

12   is on this day, May 24, 2018, Mr. Luton's phone was in

13   Allentown, Pennsylvania, and it connected with the cell

14   tower shown there.  This date is of interest because

15   Ms. Olson had a package delivered to the address shown via

16   UPS, which arrived at 9:34.

17        Mr. Luton's phone first had activity at 11:50 that

18   morning on the tower -- one of the towers shown here.  Two

19   things to also note, not all of the network connections

20   around this time are shown, I am only showing the ones

21   pertinent to the location.

22        And, additionally, on all of these maps you will

23   see other little green dots on the map.  Those represent

24   T-Mobile towers in the area that were not utilized by the

25   phone; so the remaining network infrastructure in the

1    area.

2    Q.   Did your investigation reveal how far Allentown,

3    Pennsylvania, is from the defendant's Brooklyn, New York,

4    address?

5    A.   Yes.  It is approximately 100 miles, and per Google

6    Maps, would take about 2 hours to drive.

7    Q.   Okay.  Let's look at the next slide, please.  This

8    appears to be a different address in Allentown; is that

9    correct?

10   A.   Yes.  So this is the next day, May 25, 2018,

11   Mr. Luton's phone had some activity on the two towers

12   shown beginning at 7:04 in the morning.  Ms. Olson had a

13   package delivered via UPS to the Miller residence at 10:18

14   that morning.  The Miller residence was known to us as

15   Zavian Miller, one of Mr. Luton's associates.

16   Q.   Okay.  Can you please turn to the next slide.  And

17   What is shown here, Agent?

18   A.   On May 30, 2018, Mr. Luton's phone utilized this cell

19   tower shown on this screen for 18 different connections

20   that day, beginning at 8:52 in the morning.  The red icon

21   indicates the Hosang residence, which was known to

22   investigators as one of Mr. Luton's friend.  Ms. Olson had

23   a package delivered via FedEx which arrived at 10:41 that

24   morning.

25          And, again, just a reminder, not all of the

1    activity on those days are shown, I am highlighting the

2    tower that is nearest to the location.  The other green

3    dots represent T-Mobile towers which did not have activity

4    on this map.

5    Q.   Did the investigation reveal how far Ms. Hosang's

6    residence is from the defendant's residence in Brooklyn?

7    A.   As the bird flies, 12 miles.  Google Maps says it

8    takes about 45 minutes to drive.

9    Q.   Next slide, please.  Can you state what we are seeing

10   here?

11   A.   Yes.  The same thing as the last slide.  It is the

12   next day, May 31st.  Ms. Olson had a package delivered via

13   FedEx, which arrived at 10:16.  And Mr. Luton's phone had

14   activity utilizing the tower and sector facing the Hosang

15   residence at 9:44 that morning.

16   Q.   On the next slide, can you explain this slide, sir?

17   A.   On June 5, 2018, Mr. Luton's phone had 10 connections

18   through the tower and sector facing Ms. Hosang's

19   residence, and Ms. Olson had a package delivered via FedEx

20   which arrived at 10:18 that morning.

21   Q.   Okay.  Go to the next slide.  Are you seeing the same

22   thing here, Agent?

23   A.   Yes.  June 8th, exact same type of information.

24   Ms. Olson's package was delivered via UPS at 9:20 a.m.

25   that day.

1    Q.   Next slide, please.  Is this another package delivery

2    to the Hosang residence?

3    A.   It is.  That package was delivered at 10:10 a.m., and

4    this is July 10, 2018.  Mr. Luton's phone had 20

5    connections through the tower and sector facing

6    Ms. Hosang's residence that day.

7    Q.   Slide 16, please.  Again, a delivery to the Hosang

8    residence?

9    A.   Yes.  On July 28, 2018, this package was delivered

10   via UPS at 8:45 a.m.  Mr. Luton's phone had 14 connections

11   through the tower and sector facing that residence, and

12   this corresponds with Count 5.

13   Q.   And we see that on the top right, in blue?

14   A.   Correct.

15   Q.   Now, we jumped to Count 5.  Do you have slides for

16   Counts 2 through 4?

17   A.   I do not.

18   Q.   Why is that?

19   A.   Mr. Luton's phone record do not place his phone in

20   the area of where those packages were delivered in

21   Michigan.

22   Q.   And we have done shorthand there, but just to remind

23   the jury, Counts 2 through 4 pertain to mailings to whom?

24   A.   Ms. Sandra Pitcher.

25   Q.   In Michigan?

1    A.    In Michigan.

2    Q.    Let's go to the next slide, please.  Can you explain

3    this slide, sir?

4    A.    Very similar to the previous ones.  Mr. Luton's phone

5    utilized that tower and sector facing Ms. Hosang's

6    residence at the times listed, and Ms. Olson had a package

7    delivered on August 11th to Ms. Hosang's residence via

8    FedEx at 10:42 -- which was delivered at 10:42 a.m.

9    Q.    Next, slide 18, please.  Is this a similar slide?

10   A.    Yes, nearly identical to the prior one.  This would

11   be August 22nd, same fact pattern; package delivered at

12   9:59 a.m.

13   Q.    Okay.  Slide 19.  What are we seeing here?

14   A.    So this is very similar to the previous slide.  It is

15   a little higher up, so we are seeing more of the area

16   around the Hosang residence.  Mr. Luton's phone utilized

17   that particular tower sector facing the Hosang residence

18   beginning at 8:14 a.m.  Ms. Olson had a package delivered

19   via FedEx 8:34 a.m. that day.

20         And then also on that day, additional records show

21   that Mr. Luton made a $500 ATM deposit at the icon shown

22   at the top left.

23   Q.    Okay.  Slide 20, please.  Is this a similar slide to

24   what we have been seeing?

25   A.    Correct, it is.  This would be August 30th of 2018,

1    Mr. Luton's phone, with activity on that tower and sector,

2    and a package delivered by Ms. Olson and delivered by

3    FedEx sent by Ms. Olson at 10:29 a.m.

4    Q.   Slide 21, please.  This a similar slide to what we

5    have been seeing?

6    A.   It is.  On September 4th, a package sent by Ms. Olson

7    was delivered at 9:14, and Mr. Luton utilized that tower

8    and sector for eight connections beginning at 9:17 that

9    morning.

10   Q.   Slide 22.

11   A.   The following day, September 5th, a package was

12   delivered at 1:03 in the afternoon.  Mr. Luton's phone

13   utilized that tower and sector from 8:23 a.m., or had

14   activity through that tower and sector at 8:23 a.m.

15   through 1:06 p.m. that day.

16   Q.   Slide 23, please.  And here we see a reference to

17   Count 6.  Can you explain what we are seeing here?

18   A.   Yes.  On September 7, 2018, Mr. Luton's phone

19   traveled south to Toms River, New Jersey, and utilized

20   some of the cell towers shown here.  Ms. Olson had shipped

21   a package, which was delivered via FedEx, at 10:29 a.m. to

22   the Haughton residence, as shown on the icon.  This

23   corresponds to Count 6.

24   Q.   Okay.  And you said "the Haughton residence."  What

25   does the investigation reveal as to who lived at that

1    address?

2    A.   The Haughton residence, we learned, was occupied by

3    Lincoln Haughton, one of Mr. Luton's associates.

4    Q.   And how far is the Haughton residence from the

5    defendant's Brooklyn address?

6    A.   It is approximately 80 miles driving, and Google Maps

7    says it would take about 90 minutes.

8    Q.   Turn to slide 24, please.  We see a lot of activity

9    on this slide.  Could you please walk us through this.

10   A.   Sure.  This particular slide shows a handful of

11   connections through various towers that Mr. Luton's phone

12   had on September 26th, the first of which began at 8:40 in

13   the morning.  At 9:28 a.m., a package that Ms. Olson sent

14   was delivered via FedEx, which corresponds to Count 7.

15   Then, additionally on that day, banking records show that

16   Mr. Luton made a $2,000 cash deposit at the ATM.

17   Q.   All right.  Now, do we have slides for Counts 8 and

18   9?  And those are the shipping of the phone mail counts?

19   A.   We don't, because those shipments went to Mr. Luton's

20   address, as provided to us, and I would expect his phone

21   to be at his address.

22   Q.   Please turn to slide 25.  What are we seeing here?

23   A.   Another shipment by Ms. Olson, which was delivered to

24   the Haughton residence on October 12, 2018.  And, again,

25   we see Mr. Luton's phone utilizing cell towers and sectors

1    in that area facing the residence.

2    Q.   Slide 26, please.  Is this another delivery to the

3    Haughton address?

4    A.   It is very similar to the last one.  This time,

5    November 6, 2018, the package was delivered at 10:28 a.m.,

6    and Mr. Luton had activity beginning at 7:51, and

7    stretching through 9:40 a.m.

8    Q.   Slide 27, please.  Can you explain what we are seeing

9    here on the Count 10 slide?

10   A.   Yes.  This is a package Ms. Olson had shipped which

11   was delivered on November 8, 2018.  It arrived at 10:12

12   a.m. at the Byfield residence.  As indicated here,

13   Mr. Luton's phone utilized the tower and sector just due

14   north of that residence for six connections beginning at

15   10:42 a.m.  I also noted Mr. Luton's residence on the

16   bottom left for reference.

17   Q.   Next slide, please, slide 28.  And this is the final

18   slide in your report.  Can you state what we are seeing

19   here?

20   A.   Similar to the first slide of the report we saw

21   earlier, which showed travel of the device across the U.S.

22   on January 20, 2019, through January 22, 2019, Mr. Luton's

23   phone exhibited a similar pattern.  The red dots, again,

24   represent cell towers that Mr. Luton's phone utilized

25   while crisscrossing the country.

1          His phone left the Brooklyn, New York, area at

2     approximately 5:30 a.m. on January 20th, and began to use

3     the cell towers as indicated there as it traveled

4     westward, and then arrived in the Estes Park, Colorado,

5     area, where he was subsequently arrested at approximately

6     4:30 in the afternoon on January 22nd, outside Ms. Olson's

7     residence there in Estes Park.

8          MS. PALUCH:  No further questions, Your Honor.

9          THE COURT:  Mr. Scabavea?

10                    **CROSS-EXAMINATION**

11   **BY MR. SCABAVEA:**

12   Q.   Agent Hoyland, did Leonard Luton freely give you his

13   phone number?

14   A.   Did he provide me his phone number?

15   Q.   Yes, freely?

16   A.   Yes.

17   Q.   And he is an expert in cellphones, isn't he?

18          MS. PALUCH:  I didn't understand the question, Your

19   Honor.

20          MR. SCABAVEA:  I will repeat the question.

21   Q.   (BY MR. SCABAVEA)  My question is, isn't Mr. Luton an

22   expert on cellphones?

23          MS. PALUCH:  Your Honor, that assumes facts not in

24   evidence.

25          THE COURT:  Sustained.

1   Q.   (BY MR. SCABAVEA)  You did understand that he knows

2   how to change phones and sim cards; is that correct?

3   A.   He seemed to be a fairly knowledgeable.

4   Q.   He still freely gave you his cellphone?

5   A.   He didn't provide his cellphone to me.

6   Q.   He provided it to you at the interview -- not you

7   specifically, but during that interview?

8   A.   Yes, during the interview we were discussing his

9   phone.  He agreed that he wanted to see his phone and that

10   we could talk about it, so the detective that was doing

11   the interview went and got it.

12   Q.   He freely gave access to his phone?

13   A.   Yes.  We discussed that, and there was no passcode on

14   his phone.

15   Q.   He freely gave you his mother's address?

16   A.   I don't recall if he said that the address was where

17   his mother lived.  I think he did.  But he did provide

18   that address during that interview of 1307 Pacific.

19   Q.   It turned up to be his mother's address; correct?

20   A.   Yes.

21   Q.   Was Mr. Luton read his rights?

22   A.   He was.

23   Q.   Did he give up his rights?  Did he talk with you

24   without asking for a lawyer?

25   A.   Yes.  Mr. Luton signed a waiver -- a Miranda waiver

1    prior to us beginning the interview.

2    Q.   Any promises to get him to sign it?

3    A.   I don't believe there was, no.

4    Q.   You talked a little bit about cellphone positions

5    with your testimony.  About how accurate are these

6    cellphone positions by using the towers and finding out

7    where the cellphone actually is?  Is there an accuracy

8    range?

9    A.   A specific one, no, because every cell tower is a

10   little different.  What I can say from my own personal

11   experience is I find it highly accurate, and that is what

12   CAST uses to go find children who have been kidnapped, to

13   go find fugitives.  We use the skills that we talked about

14   today every single day in all different types of cases

15   successfully.

16   Q.   Is it as accurate as GPS?

17   A.   GPS would be more accurate.

18   Q.   You said you recovered about a hundred thousand

19   images saved on Leonard Luton's cellphone; is that

20   correct?

21   A.   That's correct, yes.

22   Q.   About how many of those images were text messages?

23   A.   By the nature of the media, the text messages would

24   be separated; they would be in a different field within

25   the export or the download of the phone.  The hundred

1    thousand images were a hundred thousand images, it was

2    just photos, some of which could have been duplicated no

3    doubt, but they were there.

4    Q.   Do you know how many text messages were on his phone,

5    approximately?  I'm not asking you for an exact figure.

6    A.   Thousands.  I don't know an exact number.  Yeah, I

7    don't know an exact number or even close.  I know it was

8    in the thousands.

9    Q.   So there was thousands of text messages on there, is

10   what you are saying?

11   A.   Correct.

12   Q.   Okay.  Thank you.

13   A.   That is fine.

14   Q.   And as far as -- you said images.  Do those include

15   pictures or just screen shots?

16   A.   It could be either.

17   Q.   Either.  Okay, so a combination of his pictures and

18   screen shots?

19   A.   Yes, correct.

20   Q.   Thank you.  Your investigation revealed Mr. Luton's

21   presence at the same time as these packages were arriving

22   at Ms. Hosang's address; is that correct?

23   A.   I said Mr. Luton's device was in that area.

24   Q.   So his cellphone was there around the same time at

25   Ms. Hosang's that these packages were arriving; is that

1    your testimony?

2    A.   Correct.

3    Q.   Did your investigation reveal how many times that

4    Mr. Luton actually visited Ms. Hosang?

5    A.   I do not know that information.

6    Q.   And why didn't you investigate that information?

7    A.   My role in this was to look at the phone records and

8    what the phone records told me related to dates and times

9    of interest to the investigation.  I had -- I believe the

10   T-Mobile return had over a year's worth of data.  So, I

11   didn't look at every time the phone was in that area near

12   Ms. Hosang's residence.

13   Q.   So you really don't have any idea how many times a

14   week he was there?

15   A.   I wouldn't be able to say that, because also the

16   records don't say who particularly had his phone.  All I

17   can say is where the phone was at a particular time, I

18   wouldn't know who had his phone.  So I wouldn't know how

19   many times he personally was there.

20   Q.   So you just matched phone presence to these times the

21   packages were coming only, is what I am trying to get at?

22   A.   I am sorry, do you mind repeating that?

23   Q.   Yes, no problem.

24        So what you were able to get was when these

25   packages arrived, and if he was there or not -- or if his

1    cellphone was there or not when these packages arrived.

2    Is that fair to say that is what you investigated?

3    A.    Yes.  Looking at the dates and times of when packages

4    were shipped and then subsequently delivered, I looked at

5    Mr. Luton's phone records to see if there was any

6    corresponding activity in those areas.

7    Q.    And just to be specific, then, you didn't look at

8    every time he was there during that time, just when the

9    packages arrived?

10   A.    That's correct.

11   Q.    Thank you.  And same question, really, so I do not to

12   repeat myself, but the same kind of questions with the

13   Haughton residence.  You saw there were packages arriving

14   there at the same time his cellphone was there; is that

15   correct?

16   A.    That's correct, yes.

17   Q.    And is it also true you didn't look at all of the

18   times he was there, just when he was there or his

19   cellphone was there when the packages were arriving;

20   correct?

21   A.    That's correct.

22   Q.    Do you have any idea how many road trips Mr. Luton

23   went on?

24   A.    I do not.

25   Q.    You are just aware of the two that you investigated?

1   A.   That is correct.

2         MR. SCABAVEA:  Thank you, Your Honor, nothing

3   further.

4         THE COURT:  Any redirect?

5         MS. PALUCH:  No, Your Honor.  Thank you.

6         THE COURT:  All right.  May this witness be

7   excused?

8         MS. PALUCH:  Yes, Your Honor.

9         THE COURT:  Thank you very much, sir, you are

10  excused.

11        THE WITNESS:  Thank you.

12        (Further proceedings had but not transcribed per

13  request of ordering counsel.)

14        **R E P O R T E R ' S   C E R T I F I C A T E**

15        I, Darlene M. Martinez, Official Certified

16  Shorthand Reporter for the United States District Court,

17  District of Colorado, do hereby certify that the foregoing

18  is a true and accurate transcript of the proceedings had

19  as taken stenographically by me at the time and place

20  aforementioned.

21        Dated this 28th day of October, 2021.

22

23        _____

24        s/Darlene M. Martinez

25        RMR, CRR