**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**July 15, 2022**

Christopher M. Wolpert
**Clerk of Court**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

LEONARD LUTON, a/k/a Leonard L. Luton,

      Defendant - Appellant.

No. 21-1285
(D.C. No. 1:19-CR-00098-CMA-1)
(D. Colo.)

### ORDER AND JUDGMENT[*]

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **MATHESON**, Circuit Judges.

Leonard Luton was involved in a fraudulent lottery scheme that defrauded victims of almost $1,000,000. He was charged in a superseding indictment with one count of conspiracy to commit mail fraud and nine counts of aiding and abetting mail fraud, in violation of 18 U.S.C. §§ 1341, 1349, and 2. After a jury trial in the United States District Court for the District of Colorado, Luton was convicted on all but one count and was sentenced to 108 months on each count, to run concurrently, with three years of supervised release. Luton now appeals his sentence. We AFFIRM.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I

## A.   Factual Background

Between February 2018 and January 2019, Luton's coconspirator Rajay Dobson[1] convinced an elderly woman, S.O., that she had won a $2.8 million lottery and a Mercedes Benz.  ROA, Vol. III at 50–51.  Going by the alias "Frank White," Dobson convinced S.O. that she needed to mail cash, cashier's checks, and cellphones via UPS and FedEx to pay the "fees" required to receive her prizes.  *Id.*; Supp. ROA, at 41–60.

Dobson directed S.O. to mail these payments to Luton and to other friends and associates, including a woman with the initials S.P. who lived in Grandville, Michigan.  ROA, Vol. III at 50–51; Supp. ROA, at 45–60, 65–66, 121–36.  S.P. was another victim of the lottery scheme.  S.P. also was told she had won a lottery (in her case, a prize of $5 million dollars) and that in order to receive her winnings, she needed to receive money from others and send it on.  ROA, Vol. III at 50–51.  S.P. was instructed to deposit the cashier's checks she received from S.O. and then obtain cashier's checks made payable to Luton, which were then deposited into Luton's bank account.  *Id.*; Supp. ROA, at 126, 136.  In total, S.O. sent over $150,000 to S.P. at Dobson's direction.  ROA, Vol. III at 50–51.

Dobson also directed S.O. to hand over cash in person on two separate occasions.  The first occurred on October 3, 2018, when he directed S.O. to give $65,000 in cash to

---

[1] At all relevant times, Dobson lived in Jamaica.  ROA, Vol. I at 112, 176.  Luton knew Dobson from Jamaica, and the last time Dobson was in the United States was in 2017.  *Id.* at 112; Supp. ROA, at 114.

people who came to her home in Estes Park, Colorado. *Id.* at 51; Supp. ROA, at 61, 83. At approximately 12:30 a.m., a man knocked on S.O.'s door. He identified himself as an "FBI agent," showed S.O. what appeared to be a real FBI badge, and directed her to hand over the cash. Supp. ROA, at 61–62. S.O. hesitated and told him that Dobson had instructed her to give the money to a "merchant banker" named "Mr. Wither." *Id.* The "FBI agent" walked S.O. to a car waiting in front of her house to meet "Mr. Wither," who rolled down the window to speak with her. *Id.* "Mr. Wither" instructed S.O. to give the cash to the "FBI agent," and S.O. complied. *Id.* Luton later testified that he was in the car during this hand-to-hand transaction with the "FBI agent" and "Mr. Wither," as he had been hired to "share in the driving" to Estes Park, but he had no recollection of the event because he was "fast asleep" during the entire transaction. ROA, Vol. I at 92–96.

The second cash hand-off occurred on January 22, 2019, when Dobson again directed S.O. to give approximately $39,000 in cash to people who would come to her home. ROA, Vol. III at 51; Supp. ROA, at 78–80. By this time, law enforcement agents were involved, and they had set up a covert operation to apprehend whoever showed up at S.O.'s home to pick up the money. ROA, Vol. III at 51. When Luton and his girlfriend arrived at S.O.'s home, they were both arrested. *Id.* Luton later testified that he had left his home in Brooklyn, New York, to go to S.O.'s home in Estes Park because Dobson promised to give him $1,000 to pick up a package there. ROA, Vol. I at 85, 99–100.

S.O. was ultimately defrauded of $971,455.41, and S.P. sustained a loss of $3,500. ROA, Vol. II at 112, 115.

B.     **Procedural Background**

On July 10, 2019, Luton was charged in a ten-count superseding indictment with one count of conspiracy to commit mail fraud (Count 1) and nine counts of aiding and abetting mail fraud (Counts 2–10).  ROA, Vol. I at 48–53.

At the jury trial, the Government presented copious evidence regarding Luton's involvement with the lottery scheme.  Luton's iPhone was identified as one of the iPhones that S.O. had purchased, and on the phone were multiple phone numbers for Dobson and a photograph of the $65,000 in cash that S.O. had provided to the conspirators.  *Id.* at 171–72; Supp. ROA, at 179, 204–05, 215.  Luton's phone revealed that he and Dobson had exchanged approximately 1,000 text messages between February 2018 and January 2019, or about 2.5 messages a day.  Supp. ROA, at 205.  The call details on Luton's phone confirmed his presence on nineteen occasions at the address where Dobson had directed S.O. to send packages around the time of their expected delivery.  *Id.* at 209–25.  Certified bank records established withdrawals from S.O.'s bank accounts, money transfers to S.P., and S.P.'s deposits into Luton's bank accounts.  *Id.* at 121–35.  Text messages and shipping receipts showed that Luton directed others to wire funds to Jamaica on multiple occasions and that he paid his friends hundreds of dollars around the time packages from S.O. were delivered to their addresses.  *Id.* at 164–69.  Luton also testified that he set up a 702 MagicJack[2] account for Dobson to use when

---

[2] MagicJack is a type of phone service that allows users to make telephone calls over the Internet.  Supp. ROA, at 102.

making calls to S.O. because "you cannot use a Jamaican credit card to set up a MagicJack." ROA, Vol. I at 138, 174–75.

The jury convicted Luton on all but one count (Count 4). ROA, Vol. II at 89–90. At the outset of the sentencing hearing, the district court heard testimony and argument about the losses involved in Luton's lottery scheme. *Id.* at 105–12. The Government's expert witness calculated total losses attributable to Luton to be $974, 955.41 and restitution to be $881,447.41. *Id.* at 115–17.

The district court then turned to the Presentence Investigation Report ("PSR") and overruled a series of Luton's objections to the PSR. As relevant to this appeal, the district court overruled Luton's objection to a two-level increase under U.S.S.G. § 2B1.1(b)(10)(B) for committing a substantial part of the fraudulent scheme from outside the United States. The district court agreed with the Government that "this conspiracy begins, ends, and at all times throughout, has significant events taking place in Jamaica." *Id.* at 138–40. Based on the trial evidence, including Luton's testimony, the district court found that the co-conspirators' "efforts to defraud [S.O.] were successful because of Dobson's constant communications and coordinations from Jamaica with [Luton] back in the United States." *Id.*

After overruling Luton's objections, the district court denied Luton's request for a two-level decrease under U.S.S.G. § 3B1.2(b) for his alleged minor role in the offense. *Id.* at 141–44. The district court discussed the facts in relation to the five factors to be considered in determining whether a minor role adjustment was appropriate. *Id.* It then ruled that Luton "failed to meet his burden of proving that he [was] substantially less

culpable than the average participant in a lottery scheme in general, and in this case, as compared to the role played by Dobson specifically." *Id.* at 144.

The district court also denied Luton's request for a variance "based on [its] review of this case and after consideration of the [18 U.S.C. §] 3553 factors." *Id.* at 157. It determined that Luton's total offense level was 29 (criminal history category I), resulting in a guidelines range of 87 to 108 months in prison. *Id.* at 170. The district court ultimately imposed a sentence at the top of the advisory guidelines range of 108 months on each count, to run concurrently, with three years of supervised release. *Id.* at 171.

Luton has filed a timely appeal.

## II

Luton presents three arguments: (1) the district court erred in the increase of two offense levels when it determined that a substantial part of the scheme was committed from outside the United States; (2) the district court erred in denying Luton a two-level decrease in the offense level for his minor role; and (3) the district court unreasonably imposed a top-of-the-guidelines sentence because it did not explain any reasons for doing so. We will address each argument in turn.

## A.    "Outside the United States" Enhancement

Luton contends the district court erred in the increase of two offense levels under U.S.S.G. § 2B1.1(b)(10)(B) when it determined that a substantial part of the fraudulent scheme was committed from outside the United States. Under U.S.S.G. § 2B1.1(b)(10)(B), if "a substantial part of a fraudulent scheme was committed from outside the United States . . . , increase by 2 levels." Luton objected to this enhancement

6

in his Sentencing Statement.  ROA, Vol. II at 68.  The court applied § 2B1.1(b)(10)(B) to the facts and overruled Luton's objection because the conspiracy began, ended, and "at all times throughout, ha[d] significant events taking place in Jamaica."  *Id.* at 138–40.

We review the district court's interpretation of the guidelines de novo and any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts.  *United States v. Patton*, 927 F.3d 1087, 1100–01 (10th Cir. 2019) (quotations omitted).  Determination of whether facts satisfy a prescribed standard is a mixed question of fact and law.  *Id.* (citing *Campbell v. Bartlett*, 975 F.2d 1569, 1574 (10th Cir. 1992)).  We review "mixed questions under the clearly erroneous or de novo standard, depending on whether the mixed question involves primarily a factual inquiry or the consideration of legal principles."  *Id.* (quotations omitted).  Because a determination that a substantial part of a fraudulent scheme was committed from outside the United States is fact-focused, we review for clear error.  *See id.* (explaining that application of certain guidelines "is so fact-focused that we review for clear error"); *see also United States v. Singh*, 291 F.3d 756, 762 (11th Cir. 2002) (reviewing application of § 2B1.1(b)(10)(B) for clear error).

Luton argues that the district court erred in applying a two-level increase under U.S.S.G. § 2B.1(b)(10)(B) because "[m]ost, if not the entire scheme, was committed in the United States."  Aplt Br. at 16–17.  Luton contends that all of the victims, bank accounts, and co-conspirators in the scheme—with the exception of Dobson—were physically present in the United States when the actions in furtherance of the scheme were committed.  *Id.*  The district court therefore should not have applied this

7

enhancement "merely because one person, in a multiperson scheme, who was in Jamaica, smooth talked [S.O.] and told various co-conspirators what to do—actions that all of the co-conspirators did in the United States." *Id.* at 17.  In making this argument, Luton attempts to distinguish the facts in his case from other cases in which district courts applied the enhancement, including *United States v. Oshobe*, 145 F. App'x 243 (10th Cir. 2005) (unpublished), and Eleventh Circuit cases.  *Id.* at 17–21.

We conclude that the district court did not err in applying this two-level enhancement.  As the district court explained, a preponderance of the evidence proves that a substantial part of the fraudulent scheme was committed from outside the United States.  The district court cited the following evidence illustrating how Dobson orchestrated the scheme from Jamacia with Luton's help: (1) Dobson lived in Jamaica during the entire scheme; (2) Luton set up the MagicJack phone for Dobson so he could make numerous calls from Jamaica; (3) Dobson used the MagicJack phone to make calls to S.O. from Jamaica; (4) Luton picked up packages for Dobson during the same time period that Dobson had been directing S.O. to mail packages related to the lottery fraud; (5) Dobson texted Luton the names and tracking numbers for these packages so Luton would know when and where to go and what to pick up; (6) Luton then texted Dobson addresses for receipt of these packages; and (7) Luton coordinated with others in the United States in order to wire money back to Jamaica. ROA, Vol. II at 138–40.  The record also shows that Dobson spoke to Luton on the phone up to five times a day and texted at least a couple of times a day.  ROA, Vol. I at 113, 177.  Dobson also arranged for Luton and others to travel cross-country to

pick up money from one of the victims. *Id.* at 93–94, 97–100. In short, the district court observed that all of Dobson's conspiratorial conduct took place in Jamaica and "those efforts to defraud [S.O.] were successful because of Dobson's constant communications and coordination from Jamaica with Luton back in the United States." ROA, Vol. II at 139. The evidence therefore amply supports the application of the § 2B1.1(b)(10)(B) enhancement to the calculation of Luton's offense in this case.

Furthermore, Luton's cited cases do not change our analysis. First, Luton attempts to distinguish his case from *United States v. Oshobe*, 145 F. App'x 243 (10th Cir. 2005) (unpublished). In *Oshobe*, a Nigerian citizen living in Kansas received merchandise delivered to his home that had been fraudulently ordered over the internet using computers located in Europe and Africa. *Id.* at 245, 257. This defendant kept and used some of the items that were delivered to him, but he repackaged and shipped most of the items to another person in Nigeria. *Id.* Luton argues that his conduct is distinguishable because (1) "the method of fraudulently obtaining the merchandise in *Oshobe* was by computer automation that took place solely outside of the United States," as opposed to Dobson's phone calls to S.O. that technically took place both outside *and* inside the United States, and (2) "the fraudulently obtained objects in *Oshobe* were merchandise while the fraudulently obtained objects in . . . [Luton's case] were money only," and because money is easier to ship internationally, "the participation of Luton is substantially less than that of the defendant in *Oshobe*." Aplt. Br. at 17–19.

9

Luton's arguments are unpersuasive.  The § 2B1.1(b)(10)(B) enhancement only requires that a *substantial* part of the scheme be committed from outside the United States, not that all of the scheme occurred outside the United States or that the scheme originated outside the United States.  Numerous courts have held that the enhancement applies even when a particular defendant has not personally acted from outside the United States, in part due to the well-established principle that an act may be imputed from one co-conspirator to another.  *See, e.g.*, *United States v. Arnaout*, 431 F.3d 994, 998–99 (7th Cir. 2005); *Singh*, 291 F.3d at 759, 762.[3]  Moreover, Luton's assertion that his money scheme required less participation than *Oshobe*'s merchandise scheme because "[money] is much easier to ship" ignores Luton's substantial efforts in obtaining the money.  Aplt. Br. at 18–19.  For instance, the record shows that Luton drove cross-country on two occasions to pick up the money, coordinated nearly daily with Dobson, and set up various accounts for receiving and transferring the money.  ROA, Vol. II at 142, 156–57.

---

[3] Other cases outlining this principle include *United States v. Chukwu*, 842 F. App'x 314, 323 (11th Cir. 2021) (per curiam) (unpublished); *United States v. Williams*, 838 F. App'x 493, 495 (11th Cir. 2020) (per curiam) (unpublished); *United States v. King*, 623 F. App'x 962, 968 (11th Cir. 2015) (per curiam) (unpublished); and *United States v. Cox*, 462 F. App'x 646, 646–47 (8th Cir. 2012) (per curiam) (unpublished).

Second, Luton attempts to distinguish his case from *United States v. De Aguiar*, 453 F. App'x 927 (11th Cir. 2012) (per curiam) (unpublished).[4]  In *De Aguiar*, the defendant and his co-conspirators stole credit card numbers in Brazil, used the fraudulent credit cards to obtain goods, and then sent those goods to Brazil and sold them for profit.  *Id.* at 929.  The Eleventh Circuit determined that the defendant's conduct "easily satisfie[d]" § 2B1.1(b)(10)(B) because "parts of the beginning, middle, and end of [the defendant's scheme] took place outside of the United States."  *Id.*  Luton argues that his conduct is distinguishable because his lottery scheme "began in Jamaica and the United States . . . and ended with the mere sending [of] *money*, not *merchandise* to Jamaica."  Aplt. Br. at 21 (emphasis added).  In addition, the money in *De Aguiar* "was actually produced in Brazil by selling the merchandise for a profit *in Brazil*."  *Id.* (emphasis in original).

---

[4] Luton in passing also accuses the district court of improperly "us[ing] a standard to determine this enhancement based upon Eleventh Circuit precedent."  Aplt. Br. at 19.  We interpret Luton's statement as a challenge to the district court's interpretation of the guidelines, which we review de novo.  In undertaking this de novo review, we consider the language of the guidelines, the Tenth Circuit's decisions, *and* the interpretations of other circuits.  *United States v. Gonzales*, 931 F.3d 1219, 1221 (10th Cir. 2019).  Here, the Eleventh Circuit has addressed the § 2B1.1(b)(10)(B) enhancement more often than any other circuit.  *See, e.g.*, *Chukwu*, 842 F. App'x at 323; *Williams*, 838 F. App'x at 495; *King*, 623 F. App'x at 968; *De Aguiar*, 453 F. App'x at 929; *Singh*, 291 F.3d at 759, 762.  Furthermore, the Seventh and Eighth Circuits have agreed with the Eleventh Circuit's holding that the enhancement applies even when a particular defendant's conspiratorial conduct occurred within the United States.  *See, e.g.*, *Cox*, 462 F. App'x at 646–47; *Arnaout*, 431 F.3d at 998–99.  *Oshobe*, the sole Tenth Circuit case that Luton cites, does not contradict these cases and is in line with their reasoning.  Luton's challenge therefore fails.

But again, Luton's arguments are unpersuasive. *De Aguiar* does not suggest that its decision turned on the fact that the fraudulent scheme involved merchandise rather than money. Instead, *De Aguiar* suggests that when applying the enhancement, courts should consider where the most important aspects of the fraudulent scheme occurred. 453 F. App'x at 929. The most important aspects of *De Aguiar*'s scheme—stealing credit card numbers and selling the goods for profit—occurred outside the United States in Brazil. *Id.* Likewise, the most important aspects of Luton's scheme—Dobson convincing the victims to hand over their money and orchestrating the mailing of money or packages—occurred outside the United States in Jamaica. Dobson's acts then are imputed to Luton as they are reasonably foreseeable and in furtherance of the jointly undertaken criminal activity. *See id.* (citing *Singh*, 291 F.3d at 761–62). Consequently, like the defendant in *De Aguiar*, Luton's conduct "easily satisfies" § 2B1.1(b)(10)(B).

The district court did not clearly err in imposing the § 2B1.1(b)(10)(B) enhancement.

## B.   "Minor Participant" Adjustment

Luton next contends the district court erred in denying him a two-level decrease in his offense level for his minor role. At sentencing, Luton asserted that he was entitled to a two-level downward "minor participant" adjustment under U.S.S.G. § 3B1.2(b). ROA, Vol. II at 70–71. The district court ultimately denied Luton's request for a "minor participant" adjustment because he had failed to meet his burden

of proving he was substantially less culpable than the average participant in the lottery scheme, compared to the role Dobson played.  ROA, Vol. II at 141–44.

U.S.S.G. § 3B1.2(b) provides that "[i]f the defendant was a minor participant in any criminal activity, decrease by 2 levels."  The defendant has the burden of establishing by a preponderance of the evidence that he was "substantially less culpable than the average participant in the criminal activity." § 3B1.2, cmt. n.3(A); *see United States v. Nkome*, 987 F.3d 1262, 1277 (10th Cir. 2021).  The "crux of § 3B1.2 is a defendant's relative culpability." *Nkome*, 987 F.3d at 1273 (citing *United States v. Yurek*, 925 F.3d 423, 446 (10th Cir. 2019)).  Accordingly, a "minor participant" is a defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal."[5] § 3B1.2, cmt. n.5.

The determination of whether to apply the two-level downward "minor participant" adjustment "is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." § 3B1.2, cmt. n.3(C); *see Nkome*, 987 F.3d at 1271.  The commentary provides a "non-exhaustive list" of five factors a court should consider in making this determination:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;

---

[5] For comparison, "minimal participants" are defendants "who are plainly among the least culpable of those involved in the conduct of the group" and "lack knowledge or understanding of the scope and structure of the enterprise and of the activities of others." § 3B1.2, cmt. n.4.

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and

(v) the degree to which the defendant stood to benefit from the criminal activity.

§ 3B1.2, cmt. n.3(C).

We review the district court's denial of a mitigating-role adjustment for clear error because it is a factual determination. *Nkome*, 987 F.3d at 1268–69; *see also* § 3B1.2, cmt. n.3(C) (noting that the application of a mitigating-role adjustment is "a determination that is heavily dependent upon the facts of the particular case"). Under this deferential standard, if the district court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse it even if we may have weighed the evidence differently. *Nkome*, 987 F.3d at 1276–77 (internal quotation marks and citations omitted). And while district courts "should consider" the commentary's five non-exhaustive factors, we do not require a district court "to make detailed findings, or explain why a particular adjustment [under the guidelines] is or is not appropriate." *Id.* at 1273 (internal quotation marks and citations omitted); § 3B1.2, cmt. n.3(C).

Luton argues that the district court erred in making the factual determination that he did not qualify for a "minor participant" adjustment.  Luton contends that at bottom, he was no more than a minor participant, and he presents two arguments in support: (1) the district court's analysis of the second, third, and fourth factors applies "almost exclusively, if not totally exclusively" to Dobson and (2) the district court's failure to grant Luton a "minor participant" adjustment is inconsistent with its assessment of the "outside the United States" enhancement because there the district court found that Dobson masterminded the scheme from Jamaica.  Aplt. Br. at 23–24.

We conclude that Luton has not adequately shouldered his burden of demonstrating that the district court erred in denying his request for a "minor participant" adjustment.  As to Luton's first argument, Luton essentially is asking this court to reweigh the evidence.  To constitute clear error, we "must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge." *United States v. Torres*, 53 F.3d 1129, 1144 (10th Cir. 1995).  Luton concedes that he provided names and addresses to Dobson; obtained addresses and tracking numbers for the retrieval of packages; regularly communicated with Dobson by text, email, and cell phone; planned and organized picking up packages; and "allegedly sent some of the proceeds to Jamaica."  Aplt. Br. at 24–25.  The district court pointed to this exact evidence in its analysis of the second, third, and fourth factors when making culpability comparisons and determining that Luton was not substantially less culpable than the average

15

participant in the lottery scheme, namely Dobson.  ROA, Vol. II at 141–43.  Yet

Luton contends that the district court should have concluded based on this evidence

that he did not plan "any part of the conspiracy" and that he "was merely one of

numerous others that helped in executing [Dobson's] plan."  Aplt. Br. at 24–25.

But Luton's claims that others were also involved in the scheme or that

Dobson may have been more culpable do not entitle him to a mitigating-role

adjustment.  A defendant "is not entitled to a minor-participant reduction merely

because 'he is the least culpable among several participants in a jointly undertaken

criminal enterprise.'"  *United States v. Adams*, 751 F.3d 1175, 1179 (10th Cir. 2014)

(quoting *United States v. Lockhart*, 37 F.3d 1451, 1455 (10th Cir. 1994)).  Even if

Luton claimed that his role in the lottery scheme was merely as a "money mule,"

such conduct would not necessarily entitle him to a mitigating-role adjustment.

*Nkome*, 987 F.3d at 1277 (collecting cases).  Here, the district court provided

multiple reasons for rejecting the "minor participant" adjustment based on the

entirety of the record and the totality of the circumstances.  For instance, Luton

"drove cross country from New York to Colorado to [S.O.]'s home to pick up large

sums of cash," "set up bank accounts into which money and checks could be

deposited and from which he could transfer money to Jamaica," and "picked up a

substantial number of packages," sometimes receiving up to $5,000 for a package.

ROA, Vol. II at 141–43.  The district court's factual findings are plausible, supported

by the record, and not clearly erroneous.

As to Luton's second argument, Luton asserts that the district court's denial of his mitigating-role adjustment was premised on "incompatible" conclusions. Aplt. Br. at 24. In the district court's assessment of the "outside the United States" enhancement, the district court found that Dobson masterminded the scheme from Jamaica; yet in its assessment of Luton's mitigating-role adjustment, the district court found that Luton played *more* than a minor role. *Id.* Luton opines that "the district court wants it both ways." *Id.*

But as the district court noted, these conclusions are not mutually exclusive. The district court explained that it is not "inconsistent to say that, yes, Dobson was the mastermind, that he was the smooth-talker and that is greatly culpable, but that doesn't lessen [ ] the culpability of Mr. Luton." ROA, Vol. II at 151. The district court found that Luton's role was "crucial and critical to the completion of the fraud" because Dobson "wouldn't have completed [the scheme] if it hadn't been for Mr. Luton." *Id.* at 142, 151. Dobson "could have talked all he wanted [the victims] into doing it, but until somebody came around who would pick up the money or go pick it up where it was mailed and come personally to her home, he could not have completed the scheme." [6] *Id.* at 151.

---

[6] Luton also asserts that regarding the fifth factor, "there was no evidence that Luton benefited." Aplt. Br. at 25. As the district court pointed out, the record patently contradicts his assertion. ROA, Vol. II at 143–44. For example, Luton testified that he picked up a substantial number of packages in this case and received up to $5,000 for a package depending on how far he had to travel. *Id.* at 144.

The district court's denial of the "minor participant" adjustment therefore does not amount to clear error. The evidence supports the district court's finding that Luton was an integral part of the scheme and was deeply involved in it.

**C.      Top-of-the-Guidelines Sentence**

Luton's final argument is that the district court's imposition of a top-of-the-guidelines sentence was unreasonable because the district court "did not explain why it sentenced Luton to the high-end of the range." Aplt. Br. at 25–27. Importantly, Luton does not dispute that his sentence falls within the applicable guidelines range, nor does he claim that the district court incorrectly calculated the range. He only argues that the district court did not adequately explain why it imposed a top-of-the-guidelines sentence.

Our review of a sentence "includes both a procedural component, encompassing the method by which a sentence was calculated, as well as a substantive component, which relates to the length of the resulting sentence." *United States v. Henson*, 9 F.4th 1258, 1284 (10th Cir. 2021), *pet. for cert. filed*, No. 21-6736 (U.S. Dec. 28, 2021). Luton asserts that his 108-month sentence is unreasonable because the district court did not explain why it chose to impose a sentence at the top of the range. Aplt. Br. at 25–27. This is a procedural reasonableness challenge. *Henson*, 9 F.4th at 1284 (explaining that review for procedural error entails "considering whether the district court committed any error in calculating or explaining the sentence") (citations, brackets, and quotations omitted).

18

Because Luton failed to contemporaneously object to the district court's explanation of its sentencing decision, we review Luton's challenge for plain error. *Id.* at 1289–90; ROA, Vol. II at 178–79. Luton must show "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights—and, if he satisfies these criteria, we may, in our discretion, correct the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012) (cleaned up) (quoting *United States v. Cooper*, 654 F.3d 1104, 1117 (10th Cir. 2011)).

We conclude that the district court did not plainly err in its explanation of Luton's within-guidelines sentence. This court has repeatedly emphasized that when imposing a sentence within the properly calculated guidelines range, "(1) the district court need provide only a general statement noting the appropriate guideline range and how it was calculated; (2) such statement need involve no ritualistic incantation to establish consideration of a legal issue or recitation of any magic words to prove that the court considered the various factors Congress instructed it to consider; and, more broadly, (3) [this court] will only step in and find error when the record gives [it] reason to think that [its] ordinary . . . presumption that the district court knew and applied the law is misplaced." *Henson*, 9 F.4th at 1287 (citations, internal quotation marks, and brackets omitted). In other words, the district court need not "specific[ally] expla[in] . . . a sentence falling within the Guidelines range." *United States v. Ruiz-Terrazas*, 477 F.3d 1196, 1201 (10th Cir. 2007).

In Luton's case, the district court clearly indicated that it had reviewed the PSR and considered the § 3553(a) sentencing factors, including the nature and characteristics of the lottery scheme, the impact the crime had on S.O., the length and extent of Luton's involvement, his lack of acceptance of responsibility or remorse, and the need to deter Luton from committing similar criminal conduct.  ROA, Vol. II at 152–57.  The district court also acknowledged Luton's request for a variant sentence but explained that a downward variance was unwarranted "when the history and characteristics of the defendant, as well as the nature and circumstances of this offense[,] are juxtaposed with the goals of sentencing, pursuant to 18 United States Code Section 3553(a)."  *Id.* at 170.  The district court then found that a top-of-the-guidelines sentence "reflect[s] the seriousness of this offense, and it is a sufficient, but not greater than necessary, sentence to achieve the objectives of sentencing."  *Id.* at 178.  A more detailed sentencing explanation is not required because Luton does not dispute that he was sentenced within the applicable guidelines range.  *See Ruiz-Terrazas*, 477 F.3d at 1202.  And even if the district court inadequately explained its reasons for imposing the within-guidelines sentence, Luton has not attempted to show that any such error affected his substantial rights, as required to satisfy the demanding plain error standard.

The district court did not err in imposing a top-of-the-guidelines sentence as its explanation went beyond the minimum level of detail required to establish its procedural reasonableness.

### III

For the foregoing reasons, we AFFIRM.

Entered for the Court


Mary Beck Briscoe
Circuit Judge

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                                                         Jane K. Castro
Clerk of Court                                                                            Chief Deputy Clerk

July 15, 2022

Mr. Mark Edward Scabavea
Scabavea & Associates
301 Sheridan Boulevard
Lakewood, CO 80226

**RE:     21-1285, United States v. Luton**
          Dist/Ag docket: 1:19-CR-00098-CMA-1

Dear Counsel:

Attached is a copy of the order and judgment issued today in this matter. The court has
entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(a)(1), any petition for rehearing must be filed within
14 days after entry of judgment. Please note, however, that if the appeal is a civil case in
which the United States or its officer or agency is a party, any petition for rehearing must
be filed within 45 days after entry of judgment. Parties should consult both the Federal
Rules and local rules of this court with regard to applicable standards and requirements.
In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length,
and no answer is permitted unless the court enters an order requiring a response. *See* Fed.
R. App. P. Rules 35 and 40, and 10th Cir. R.35 and 40 for further information governing
petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:     Kyle W. Brenton

CMW/at